## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **COUNCIL FOR OPPORTUNITY IN EDUCATION**, 1025 Vermont Avenue NW, Suite 400, Washington, D.C. 20005 )<br><br>Plaintiff, )<br><br>v. )<br><br>**U.S. DEPARTMENT OF EDUCATION and LINDA MCMAHON**, 400 Maryland Avenue SW, Washington, D.C. 20202 )<br><br>Defendants. | Case No. 25-cv-3514 |

## <u>COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF</u>

Plaintiff Council for Opportunity in Education ("**COE**") brings this Complaint for Declaratory, Injunctive, and Mandamus Relief against the U.S. Department of Education ("**the Department**" or "**ED**") and Linda McMahon in her official capacity as the United States Secretary of Education (the "**Secretary**").[1] COE is concurrently filing a Motion for Preliminary Injunction.

---

[1] This Complaint refers to the Department and the Secretary collectively as "the Department" unless specified otherwise.

## PRELIMINARY STATEMENT

It is a song's refrain. In this iteration, the U.S. Department of Education has taken aim at thousands of low-income, first-generation college students and 60-year old grant programs designed to help this group of students that are so frequently left behind. The Department elected not to continue dozens of grants that were not scheduled to expire until 2026 or later, and it did so without regard for the law, Congress's intent for the grant programs, the grantees' settled reliance interests, or the real-world consequences of ending their individual grant projects that are a lifeline of critical academic and support services to so many. These programs created a community, and a hallmark characteristic of their student participants is to pay it forward and help future generations. The Department and the Secretary, however, have gone the other way and instead want to shut the door. COE brings this action on behalf of itself and its affected members to challenge the Department's actions that are not only callous but also contrary to the statutes and regulations that govern these programs.

At issue are the federal TRIO programs. TRIO is an umbrella term encompassing eight grant programs that Congress established beginning in the 1960s. All these programs are designed to help disadvantaged students pursue a postsecondary education. The Department is required to carry out the TRIO programs by awarding multiyear grants to colleges and universities, community-based agencies, and nonprofit organizations. Grant recipients in turn offer academic tutoring, counseling, and other critical support services to low-income, first-generation college students to help them progress through the academic pipeline and earn a college degree. By consistently appropriating funds to TRIO for decades, including at least $1.19 billion in fiscal year 2025, Congress has repeatedly affirmed the federal interest in seeing these students succeed.

COE is the sole nonprofit membership organization in the United States for the TRIO community. Its members include many postsecondary educational institutions and organizations that just had one (or more) of their grants discontinued. These grants were discontinued for the same fundamental reason: application of the Trump Administration's new policies that are hostile to diversity, equity, and inclusion practices, whether such practices are real or perceived.

These grants were all awarded by the Department during the Biden Administration after the agency found that the grantees' individual TRIO projects were meritorious and achieved Congress's goals. Now they have been discontinued because they advanced the "prior Administration's policies." The Department's letters to COE's members who are the Affected Programs (as defined below) pointed to language in grant applications they submitted *years ago*. Based on these statements, which federal law *required* to be in their applications, the Department determined that their projects violate "the letter or purpose of Federal civil rights law." From that, in boilerplate letters delivered *en masse* to the Affected Programs, with no meaningful individual analysis, the Department came to the sweeping conclusion that continuing the grants was "not in the best interest of the Federal government."

It certainly is not uncommon for executive agencies to change their policies when a new President assumes office. This case does not challenge that basic principle. Yet an equally fundamental principle is that agencies must change their policies in the manner prescribed by law to avoid upsetting reliance interests. Here, federal law, unique to the Department, requires that it undergo notice-and-comment rulemaking to set new policies or "priorities" to use when making grant decisions. The Department did not do that—instead it retroactively applied the current Administration's anti-DEI policies and standards, invoked new interpretations of civil rights laws

to cancel dozens of grants, and relied on a "best interest of the Federal government" regulatory provision that the Department's current interpretation suggests gives it unfettered discretion.

The Affected Programs—and all federal grant recipients—need some minimum level of certainty. If executive agencies can determine what the "best interest" of the government is, it undermines recipients' ability to plan and structure their grant projects in myriad ways. And it undermines Congress's intent when Congress has affirmatively made those determinations, such as here—where it has expressed that intent over decades of legislation and appropriations for TRIO.

The federal government ultimately consists of more than one branch, and if the government's "best interest" can be unilaterally defined by the Executive Branch without care for the Legislative Branch, the Judicial Branch must step in.  At the moment, the Affected Programs' TRIO projects are closing, staff and faculty are being laid off, and students are losing resources.

For all these reasons, as detailed in this Complaint, the Department has violated numerous laws and regulations. For immediate purposes and through separate motion, COE is requesting that the Court enter a preliminary injunction to prevent further harm by vacating the Department's Notices of Non-Continuation (as defined below) that were issued to the Affected Programs and by directing the Department to reconsider those decisions and take action by following the process required under law.

<u>**JURISDICTION AND VENUE**</u>

1.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, 2201–02, and 5 U.S.C. §§ 701–06.

2.      In addition, this Court has jurisdiction pursuant to Title VI, which authorizes "judicial review" of federal agency action, including action "terminating or refusing to grant or to

continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 2000d–1 of this title" through the Administrative Procedures Act ("**APA**"). 42 U.S.C. § 2000d-2.

3.      This Court also has jurisdiction pursuant to Title IX, which generally mirrors Title VI and authorizes "judicial review" of agency action, including "terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 1682 of this title" through the APA. 20 U.S.C. § 1683.

4.      This Court is authorized to issue injunctive and declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, Federal Rules of Civil Procedure 57 and 65, the Court's inherent equitable powers, and under the APA, 5 U.S.C. § 706.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1)(C) because COE is a Washington D.C. nonprofit corporation, and its principal place of business is located in Washington, D.C. Venue is also proper under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1)(A) because the Department is an agency of the United States and the Secretary is an officer of the Department who is sued in her official capacity.

## PARTIES

6.      Plaintiff Council for Opportunity in Education is a national membership organization comprised of more than 1,000 colleges, universities, community-based agencies and nonprofit organizations within its 10 regional associations that participate in one or more of the federal TRIO programs.

7.      A 501(c)(3) nonprofit organization established in 1981, COE is dedicated to furthering the expansion of educational opportunities for low-income students, first-generation

college students, students with disabilities, and veteran students who are served by the TRIO programs.

8.      Every year, TRIO serves nearly 1 million students across 3,400 separate TRIO projects. These TRIO projects operate in all 50 states, plus Washington D.C., the Pacific Islands, and Puerto Rico.[2]

9.      COE provides numerous services to its members' TRIO projects, and it works in conjunction with them to help disadvantaged students enter college, stay in college, and earn a degree. The academic and future successes of these students is at the core of COE's mission.

10.     Among other things, COE offers its members educational programming, counseling, technical assistance, and many other valuable services. COE also performs research through its Pell Institute for the Study of Opportunity in Education that informs policymakers, educators, and the public on issues impacting educational opportunities and outcomes for low-income, first-generation students, and students with disabilities.

11.     Dozens of COE's members recently were notified by the Department that their TRIO grants were being discontinued on or before September 30, 2025 (the "**Affected Programs**"). These Affected Programs have been directly harmed by the Department's non-continuation decisions ("**Notice(s) of Non-Continuation**").

12.     Defendant U.S. Department of Education is an executive agency of the United States government. The Department's principal address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

---

[2] *Available at* https://ope.ed.gov/programs/mapED/storymaps/trio/. All hyperlinks cited throughout were last accessed on September 29, 2025.

13.     Defendant Linda McMahon is the Secretary of the Department. Her official address is 400 Maryland Avenue, SW, Washington, D.C. 20202. She is sued in her official capacity as Secretary.

## FACTUAL BACKGROUND

### I.     The history of federal grant programs for education and the current state of TRIO

#### a.     Mid-20th century barriers for low-income Americans to enroll in postsecondary education and early attempts to increase access

14.     In the last 125 years, Harry Truman is the only U.S. President who did not earn a postsecondary degree—whether from a trade school, community college, liberal arts university, or any other type of postsecondary educational institution.

15.     President Truman's experience led him to believe in the importance of postsecondary education, and specifically, in every young person having the *opportunity* to attend college if they wished, regardless of their individual resources to finance higher education.

16.     In 1946, President Truman formed a Presidential Commission on Higher Education. He charged the Commission, composed of civic and educational leaders, with "an examination of the functions of higher education in our democracy and the means by which they can best be performed." Letter from President Truman, Appointing Members to the National Commission on Higher Education (July 13, 1946) (available in the Public Papers of Harry S. Truman). President Truman specifically directed the Commission to address "ways and means of expanding educational opportunities for all able young people." *Id.*

17.     The Truman Commission returned 18 months later with a comprehensive six-volume report addressing all aspects of higher education in the United States. *See The President's*

*Commission on Higher Education*, Higher Education for American Democracy (Dec. 11, 1947);[3] *see also* Statement by the President Making Public a Report of the Commission on Higher Education (Dec. 15, 1947).

18.     The Truman Commission examined then-existing economic barriers to college and concluded "that the decision as to who shall go to college is at present influenced far too much by economic considerations." 2 *The President's Commission on Higher Education*, Higher Education for American Democracy, Equalizing and Expanding Individual Opportunity, at 16. The Truman Commission elaborated, stating:

> The old, comfortable idea that "any boy can get a college education who has it in him" simply is not true. Low family income, together with the rising costs of education, constitutes an almost impassable barrier to college education for many young people. For some, in fact, the barrier is raised so early in life that it prevents them from attending high school even when free public high schools exist near their homes.

*Id.* at 28.

19.     The Truman Commission determined that along with state and local actors, the federal government bore a responsibility to remedy the obstacles facing low-income students, and emphasized the equity arguments for improving college access, stating:

> It is the responsibility of the community, at the local, State, and National levels, to guarantee that financial barriers do not prevent any able and otherwise qualified young person from receiving the opportunity for higher education. There must be developed in this country the widespread realization that money expended for education is the wisest and soundest of investments in the national interest. The democratic community cannot tolerate a society based upon education for the well-to-do alone. If college opportunities are restricted to those in the higher income brackets, the way is open to the creation and perpetuation of a class society which has no place in the American way of life.

---

[3] *Available at* https://ia801506.us.archive.org/25/items/in.ernet.dli.2015.89917/2015.89917.Higher-Education-For-American-Democracy-A-Report-Of-The-Presidents-Commission-On-Higher-Education-Vol-I---Vi_text.pdf.

*Id.* at 23.

20.     In its recommendations to President Truman, the Commission therefore called for increased and "immediate" federal spending for young, low-income students. "Of major importance is the establishment of a national system of scholarships (or individual grants in-aid) and fellowships which will guarantee that a greatly increased number of qualified young persons have a chance for full educational development." *Id.* at 22.

21.     The federal government's efforts to eliminate these barriers did not come right away, however. In the decade after the Truman Commission produced its Report, the only major federal education initiative providing financial assistance was the Serviceman's Readjustment Act, commonly known as the G.I. Bill. *See* Servicemen's Readjustment Act of 1944, Pub. L. No. 78-346, 58 Stat. 284. The G.I. Bill, while significant in its own right, was limited to benefitting military veterans returning from World War II. *See* Tit. II, § 400, 58 Stat. at 287–88.

22.     Later, in response to the Soviet Union's launching of the Sputnik satellite and concerns that America was losing ground to the Soviets in the space race, President Dwight Eisenhower in 1958 signed into law legislation to fund scholarships for students studying in science and foreign languages, areas deemed critical to national defense. *See* National Defense Education Act of 1958, Pub. L. No. 85-864, 72 Stat. 1580. But this legislation had a similarly-limited impact on the goals laid out by the Truman Commission, because aid benefitted students studying only some disciplines, such as science, mathematics, engineering, or a modern foreign language. *See* § 204, 72 Stat. at 1584.

23.     The Truman Commission's goals ultimately would not be realized in earnest until the 1960s.

24.     During his 1964 State of the Union address, President Lyndon B. Johnson "declare[d] unconditional war on poverty in America." Lyndon B. Johnson, State of the Union Address (Jan. 8, 1964). Two months later, President Johnson outlined his terms of engagement:

> I have called for a national war on poverty. Our objective: total victory. There are millions of Americans—one fifth of our people—who have not shared in the abundance which has been granted to most of us, and on whom the gates of opportunity have been closed.

Lyndon B. Johnson, Special Message to the Congress Proposing a Nationwide War on the Sources of Poverty (Mar. 16, 1964).

25.     At the time of President Johnson's remarks, the United States had become a full-fledged superpower. But many Americans still remained in poverty. When Congress established the first grant program under the TRIO umbrella—Upward Bound—it stated:

> Although the economic well-being and prosperity of the United States have progressed to a level surpassing any achieved in world history, and although these benefits are widely shared throughout the Nation, poverty continues to be the lot of a substantial number of our people. The United States can achieve its full economic and social potential as a nation only if every individual has the opportunity to contribute to the full extent of his capabilities and to participate in the workings of our society. It is, therefore, the policy of the United States to eliminate the paradox of poverty in the midst of plenty in this Nation by opening to everyone the opportunity for education and training, the opportunity to work, and the opportunity to live in decency and dignity. It is the purpose of this Act to strengthen, supplement, and coordinate efforts in furtherance of that policy.

Economic Opportunity Act of 1964, Pub. L. No. 88-452, Findings and Declaration of Purpose, § 2, 78 Stat. 508, 508.

26.     Along with the 1964 Economic Opportunity Act that created the Upward Bound program, under President Johnson's leadership, several more laws in the 1960s established new federal programs aimed at combatting poverty. *See, e.g.*, Social Security Amendments of 1965,

Pub. L. No. 89-97, 79 Stat. 286 (creating Medicare and Medicaid); *see also* The Food Stamp Act of 1964, Pub. L. No. 88-525, 78 Stat. 703.

27.    Among the era's most consequential pieces of legislation was the landmark Higher Education Act of 1965 ("**HEA**").

**b.    The Higher Education Act of 1965, the Education Amendments of 1968, and the creation of TRIO programs**

28.    Picking up where the Commission left off, Congress in the HEA created a broad array of federal financial loan and grant programs to assist students and their families with the cost of paying for a postsecondary education, as well as grant programs that provided funds directly to postsecondary institutions and others to fund projects that assist low-income students attend college. *See* Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219.

29.    Since 1965, the HEA and its many component programs have been amended and extended several times, most recently in 2008. *See* Higher Education Opportunity Act of 2008, Pub. L. No. 110-315, 122 Stat. 3078.

30.    The HEA today is organized into eight titles. Most of the student financial aid programs are authorized under Title IV, Student Assistance. *See* § 401(a), 79 Stat. at 1232–34.

31.    Echoing the Commission's views, Congress declared Title IV's "purpose" as "to provide, through institutions of higher education, educational opportunity grants to assist in making available benefits of higher education to qualified high school graduates of exceptional financial need, who for lack of financial means of their own or of their families would be unable to obtain such benefits without such aid." § 401(a), 79 Stat. at 1232.

32.    Specifically, in order "to assist in making available the benefits of postsecondary education," Part A of Title IV authorized "special programs and projects . . . designed . . . to

prepare students from low-income families for postsecondary education." 20 U.S.C. § 1070(a)(4); Higher Education Amendments of 1986, § 401(a), 100 Stat. 1268, 1308.

33.    Part A took two approaches in this respect. One was the establishment of grant programs that provided financial aid *directly* to low-income students to offset the costs of higher education, such as the well-known Pell Grant program. *See* Education Amendments of 1972, Pub. L. No. 92-318, § 131, 86 Stat. 235, 247, amended by Education Amendments of 1980, Pub. L. No. 96-374, § 402, 94 Stat. 1367, 1401 (renaming Basic Educational Opportunity Grants to Pell Grants), codified at 20 U.S.C. §§ 1070a – 1070a-2.

34.    Part A's other approach was to establish grant programs that provide funds to educational institutions and other entities to carry out projects offering *support services* to low-income and other students in need.

35.    Among these grant programs are the TRIO programs. *See* 20 U.S.C. §§ 1070a-11 to a-18.

36.    Following the 1964 Economic Opportunity Act's creation of the Upward Bound program, Congress in the original HEA established a second program known as Talent Search. *See* § 408, Contracts to Encourage Full Utilization of Educational Talent, 79 Stat. 1235–36.

37.    Three years later, Congress created a third program known as Student Support Services. *See* Education Amendments of 1968, Pub. L. No. 90-575, § 105(a), 82 Stat. 1014, 1018 (creating Special Services for Disadvantaged Students); Higher Education Amendments of 1986, Pub. L. No. 99-498, § 401(a), 100 Stat. 1268, 1339 (renaming Special Services for Disadvantaged Students to Student Support Services).

38.    With the creation of Student Support Services, along with Upward Bound and Talent Search, these programs formed a "trio" of grant programs designed to foster increased educational opportunity and attainment.

39.    Since 1968, other programs have been established, providing a wider range of support services, all which fall under the "TRIO" umbrella today.

40.    The TRIO programs are all authorized under Title IV, Part A, subpart 2 of the HEA, and codified at 20 U.S.C. § 1070a. *See* 20 U.S.C. §§ 1070a-11 (TRIO program authority); 1070a-12 (Talent Search); 1070a-13 (Upward Bound, including Veterans Upward Bound and Upward Bound Math and Science); 1070a-14 (Student Support Services); 1070a-15 (Ronald E. McNair Postbaccalaureate Achievement Program); 1070a-16 (Educational Opportunity Centers); 1070a-17 (Staff Training).

41.    The Department is statutorily required to carry out the TRIO programs. Congress directed that:

> The Secretary shall . . . carry out a program of making grants and contracts designed to identify qualified individuals from disadvantaged backgrounds, to prepare them for a program of postsecondary education, to provide support services for such students who are pursuing programs of postsecondary education, to motivate and prepare students for doctoral programs, and to train individuals serving or preparing for service in programs and projects so designed.

20 U.S.C. § 1070a-11(a); *see also* 20 U.S.C. § 1070(b) ("The Secretary shall, in accordance with subparts 1 through 9 of this part, carry out programs to achieve the purposes of this part.").

42.    Today, the national network of TRIO programs is the largest federal infrastructure serving the expansion of college opportunities for the low-income, first-generation student population.

43.     Approximately 3,400 TRIO projects, located at more than 1,000 colleges, universities, community-based agencies and nonprofit organizations across all 50 states, plus Washington D.C., Puerto Rico, and the Pacific Islands, operate today. *See, e.g.*, Department of Education, TRIO Footprint in 2023-24.[4] These projects collectively serve around 900,000 students every year. *See, e.g.*, Department of Education, Fiscal Year 2026 Budget Request, at 85 ("**FY 2026 Budget Request**").[5]

44.     The TRIO programs work. TRIO participants consistently achieve higher rates of high school graduation, college enrollment, retention, and degree attainment compared to peers from similar backgrounds who do not receive TRIO services.[6]

45.     Hundreds of thousands of students have benefitted from them. Jose Hernandez grew from a migrant farmworker to a U.S. astronaut with the help of a TRIO program. Tara Ruttley began her career at NASA and then became Chief Scientist for Orbital Reef, a low Earth orbit space station under development, after participating in a TRIO program. Gwen Moore became the first African American elected to Congress from Wisconsin after participating in a TRIO program. Academy-award winning actress Viola Davis participated in a TRIO program. John Quinones grew from a migrant farmworker to ABC News host and journalist also with the help of TRIO's Upward Bound program.

---

[4] *Available at* https://ope.ed.gov/programs/mapED/storymaps/trio/.

[5] *Available at* https://ed.gov/media/document/fy-2026-congressional-justification-higher-education-110154.pdf.

[6] Adam K. Edgerton, Congr. Rsch. Serv., R42724, *The TRIO Programs: A Primer* (updated January 6, 2025); *see also* Council for Opportunity in Education, TRIO Fast Facts, https://coenet.org/wp-content/uploads/2025/09/TRIO_Fast-Facts-Research-Brief_v7.pdf.

46.     Good Morning America recently highlighted the TRIO programs and their successes. *See* Future of Federal Trio Programs at Risk, ABC News.[7] As stated in that video, a TRIO program is "not a handout. It's a hand up."

### c.     Congressional funding for TRIO

47.     Congress has funded TRIO programs via annual appropriations acts since 2015.[8]

48.     Annual appropriations acts specify the dollar amount appropriated to the Department for carrying out the programs it administers. Congress appropriates funds to the Department at an "account level" to fund individual programs authorized under each title of the HEA.

49.     Relevant here, Congress appropriates funding to the Department to carry out the TRIO programs under the "Higher Education" account.

50.     For fiscal year 2024, Congress appropriated $3.28 billion to the Department "[f]or carrying out, to the extent not otherwise provided, titles II, III, IV, V, VI, VII, and VIII of the HEA, the Mutual Educational and Cultural Exchange Act of 1961, and section 117 of the Perkins Act . . . ." Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460 ("**2024 Appropriations Act**").

---

[7] *Available at* https://abcnews.go.com/GMA/News/video/future-federal-trio-programs-risk-125357309.

[8] *See* Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, div. g, tit. III, 128 Stat. 2130, 2501–02 (2014); Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. h, tit. III, 129 Stat. 2242, 2635 (2015); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, div. h, tit. III, 131 Stat. 135, 549–50; Consolidated Appropriations Act, 2018, Pub. L. No. 115–141, div. h, tit. III, 132 Stat. 348, 747; Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, div. b, tit. III, 132 Stat. 3102–03 (2018); Further Consolidated Appropriations Act, 2020 Pub. L. No. 116-94, div. a, tit. III, 133 Stat. 2534, 2593 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. h, tit. III, 134 Stat. 1182, 1605 (2020); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. h, tit. III, 136 Stat. 49, 481–82 (2022); Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, tit. III, 136 Stat. 4894–95 (2022); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. d, tit. III, 138 Stat. 460, 689 (2024).

51.     Of that amount, Congress allocated at least $1.19 billion to the Department for carrying out the federal TRIO programs. *See* Explanatory Statement Regarding Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H2057 (Higher Education account spending table); H1886 (noting that Explanatory Statement reflects intent of Congress).[9]

52.     For fiscal year 2025, Congress level funded TRIO programs through three continuing resolutions ("CR").

53.     A CR is a temporary measure that Congress uses to fund the federal government when regular appropriations bills are not passed by the start of the fiscal year to avoid a government shutdown and provide temporary funding for government operations. CRs typically provide appropriations at an amount based on the previous fiscal year's appropriations acts and for the same purposes as those provided in the previous fiscal year.

54.     Relevant here is a CR passed in March 2025 that continued funding through the remainder of fiscal year 2025 at the previous year's level for most programs. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9 ("**2025 CR**").[10]

55.     The 2025 CR appropriated to the Department for fiscal year 2025 "[s]uch amounts as may be necessary, at the level specified . . . in applicable appropriations Acts for fiscal year 2024." *See* § 1101(a), 139 Stat. at 10–11.[11] The applicable fiscal year 2025 appropriations act for the Department is the 2024 Appropriations Act. *See* § 1101(a)(8), 139 Stat. at 11.

---

[9] *Available at* https://www.congress.gov/118/crec/2024/03/22/170/51/CREC-2024-03-22-bk2.pdf.

[10] On September 30, 2024, a first CR was passed by Congress to provide temporary funding for government operations through December 20, 2024. *See* H.R. 9747, Continuing Appropriations and Extensions Act, 2025. A second CR was enacted in December 2024 to extend government funding through March 14, 2025. *See* H.R. 10545, American Relief Act, 2025.

[11] The 2025 CR slightly reduced fiscal year 2025 funding for the Higher Education account by $202 million, without affecting funding specifically for the TRIO programs. *See* § 1908(6), 139 Stat. at 32–33 ("Notwithstanding section

56.     The 2025 CR appropriated funds "under the authority and conditions provided in" the 2024 Appropriations Act. *See* § 1101(a), 139 Stat. at 10–11.

57.     The 2025 CR further stated that "appropriations and funds made available and authority granted pursuant to this division shall be available through September 30, 2025." § 1106, 139 Stat. at 12.[12]

### d.     The TRIO programs

58.     As discussed, there are eight TRIO programs: Upward Bound ("UB"), Upward Bound Math-Science ("UBMS"), Veterans Upward Bound ("VUB"), Educational Opportunity Centers ("EOC"), Talent Search ("TS"), Student Support Services ("SSS"), Ronald E. McNair Postbaccalaureate Achievement ("McNair"), and Training Program for Federal TRIO Programs Staff ("Staff Training"). All eight TRIO programs are at issue in this case.[13]

---

1101 of this Act, the level for the following accounts shall be applied as follows: . . . [u]nder the heading 'Department of Education—Higher Education', by substituting '$3,080,952,000' for '$3,283,296,000.'").

[12] Both Senate and House Committees on Appropriation have recently proposed to continue funding TRIO programs in fiscal year 2026. On July 31, 2025, the Senate Appropriations Committee by a 26-3 vote advanced the Appropriations Subcommittee on Labor, Health and Human Services, Education, and Related Agencies' draft fiscal year 2026 spending bill and allocated $3,267,926,000 to the "Higher Education" budget account. *See* S. 2587, 119th Cong. at 162–64 (2025). The Senate Committee Report directs the Department to allocate $380,816,000 to SSS. *See* S. Rept. 119-55, at 306. House Appropriations Committee Chairman Tom Cole expressly stated that the bill "maintains funding for important education programs, such as TRIO and GEAR UP and Pell Grants." Tom Cole Remarks at FY26 Labor, Health and Human Services, Education, and Related Agencies Bill Subcommittee Markup (Sept. 2, 2025), *available at* https://appropriations.house.gov/news/remarks/cole-remarks-fy26-labor-health-and-human-services-education-and-related-agencies-bill; *see also* Subcommittee Print, *Making appropriations for the Departments of Labor, Health and Human Services, and Education, and related agencies for the fiscal year ending September 30, 2026, and for other purposes,* 119th Cong. at 142–44 (2025) (allocating $2,714,241,000 to the "Higher Education" budget account).

[13] Also on September 30, 2025, COE filed a separate lawsuit against the Department (and its Secretary) challenging the Department's denials of its members' applications who applied for a new SSS grant in 2024 and that the Department denied in 2025. *See COE v. U.S. Dep't of Educ., et al.*, No. 1:25-cv-03491-TSC (D.D.C.) (compl. filed Sept. 30, 2025). Unlike the other TRIO grants, SSS grants were in "competition" in 2025. Although this case and the SSS-specific case are factually related in many ways, COE has filed them separately because the statutory and regulatory scheme governing denials of applications for new grants and the discontinuation of grants is distinct. Nevertheless, upon information and belief, the Department discontinued a very small number of SSS grants of Affected Programs that were on a different 5-year cycle than most SSS grant recipients.

59.     Each TRIO program serves a different demographic. UB serves high school students, providing intensive preparation services and encouragement to help them pursue postsecondary education. *See* 34 C.F.R. § 645.10(a). UBMS is targeted at helping those high school students who seek to pursue postsecondary programs leading to careers in the math and science fields students. *See* 34 C.F.R. § 645.10(b). VUB provides services to assist military veterans prepare for postsecondary education. *See* 34 C.F.R. § 645.10(c). TS primarily serves students and out-of-school youth to support high school completion and postsecondary enrollment. *See* 34 C.F.R. § 643.3. EOC primarily serves adults over the age 19 in pursuing postsecondary education. *See* 34 C.F.R. § 644.3. SSS aims to motivate undergraduate students to complete their undergraduate education. *See* 34 C.F.R. § 646.3. McNair prepares undergraduate students for graduate school. *See* 34 C.F.R. § 647.3. Finally, Staff Training provides training to TRIO project staff to be more effective. *See* 34 C.F.R. § 642.3.

60.     There are other differences between the individual TRIO programs, but except where discussed herein, they are not particularly relevant.

## II.     The process for awarding TRIO grants and issuing continuation awards

61.     The grant application and award process for TRIO grants is outlined in the TRIO authorizing statute, *see* 20 U.S.C. § 1070a-11, and the statutes specific to each TRIO program, *see* §§ 1070a-12 to 17.    They are implemented by the Department's TRIO program-specific regulations, in addition to the Department's discretionary grantmaking regulations.

### a.     Notices inviting applications for new grants

62.     The process begins when the Department announces a grant "competition" and issues a notice of invitation to apply for a new TRIO grant, which is published in the Federal Register. *See* 34 C.F.R. § 75.105(b)(1)–(2).

63.     Among other things, the notices tell prospective applicants how the Department will evaluate, score, and select applicants for new TRIO grants. More specifically, the notices describe the "selection criteria" and the "priorities" that it will use for the competition.

64.     The selection criteria contained within a notice are based on the TRIO program-specific statute, the program-specific regulations, and on the Department regulations found at 34 C.F.R. § 75.210.

65.     The "priorities" in a notice may include those that the Department previously established through notice-and-comment rulemaking. *See* 34 C.F.R. § 75.105(b)(2).

66.     Although the APA generally exempts grant-related rules from public notice-and-comment rulemaking requirements, the General Education Provisions Act ("**GEPA**") carves out from that exemption for rules by the Department that establish priorities applicable to discretionary grant programs, including the TRIO programs. *See* 20 U.S.C. § 1232.

67.     Once the priorities are proposed and public comment is received, the Department then publishes the final priorities in the Federal Register. The Department may then incorporate these priorities in a notice of invitation to apply for a TRIO grant.

68.     The priorities may be designated as invitational, "competitive preference," or "absolute preference" priorities. 34 C.F.R. § 75.105(c)(1)–(3).

69.     The effect of each type of priority is as follows:

    a.  *Absolute-preference priority:* Under an absolute-preference priority, the Department considers only applications that meet the priority. 34 C.F.R. § 75.105(c)(3).

    b.  *Competitiv- preference priority:* Under a competitive-preference priority, the Department gives competitive preference to an application by (1) awarding additional points, depending on the extent to which the application meets the priority, *see* 34 C.F.R. § 75.105(c)(2)(i); or (2) selecting an application that meets the priority over an application of comparable merit that does not meet the priority, *see* 34 C.F.R. § 75.105(c)(2)(ii).

      c. *Invitational priority:* Under an invitational priority, the Department is particularly interested in applications that meet the priority. However, the Department does not give an application that meets the priority a preference over other applications. *See* 34 C.F.R. § 75.105(c)(1).

70.    The notice states the maximum number of points that may be awarded to applications that successfully address each selection criterion and each priority.

71.    GEPA also requires TRIO grant applicants to describe the steps they propose to take to ensure equity in their projects, including by addressing the special needs of students to overcome barriers to equitable participation, including barriers based on gender, race, color, and other characteristics. 20 U.S.C. § 1228a(b) ("**GEPA Equity Directive**").

72.    Upon issuing the notice of invitation and receiving applications, the Secretary recruits and relies on a panel of "peer reviewers" to evaluate applications against its selection criteria and priorities. *See* 20 U.S.C. § 1070a-11(c)(4); 34 C.F.R. § 75.200; 34 C.F.R. § 217.

73.    Peer reviewers are individuals from outside the federal government that have expertise in the subject area of the TRIO program at issue. 20 U.S.C. § 1070a-11(c)(4); *see* Department of Education, Discretionary Grantmaking at ED 25–26.[14]

74.    Each peer reviewer scores an application, and the Department averages all the scores given. 20 U.S.C. § 1070a-11(c)(3). The Department then adjusts the average score to account for the applicants' prior experience in carrying out the same type of TRIO grant project for which they are applying during the three fiscal years designated in the notice.

75.    The Department then ranks the applications in the order of their scores. The Department "shall award grants and contracts under this division in the order of the scores received

---

[14] *Available at* https://www.ed.gov/media/document/grantmaking-ed-108713.pdf (hereinafter, "Discretionary Grantmaking").

by the application for such grant or contract in the peer review process . . . and adjusted for prior experience." 20 U.S.C. § 1070a-11(c)(3); *see* Discretionary Grantmaking, *supra* ¶ 73, at 27 ("[ED] uses the scores determined by non-Federal reviewers to make funding determinations.").

**b.    Awarding a new grant**

76.    The Department notifies applicants if their application has been evaluated and selected for funding, and if so, the Department issues the successful applicant a grant award notification ("GAN").

77.    "The grant obligates both the Federal Government and the grantee to the requirements that apply to the grant." 34 C.F.R. § 75.236.

78.    By statute, UB, UBMS, VUB, TS, EOC, SSS and McNair grants "shall be awarded for a period of 5 years." 20 U.S.C. § 1070a-11(b)(2)(A). Staff Training grants "shall be awarded for a period of 2 years." 20 U.S.C. § 1070a-11(b)(2)(B).

**c.    Issuing a continuation award**

79.    Although TRIO grants are awarded for either two-year (Staff Training) or five-year (UB, UBMS, VUB, TS, EOC, SSS and McNair) periods, funds are obligated and disbursed by the Department to grant recipients in individual 12-month "budget periods."

80.    When the Department awards a multiyear grant, it "approves a budget period of not more than 12 months, even if the project has a multi-year project period." 34 C.F.R. § 75.251(a).

81.    "If the Secretary approves a multi-year project period, the Secretary: (1) Makes a grant to the project for the initial budget period; and (2) Indicates his or her intention to make continuation awards to fund the remainder of the project period." 34 C.F.R. § 75.251(b).

82.    To obtain a "continuation award" for each budget period after the first, recipients must satisfy applicable statutes and regulations incorporated into the grant. 34 C.F.R. § 75.253(a).

83.     Unlike when applying for a new grant, however "[a] grantee does not have to compete with other applicants to receive" a continuation award. *See* Discretionary Grantmaking, *supra* ¶ 73, at 50.

84.     Specifically, 34 C.F.R. § 75.253(a), which governs continuation awards, states:

A grantee, in order to receive a continuation award from the Secretary for a budget period after the first budget period of an approved multiyear project, must—

(1) Either—

(i) Demonstrate that it has made substantial progress in achieving—

(A) The goals and objectives of the project; and

(B) The performance targets in the grantee's approved application, if the Secretary established performance measurement requirements for the grant in the application notice; or

(ii) Obtain the Secretary's approval for changes to the project that—

(A) Do not increase the amount of funds obligated to the project by the Secretary; and

(B) Enable the grantee to achieve the goals and objectives of the project and meet the performance targets of the project, if any, without changing the scope or objectives of the project;

(2) Submit all reports as required by § 75.118;

(3) Continue to meet all applicable eligibility requirements of the grant program;

(4) Maintain financial and administrative management systems that meet the requirements in 2 CFR 200.302 and 200.303; and

(5) Receive a determination from the Secretary that continuation of the project is in the best interest of the Federal Government.

34 C.F.R. § 75.253(a).[15]

85.     Under 34 C.F.R. § 75.253(f), "[t]he Secretary may decide not to make a continuation award if . . . (1) A grantee fails to meet any of the requirements in paragraph (a) of

---

[15] An earlier version of 34 C.F.R. § 75.253(a) had the "best interest of the Federal Government" requirement in § 75.253(a)(4) and stated that "The Secretary may make a continuation award for a budget period after the first budget period of an approved multi-year project if . . . [c]ontinuation of the project is in the best interest of the Federal Government."

this section; or (2) A grantee fails to ensure that data submitted to the Department as a condition

of the grant meets the definition of 'quality data' in 34 C.F.R. § 77.1(c) and does not have a plan

acceptable to the Secretary for addressing data-quality issues in the next budget period."

86.    "In determining whether the grantee has met the requirements described in

paragraph (a) of this section, the Secretary may consider any relevant information regarding

grantee performance. This includes considering reports required by § 75.118[16], performance

measures established under § 75.110, financial information required by 2 CFR part 200, and any

other relevant information." 34 C.F.R. § 75.253(b).

87.    Nothing in the regulations, however, contemplates that the Department will review

a grantee's *application* to determine whether to issue a continuation award.

88.    The Department, prior to 2025, rarely did not issue continuation awards. *See*

Education Department General Administrative Regulations and Related Regulatory Provisions, 89

Fed. Reg. 70,300, at 70,316 (Aug. 29, 2024) ("In general, we do not deny a large number of non-

competing continuation awards and, if that does happen, grantees are often aware of the likelihood

of the decision well in advance"); Direct Grant Programs; Final Rule, 59 Fed. Reg. 30,258, at

30,259 (June 10, 1994) (a cut-off in continuation award funding is "extremely rare in practice").

89.    The Department must inform current recipients of "the status of their application

for continued funding at least 8 months prior to the expiration of" their grant. 20 U.S.C. § 1070a-

11(7).

---

[16] Recipients specifically must submit financial and performance reports, which are generally in the form of an Annual
Performance Report ("APR"), to the Department following the end of the prior budget period that details their project
activities, participants, and spending during that budget period. *See* 34 C.F.R. §§ 75.118, 75.720.

90.    "If the Secretary makes a continuation award under this section—(1) The Secretary makes the award under §§ 75.231 through 75.236; and (2) The new budget period begins on the day after the previous budget period ends." 34 C.F.R. § 75.253(d).

91.    If the Secretary "decides not to make a continuation award . . . the Secretary will notify the grantee of that decision, the grounds on which it is based, and, consistent with 2 C.F.R. § 200.342, provide the grantee with an opportunity to request reconsideration of the decision." 34 C.F.R. § 75.253(g). There is no established deadline for the Department to act on requests for reconsideration.

**d.    The requirement for grant recipients to comply with federal civil rights law.**

92.    Per the Department's regulations, a recipient of grant funds must comply with Title VI, Title IX, and other civil rights laws. *See* 34 C.F.R. § 75.500(a).[17]

93.    Title VI prohibits discrimination on the basis of race, color, or national origin in any program receiving federal financial assistance. *See* 42 U.S.C. § 2000d. Further, Title VI authorizes and directs "[e]ach Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant . . . to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." 42 U.S.C. § 2000d-1.

94.    In addition to requiring compliance by programs receiving federal funding, Title VI requires an agency administering federal funds to follow specific steps to enforce compliance.

---

[17] Such laws include Section 504 of the Rehabilitation Act of 1973 ("Section 504") and the Age Discrimination Act of 1975 (the "ADEA"). *See* 42 U.S.C. § 6102; 29 U.S.C. § 794a.

95.     Specifically, Title VI provides that no action refusing to grant federal financial assistance "shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." 42 U.S.C. § 2000d-1.

96.     If an agency cannot secure voluntary compliance with Title VI, it may terminate funding. But refusing to provide funding requires "an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement." 42 U.S.C. § 2000d-1.

97.     "[S]uch termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law." 42 U.S.C. § 2000d-1.

98.     Once the agency has terminated financial assistance, the head of the agency "shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action." Any department action terminating financial assistance does not "become effective until thirty days have elapsed after the filing of such report." *Id.*

99.     Title IX prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681. Title IX's procedural requirements and enforcement mechanisms mirror those of Title VI and also require an agency to first seek voluntary compliance before terminating funding. *See* 20 U.S.C. § 1682.[18]

---

[18] Section 504 "incorporate[es] the enforcement mechanisms available under Title VI." *Alexander v. Choate*, 496 U.S. 287, 306 n.27 (1985). The ADEA, too, requires a department or agency to seek voluntary compliance and determine that compliance cannot be secured by voluntary means before terminating funding. *See* 42 U.S.C. § 6104(c) ("No action may be taken under subsection (a) until the head of the Federal department or agency involved has advised the appropriate person of the failure to comply with the regulation involved and has determined that compliance cannot be secured by voluntary means.").

III.    **Between 2021 and 2024, the Affected Programs met grant requirements and the Department awarded TRIO grants.**

a.    **In 2021, the Department published final priorities that included competitive preference priorities that relied on commonly used DEI terms.**

100.    In accordance with 20 U.S.C. § 1232(d) and 34 C.F.R. § 75.105(b), the Department in June 2021 issued proposed supplemental priorities and definitions for discretionary grants programs. *See* Proposed Priorities and Definitions, 86 Fed. Reg. 34,664 (June 30, 2021). The Department issued its final supplemental priorities and definitions for discretionary grant programs in December 2021. *See* Final Priorities and Definitions, 86 Fed. Reg. 70,612 (Dec. 10, 2021) ("**2021 Final Priorities**").

101.    The 2021 Final Priorities listed six final priorities: (1) Addressing the Impact of COVID-19 on Students, Educators, and Faculty; (2) Promoting Equity in Student Access to Educational Resources and Opportunities; (3) Supporting a Diverse Educator Workforce and Professional Growth To Strengthen Student Learning; (4) Meeting Student Social, Emotional, and Academic Needs; (5) Increasing Postsecondary Education Access, Affordability, Completion, and Post-Enrollment Success; and (6) Strengthening Cross-Agency Coordination and Community Engagement To Advance Systemic Change. *See* 2021 Final Priorities, 86 Fed. Reg. at 70,635–70,639.

102.    The six final priorities refer to "underserved students", and the 2021 Final Priorities defined "underserved student" to include "[a] student of color" and "[a] lesbian, gay, bisexual, transgender, queer or questioning, or intersex (LGBTQI+) student." 2021 Final Priorities, 86 Fed. Reg. at 70,639–70,640.

b.    **In 2023, the Department revised the GEPA Equity Directive to address four questions involving "equity."**

103.    As noted earlier, GEPA requires that grant applicants describe the steps they propose to take to ensure equity in their projects, including by addressing the special needs of students to overcome barriers to equitable participation, including barriers based on gender, race, color, and other characteristics.

104.    20 U.S.C. § 1228a, titled "Equity for students, teachers, and other program beneficiaries," states:

> The Secretary shall require each applicant for assistance under an applicable program (other than an individual) to develop and describe in such applicant's application the steps such applicant proposes to take to ensure equitable access to, and equitable participation in, the project or activity to be conducted with such assistance, by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age.

20 U.S.C. § 1228a(b).

105.    In 2022, in response to President Biden's January 25, 2021 Executive Order 13985, Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, the Department proposed changing this form to its current four question format. *See* Agency Information Collection Activities; Comment Request; GEPA Section 427 Guidance for All Grant Applications, 87 Fed. Reg. 47,733 (Aug. 4, 2022) ("In response to the Agency's Equity Plan resulting from the President's Executive Order 13985, we now propose to update that form by expanding the number of questions from one to four.").

106.    The current GEPA Equity Directive form asks: (1) "Describe how your entity's existing mission, policies, or commitments ensure equitable access to, and equitable participation in, the proposed project or activity"; (2) "Based on your proposed project or activity, what barriers

may impede equitable access and participation of students, educators, or other beneficiaries?" (3) "Based on the barriers identified, what steps will you take to address such barriers to equitable access and participation in the proposed project or activity?" and (4) "What is your timeline, including targeted milestones, for addressing these identified barriers?" ED, GEPA Section 427 Form.[19]

### c.     The Department incorporates the 2021 Final Priorities as part of TRIO grant competitions.

107.     Between 2020 and 2024, the Department issued notices inviting applications for new two-year or five-year grants for TRIO programs. *See* Applications for New Awards—Upward Bound Program, 86 Fed. Reg. 71,460 (Dec. 16, 2021) ("Upward Bound NIA"); Applications for New Awards—Veterans Upward Bound Program, 87 Fed. Reg. 24,537 (Apr. 26, 2022) ("Veterans Upward Bound NIA"); Applications for New Awards—Upward Bound Math and Science Program, 87 Fed. Reg. 23,170 (Apr. 19, 2022) ("Upward Bound MS NIA"); Applications for New Awards—Student Support Services Program, 89 Fed. Reg. 35,080 (May 1, 2024) ("Student Support Services NIA"); Applications for New Awards—Ronald E. McNair Postbaccalaureate Achievement Program, 87 Fed. Reg. 13,280 (Mar. 9, 2022) ("McNair NIA"); Applications for New Awards—Training Program for Federal TRIO Programs, 89 Fed. Reg. 12,325 (Feb. 16, 2024) ("Staff Training NIA").[20]

108.     These notices described the selection criteria and competitive preference priorities that the Department would use in making decisions to evaluate applications and award new TRIO

---

[19] *Available at* https://sites.ed.gov/idea/files/Grants-Part-C-GEPA-Section-427-Form.pdf.

[20] The Department published the applications for Talent Search and EOC grant competitions during the final days of the first Trump Administration, so they do not incorporate any competitive preference priorities from the 2021 Final Priorities. *See* Applications for New Awards; Talent Search Program, 85 Fed. Reg. 84,324 (Dec. 28, 2020) ("Talent Search NIA"); Applications for New Awards; Educational Opportunity Centers Program, 86 Fed. Reg. 2658 (Jan. 13, 2021) ("EOC NIA").

grants. The Department's notices in 2021, 2022, and 2023 expressly incorporated competitive preference priorities from the 2021 Final Priorities, and informed prospective applicants that it would use these priorities when making decisions to award new TRIO grants.

109.    The Upward Bound NIA, Veterans Upward Bound NIA, and Upward Bound Math Science NIA all used the "Meeting Student Social, Emotional, and Academic Needs" and the "Strengthening Cross-Agency Coordination and Community Engagement to Advance Systemic Change" competitive preference priorities from the 2021 Final Priorities. *See* 86 Fed. Reg. at 71,460; 87 Fed. Reg. at 24,537; 87 Fed. Reg. at 23,170.

110.    The Student Support Services NIA used "Meeting Student Social, Emotional, and Academic Needs" and "Increasing Postsecondary Education Access, Affordability, Completion, and Post-Enrollment Success" as competitive preference priorities. *See* 89 Fed. Reg. 35,080.

111.    The McNair NIA used "Promoting Equity in Student Access to Educational Resources and Opportunities" as a competitive preference priority. *See* 87 Fed. Reg. at 13,280.

112.    The "Meeting Student Social, Emotional, and Academic Needs" competitive preference priority awards additional points to projects that are designed to improve students' social, emotional, academic, and career development needs, with a focus on underserved students. *See* Upward Bound NIA, 86 Fed. Reg. at 71,460; Veterans Upward Bound NIA, 87 Fed. Reg. at 24,537; Upward Bound Math Science NIA, 87 Fed. Reg. at 23,170; Student Support Services NIA, 89 Fed. Reg. 35,080.

113.    The "Strengthening Cross-Agency Coordination and Community Engagement to Advance Systemic Change" competitive preference priority awards extra points to projects that are designed to take a systemic evidence-based approach to improving outcomes for underserved

students. *See* Upward Bound NIA, 86 Fed. Reg. at 71,460; Veterans Upward Bound NIA, 87 Fed. Reg. at 24,537; Upward Bound Math Science NIA, 87 Fed. Reg. at 23,170.

114.    The "Increasing Postsecondary Education Access, Affordability, Completion, and Post-Enrollment Success" competitive preference priority awards extra points to projects that are designed to increase postsecondary access, affordability, completion, and success for underserved students by increasing access and reducing cost or establishing a system of high-quality data collection and analysis. *See* Student Support Services NIA, 89 Fed. Reg. 35,080.

115.    The "Promoting Equity in Student Access to Educational Resources and Opportunities" competitive preference priority awards extra points to project that are implemented by Historically Black Colleges and Universities, Tribal Colleges and Universities, or Minority-serving institutions. *See* McNair NIA, 87 Fed. Reg. 12,280.

**d.    The Affected Programs apply for TRIO grants and receive awards.**

116.    The Affected Programs timely applied for new TRIO grants, and between 2021 and 2024,[21] received notice from the Department that their applications had been selected. For example, the State University of New York at Plattsburgh ("SUNY Plattsburgh") applied for an Upward Bound grant on January 26, 2021. Suffolk University applied for a VUB grant on June 7, 2022. South Seattle College applied for an EOC grant on February 25, 2021. The University of New Hampshire ("UNH") applied for a McNair grant on April 25, 2022, and Marquette University

---

[21] FY 2022 Upward Bound Application Instructions, https://apply07.grants.gov/apply/opportunities/instructions/PKG00270968-instructions.pdf; FY 2022 Upward Bound Math Science Application, https://apply07.grants.gov/apply/opportunities/instructions/PKG00273479-instructions.pdf; FY 2022 Veterans Upward Bound Application, https://apply07.grants.gov/apply/opportunities/instructions/PKG00273722-instructions.pdf; FY 2021 Talent Search Application, https://apply07.grants.gov/apply/opportunities/instructions/PKG00264704-instructions.pdf; FY Student Support Services Application Instructions, https://apply07.grants.gov/apply/opportunities/instructions/PKG00286185-instructions.pdf, FY 2022 McNair Application Instructions, https://apply07.grants.gov/apply/opportunities/instructions/PKG00272507-instructions.pdf, EOC Application Instructions, https://apply07.grants.gov/apply/opportunities/instructions/PKG00264947-instructions.pdf, Staff Training Application Instructions, https://apply07.grants.gov/apply/opportunities/instructions/PKG00284929-instructions.pdf.

applied for a McNair grant on April 25, 2022. Augsberg University also applied for a McNair grant on April 24, 2022.

117.    The Department thereafter issued new grants to these and other Affected Programs.

118.    The "performance period" of their new grants was five years (or two years for Staff Training), and the budget period was 12 months.

119.    Affected Programs complied with the applicable requirements to obtain continuation awards for each budget period of their TRIO grants.

120.    First, each "[d]emonstrate[d] that it has made substantial progress in achieving—(A) The goals and objectives of the project; and (B) The performance targets in the grantee's approved application, if the Secretary established performance measurement requirements for the grant in the application notice." 34 C.F.R. § 75.253(a)(1).

121.    Second, each submitted "all reports as required by" 34 C.F.R. § 75.118, including the "performance report that provides the most current performance and financial expenditure information, as directed by the Secretary, that is sufficient to meet the reporting requirements of 2 CFR 200.328 and 200.329 and 34 CFR 75.590 and 75.720." 34 C.F.R. § 75.253(a)(2).

122.    Third, each "continued to meet all applicable eligibility requirements of the grant program." 34 C.F.R. § 75.253(a)(3).

123.    Fourth, each maintained "financial and administrative management systems that meet the requirements in 2 CFR 200.302 and 200.303." 34 C.F.R. § 75.253(a)(4).

124.    Additionally, for each fiscal year at issue, Congress appropriated federal funds to the Department for the purpose of "carrying out" the TRIO programs. *See* discussion *supra* Background § I.c

125.    Every budget period after the first (until the 2025-2026 budget period), each Affected Program received a continuation award.

126.    The continuation awards issued to the Affected Programs contain the same substantive terms, and differ only in the identity of the grant recipient, the type of TRIO grant, the amount of the grant, and the grant performance and budget periods.

## IV.    The Trump Administration's Executive Orders on DEI and the Department's denial of continuation awards to the Affected Programs

### a.    The Trump Administration's new policies and priorities

127.    The Trump Administration assumed office on January 20, 2025 and immediately issued a barrage of challenges on higher education and promulgated executive orders and directives critical of diversity, equity, and inclusion (DEI) practices.

128.    More directly, the President issued a number of executive orders directing the Department and other agencies to eliminate DEI practices and initiatives from all aspects of the federal government. *See, e.g.*, Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8,633 (Jan. 21, 2025) ("**EO 14173**"); Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8,339 (Jan. 20, 2025) ("**EO 14151**") (EO 14173 and EO 14151 collectively, the "**DEI Executive Orders**").

129.    EO 14173 states that "critical and influential institutions of American society," including the federal government and institutions of higher education, "have adopted and actively use dangerous, demeaning, and immoral race-and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) that can violate the civil-rights laws of this Nation." *See* 90 Fed. Reg. at 8,633.

130.    EO 14173 expressly "directs" the U.S. Office of Management and Budget ("**OMB**") to "[e]xcise references to DEI and DEIA principles under whatever name they may appear," including federal grants. 90 Fed. Reg. at 8,634.

131.    EO 14151 further instructs "each agency, department, or commission head," to provide OMB a list of all "[f]ederal grantees who received [f]ederal funding to provide or advance DEI . . . programs, services, or activities since January 20, 2021." 90 Fed. Reg. at 8,339–8,340. EO 14151 further directs agency heads to assess the operational impact and cost of those specified grants and recommend action. *Id*. at 8,340. It expressly directs agency heads to "terminate . . . all . . . 'equity-related' grants." *Id*. at 8,339.

132.    Since January 2025, thousands of applicants for and recipients of federal grants and contracts have lost federal funding on account of language appearing in or on their websites, advertisements, logos, catalogs, grant documents, and other materials containing any word or phrase that might fall within scope of DEI.

133.    The Trump Administration also announced plans to close the Department itself. *See* Exec. Order No. 14242, *Improving Education Outcomes by Empowering Parents, States, and Communities* , 90 Fed. Reg. 13,679 (Mar. 20, 2025) ("**EO 14242**").

134.    EO 14242 directed the Secretary, "to the maximum extent appropriate and permitted by law," to "take all necessary steps to facilitate the closure of the Department of Education and return authority over education to the States and local communities." *Id.*

**b.    The Trump Administration's current and future outlook towards TRIO**

135.    In the wake of President Trump's DEI Executive Orders and ordering the Department and other agencies to review federal-fund recipients and eliminate spending to all

recipients whose grants bore any connection to DEI, the Executive Branch began targeting the federal TRIO programs.

136.    To be clear, TRIO programs do not require grant recipients to serve students of any particular race or any other protected characteristic. The authorizing statutes focus eligibility on disability, income, and parent education (targeting first-generation college students).

137.    Nonetheless, in the Department's fiscal year 2026 budget request, it proposed eliminating funding for *all TRIO programs*, stating:

> The Administration does not request funding for the TRIO program for fiscal year 2026. TRIO has not met most of its performance measures for a number of years. States, localities, and universities, not the Federal government, are best suited to determine whether and how to most effectively support the activities authorized under this program or similar activities within their own budgets and without unnecessary administrative burden imposed by the Federal government.

FY 2026 Budget Request, *supra* ¶ 43 n.5, at 41.

138.    Similarly, OMB on May 2, 2025 proposed eliminating funding for all the TRIO programs. OMB stated:

> TRIO and GEAR UP are a relic of the past when financial incentives were needed to motivate Institutions of Higher Education (IHEs) to engage with low-income students and increase access. The lack of action by IHEs also meant that States and local school districts needed additional support to prepare low-income students for college. Today, the pendulum has swung and access to college is not the obstacle it was for students of limited means. IHEs should be using their own resources to engage with K-12 schools in their communities to recruit students, and then once those students are on campus, aid in their success through to graduation. A renewed focus on academics and scholastic accomplishment by IHEs, rather than engaging in woke ideology with Federal taxpayer subsidies, would be a welcome change for students and the future of the Nation.

Letter from Russell Vought, Director of OMB, to the Honorable Susan Collins, Chair, Senate Committee on Appropriations (May 2, 2025).[22]

### c.    Under President Trump, the Department issues Notices of Non-Continuation

139.    In summer 2025, the Affected Programs received a Notice of Non-Continuation letter from the Department.

140.    The Notices of Non-Continuation informed each Affected Program that "the United States Department of Education has determined not to continue your federal award . . . in its entirety" at the end of their respective budget periods in 2025.

141.    Affected Programs, including but not limited to Suffolk, South Seattle College, Marquette, SUNY-Plattsburgh, UNH, and many others postsecondary institutions and nonprofits with TRIO grants, also received a Notice of Non-Continuation throughout summer 2025 and as recently as mid-September 2025.

142.    Depending on the type of TRIO grant, the Notice of Non-Continuation informed Affected Programs that their grants were discontinued effective May 30, 2025, August 31, 2025, or September 30, 2025.

143.    The Department's stated reasons for discontinuing the Affected Programs' grants are similar, if not identical.

144.    According to the Notices of Non-Continuation, the Affected Programs did not receive continuation awards because the Department determined that their TRIO projects were "not in the best interest of the Federal Government" under 34 C.F.R. § 75.253(a)(5).

145.    The Notices of Non-Continuation generally stated the following stock language:

---

[22] *Available at* https://www.whitehouse.gov/wp-content/uploads/2025/05/Fiscal-Year-2026-Discretionary-Budget-Request.pdf.

Continuation requires "a determination from the Secretary that continuation of the project is in the best interest of the Federal Government." *Id.* The Department has undertaken a review of grants and determined that the grant specified above provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds. The grant is therefore inconsistent with, and no longer effectuates, the best interest of the Federal Government and will not be continued.

146.    The Notices of Non-Continuation identified information in the Affected Programs grant materials, including in their applications for new grants that had already been selected in 2024 or earlier, that "may conflict with the Department's policy of prioritizing merit, fairness, and excellence in education;" or may "violate the letter or purpose of Federal civil rights law."

147.    It is apparent from the Notices of Non-Continuation that the Department's determination was based on the current Administration's new policies, including those set forth in the DEI Executive Orders.

148.    The Department advised the Affected Programs that they had the opportunity to request reconsideration. The Affected Programs timely submitted requests for reconsideration; however, the Department did not respond to these requests prior to the date of this Complaint.

## HARM TO AFFECTED PROGRAMS

149.    The harms to the Affected Programs are severe. First and foremost, the Affected Programs have lost their grant funding. The loss of funding means that they can no longer maintain their projects and are terminating employees and staff whose salaries were funded by TRIO grants. It also inevitably impacts students who the Affected Programs can no longer serve. This is true for

many members of COE who are among the Affected Programs, such as Suffolk, SUNY Plattsburgh, Marquette, UNH, and South Seattle College.[23]

150.    Beyond the obvious harm with respect to the immediate loss of funding, the Affected Programs face two more veiled harms that are nevertheless concrete, severe, and a direct consequence of the Department's decision not to continue their TRIO projects.

**1.    Due to the Department's Notices of Non-Continuation, the Affected Programs will not be able to receive prior experience points during future grant competitions.**

151.    If a TRIO grant applicant proposes to "continue" serving substantially the same target population as under an existing "expiring" project, the Department allows the applicant to earn prior experience points evaluated under program-specific criteria. *See* 34 C.F.R. § 645.30(a)(2)(i) (Upward Bound, Veterans Upward Bound, and Upward Bound Math & Science); § 643.20(a)(2)(i) (Talent Search); § 646.20(a)(2)(i) (Student Support Services); § 647.20(a)(2)(i) (McNair); § 644.20(a)(2)(i) (EOC).

152.    The Department evaluates the prior experience of an applicant based on three years that it designates in the notice inviting applications. *See* 34 C.F.R. § 645.30(a)(2)(iii) (Upward Bound, Veterans Upward Bound, and Upward Bound Math & Science); § 643.20(a)(2)(iii) (Talent Search); § 646.20(a)(2)(iii) (Student Support Services); § 647.20(a)(2)(iv) (McNair); § 644.20(a)(2)(iii) (EOC).

153.    An applicant may earn up to 15 points for each designated project year. An Applicant's final prior experience score is the average of the three designated years and a maximum of 15 points total. *See* 34 C.F.R. § 645.30(a)(2)(ii)–(v) (Upward Bound, Veterans Upward Bound, and Upward Bound Math & Science); § 643.20(a)(2)(ii)–(v) (Talent Search);

---

[23] There are many more Affected Programs, and COE will identify them at the appropriate time in this litigation.

§ 646.20(a)(2) (ii)–(v) (Student Support Services); § 647.20(a)(2) (ii) & (iv)–(vi) (McNair); § 644.20(a)(2)(ii)–(v) (EOC).

154.    Prior experience points for Staff Training grants operate slightly differently because the program only lasts for two years. Instead of averaging three years, prior experience points are based on the applicant's performance during the first year of the Staff Training grant. *See* 34 C.F.R. § 642.20(a)(2)(i). The Department selects applications for funding within each absolute-preference priority and only considers prior experience for Staff Training grants if within each particular absolute-preference priority, the Department does not have enough funds to fund all applications at the peer review score. *See* 34 C.F.R. § 642.20(c)–(d).

155.    For all programs that qualify for prior experience, the Department calculates points based on certain performance metrics, which are different for each program depending on the program's target population and purpose. The metrics include enrollment numbers, retention and graduation, degree completion, and/or postsecondary retention. *See* 34 C.F.R. §§ 645.32 (Upward Bound, Veterans Upward Bound, and Upward Bound Math & Science); 643.22 (Talent Search); 646.22 (Student Support Services); 647.22 (McNair); 644.22 (EOC); 642.22 (Staff Training).

156.    Because the Affected Programs (who received Notices of Non-Continuation) can no longer propose to "continue" to serve substantially the same population that they are serving under an "expiring" grant, they will be ineligible for prior experience points in any future grant competition.

157.    The inability to earn prior experience points will have a significant effect on the Affected Programs in the future. Because prior experience points constitute up to 15 total points, Affected Programs may be unable to score high enough to receive future grant awards for many years to come.

158.    Under the criteria for Upward Bound, Veteran's Upward Bound, Upward Bound Math & Science, Talent Search, Student Support Services, McNair, and EOC, applicants may earn up to 100 points based on the standard criteria. *See* 34 C.F.R. § 645.30(a)(1)(ii) (Upward Bound, Veteran's Upward Bound, Upward Bound Math & Science); 643.20(a)(1)(ii) (Talent Search); 646.20(a)(1)(ii) (Student Support Services); 647.20(a)(1)(ii) (McNair); 644.20(a)(1)(ii) (EOC). Including prior experience points, applicants can score up to 115 points.

159.    The Affected Programs, however, may only score up to a maximum of 100 out of 115 points.

160.    Staff Training applicants can score up to 75 points using the standard criteria. *See* 34 C.F.R. § 642.20(a)(1). Including prior experience, Staff Training applicants may score up to 90 points.

161.    The Affected Programs that operated Staff Training projects may only score up to 75 out of 90 points.

162.    This harm is concrete and actual. Without continuing programs, the Affected Programs cannot receive prior experience points. And without prior experience points, the Affected Programs are at a significant disadvantage during the subsequent grant competitions for each respective TRIO program.

**2.    The Affected Programs will not be able to seek the same amount of their previous grant awards during future competitions.**

163.    With respect to the amount of a possible grant award, the most recent grant competition for each TRIO program separated applicants into two groups: applicants who were currently receiving the same type of TRIO grant that they were applying for, and applicants who were not currently receiving the same type of TRIO grant that they were applying for.

164.    For Upward Bound, the estimated range of awards was from $287,537-$981,028,

and:

> The maximum award varies based on whether the applicant is currently receiving a UB Program grant, as well as the number of participants served.
>
> For an applicant that is not currently receiving a UB Program grant, the maximum award amount is $287,537, based upon a per-participant cost of no more than $4,792 and a minimum of 60 participants.
>
> For an applicant that is currently receiving a UB Program grant, the minimum number of participants is the number of participants in the project's FY 2021 grant award notification and the maximum award amount is equal to the applicant's base award amount for FY 2021.

86 Fed. Reg. at 71,462.

165.    For Veteran's Upward Bound, the estimated range of awards was from $287,537-

$460,000, and:

> The maximum award varies based on whether the applicant is currently receiving a VUB Program grant, as well as the number of participants served.
>
> For an applicant that is not currently receiving a VUB Program grant, the maximum award amount is $287,537, based upon a per-participant cost of no more than $2,300 and a minimum of 125 participants.
>
> For an applicant that is currently receiving a VUB Program grant, the maximum award amount is equal to the applicant's base award amount for FY 2021, and the minimum number of participants is the number of participants in the project's FY 2021 grant award notification.

87 Fed. Reg. at 24,538.

166.    For Upward Bound Math & Science, the estimated range of awards was from

$287,537-$442,525, and:

> The maximum award varies based on whether the applicant is currently receiving a UBMS Program grant, as well as the number of participants served.

> For an applicant that is not currently receiving a UBMS Program grant, the maximum award amount is $287,537, based upon a per-participant cost of no more than $4,792 and a minimum of 60 participants.
>
> For an applicant that is currently receiving a UBMS Program grant, the maximum award amount is equal to the applicant's base award amount for FY 2021, and the minimum number of participants is the number of participants in the project's FY 2021 grant award notification.

87 Fed. Reg. at 23,172.

167.    For Talent Search, the estimated range of awards was from $267,995-$1,030,588,

and:

> For an applicant that is not currently receiving a Talent Search Program grant, the maximum award amount is $277,375. All projects must serve a minimum of 500 participants annually and have a per participant cost of no more than $555.
>
> For an applicant that is currently receiving a Talent Search Program grant, the maximum award amount is the greater of (a) $277,375 or (b) 100 percent of the applicant's base award amount for FY 2020. For example, an applicant that is eligible for, and requests, a $550,000 grant, must propose to serve at least 990 participants. All projects must serve a minimum of 500 participants annually and have a per participant cost of no more than $555.

85 Fed. Reg. at 84,325.

168.    For Student Support Services, the estimated range of awards was from $148,181-

$1,659,366, and:

> The maximum award varies based on whether the applicant is currently receiving an SSS grant, as well as the type of project and number of students served. For applicants not currently receiving an SSS Program grant, the maximum awards are as follows:

| Type of proposal | Maximum amount |
|---|---|
| Regular SSS Proposal Serving a Minimum of 140 Student Participants | $272,364 |
| Regular SSS Proposal Serving a Minimum of 100 Student Participants who are Students with Disabilities | $272,364 |
| English as a Second Language (ESL) SSS Proposal Serving a Minimum of 140 Student Participants | $272,364 |

| Type of proposal | Maximum amount |
|---|---|
| Science, Technology, Engineering, and Mathematics (STEM) and Health Science SSS Proposal Serving a Minimum of 120 Student Participants | $272,364 |
| Teacher Preparation SSS Proposal Serving a Minimum of 140 Student Participants | $272,364 |
| Veterans SSS Proposal Serving a Minimum of 120 Student Participants | $272,364 |

For applicants proposing to serve fewer than the minimum number of student participants specified in the above table, the maximum award is an amount equal to: $1,945 per student participant for Regular, ESL, and Teacher Preparation proposals; $2,724 per student participant for projects serving Students with Disabilities (SWD proposals); and $2,270 per student participant for STEM (including Health Science) and Veterans proposals.

For applicants currently receiving an SSS Program grant, the maximum award amount is the greater of (a) $272,364 or (b) 100 percent of the applicant's base award amount for FY 2024.

For any currently funded applicant that proposes to serve fewer students than it served in FY 2024, the maximum award is the amount that corresponds with the cost per participant previously established for the project in FY 2024.

89 Fed. Reg. at 35,082.

169.    For McNair, the estimated range of awards was from $261,888 to $437,772, and:

The maximum award varies based on whether the applicant is currently receiving a McNair Program grant, as well as the number of participants served.

For an applicant that is not currently receiving a McNair Program grant, the maximum award amount is $261,888 based upon a per participant cost of no more than $10,476 to serve a minimum of 25 eligible participants. For an applicant currently receiving a McNair Program grant and applying to serve a different campus, the maximum award is $261,888, to serve a minimum of 25 eligible participants.

For an applicant currently receiving a McNair Program grant and not applying to serve a different campus, the maximum award is the amount equal to the applicant's base award amount for FY 2021, and the minimum number of participants is the number of participants in the project's FY 2021 grant award notification.

87 Fed. Reg. at 12,281.

170.    For EOC, the estimated range of awards was from $232,050-$1,280,000, and

The maximum award varies based on whether the applicant is currently receiving an EOC Program grant, as well as the number of participants served.

For an applicant that is not currently receiving an EOC Program grant, the maximum award amount is $232,050. Applicants must have a per-participant cost of no more than $273 and propose to serve a minimum of 850 participants.

For an applicant that is currently receiving an EOC Program grant—

1. The applicant may request a maximum award amount that is an amount equal to 100 percent of the applicant's base award amount for FY 2020 to serve a minimum number of participants equal to the applicant's approved FY 2020 participant number; or

2. If the applicant proposes to reduce the number of participants to be served below the amount served in FY 2020, the proposed number of participants must be at least 850 *and* the per-participant cost must not exceed the applicant's cost per participant for FY 2020 or $273, whichever is greater. For example, if an applicant's per participant cost for FY 2020 is $344 and the applicant is proposing to serve 850 participants under the FY 2021 competition, the applicant would be eligible to request a $292,400 grant ($344 × 850 = $292,400).

86 Fed. Reg. at 12,326.

171.    The Affected Programs previously operated Upward Bound, Veterans Upward Bound, Upward Bound Math & Science, Talent Search, Student Support Services, McNair, and Educational Opportunity Centers TRIO projects.

172.    As a result of the Department's determination to discontinue the Affected Programs' projects, they will be treated as if they never operated a TRIO project at all when applying for future grant funds. Although the Affected Programs successfully operated TRIO projects—in some cases for many years or decades—they will be treated as a brand-new applicant.

## VIOLATIONS OF LAW

1. **The Department failed to follow the procedural requirements that every civil rights statute cited in its regulations mandate before terminating funding.**

173.    The Department decided to not continue the Affected Programs in part because their projects allegedly "violate the letter or purpose of Federal civil rights law."

174.    34 C.F.R. § 75.500 outlines the requirements for grantees to comply with federal civil rights laws and specifically cites Title VI and Title IX.

175.    Title VI outlines a series of specific procedures that must be followed before the Department could deny funding to a grant applicant based on Title VI compliance. *See* 42 U.S.C. § 2000d-1. Title IX mirrors these procedural requirements. *See* discussion *supra* § II.d.

176.    Terminating federal funding under Title VI or Title IX requires that the Department first have attempted to seek voluntary compliance. *See* discussion *supra* § II.d.

177.    The Department's regulations outline a detailed process for Title VI compliance. 34 C.F.R. Part 100 "effectuate[s] the provisions of title VI of the Civil Rights Act of 1964." 34 C.F.R. § 100.1.

178.    34 C.F.R. Part 100 "applies to any program to which Federal financial assistance is authorized to be extended to a recipient under a law administered by the Department, including the Federal financial assistance listed in appendix A of this regulation."

179.    Appendix A expressly refers to programs under Title IV of the HEA, including TRIO programs. Appx. A to Part 100, Part 1(21).

180.    34 C.F.R. § 100.6 provides that "the responsible Department official shall to the fullest extent practicable seek the cooperation of recipients in obtaining compliance with this part and shall provide assistance and guidance to recipients to help them comply voluntarily with this part."

181.    34 C.F.R. § 100.8 provides that "[i]f there appears to be a failure or threatened failure to comply with this regulation, and if the noncompliance or threatened noncompliance cannot be corrected by informal means, compliance with this part may be effected by the suspension or termination of or refusal to grant or to continue Federal financial assistance or by any other means authorized by law."

182.    34 C.F.R. § 100.8(c) provides that "[n]o order suspending, terminating or refusing to grant or continue Federal financial assistance shall become effective until (1) the responsible Department official has advised the applicant or recipient of his failure to comply and has determined that compliance cannot be secured by voluntary means," (2) "there has been an express finding on the record, after opportunity for hearing, of a failure by the applicant or recipient to comply with a requirement imposed by or pursuant to this part," and (3) "the expiration of 30 days after the Secretary has filed with the committee of the House and the committee of the Senate having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action."

183.    Prior to sending the Notices of Non-Continuation, the Department had not informed the Affected Programs, formally or informally, about any failure or threatened failure to comply with Title VI or Title IX. The Department never attempted to seek voluntary compliance from any Affected Program. Before receiving a Notice of Non-Continuation, no Affected Member received a communication from the Department with respect to noncompliance with federal civil rights law.

184.    The Department likewise did not follow any of the other procedures under 34 C.F.R. Part 100. The Department never provided the Affected Programs with an opportunity for a hearing, and accordingly, never made any express finding on the record that any of the Affected Programs failed to comply with Title VI or Title IX.

185.    Upon information and belief, the Department, through the Secretary, never filed a full written report of the circumstances and the grounds for discontinuing the grants with the Senate Committees on Health, Education, Labor, and Pensions or the House Committee on Education and the Workforce.

186.    Consequently, the Department acted contrary to law, in excess of statutory authority, and without observance of procedure.

**2.    The Department's interpretation of 34 C.F.R. § 75.253(a)(5) to deny continuation awards is in excess of statutory authority.**

187.    The Department's current interpretation of 34 C.F.R. § 75.253(a)(5) that it used to deny the continuation awards is not authorized by any statutory provision.

188.    34 C.F.R. § 75.253(a)(5) states, "A grantee, in order to receive a continuation award from the Secretary for a budget period after the first budget period of an approved multiyear project, must . . . [r]eceive a determination form the Secretary that continuation of the project is in the best interest of the Federal Government."[24]

189.    34 C.F.R. § 75.253(b) states:

> In determining whether the grantee has met the requirements described in [§ 75.253(a)] of this section, the Secretary may consider any relevant information regarding grantee performance. This includes considering reports required by § 75.118, performance measures established under § 75.110, financial information required by 2 CFR part 200, and any other relevant information.

190.    Title 20 authorizes the Secretary to prescribe regulations necessary to "administer and manage" the functions of the Department. 20 U.S.C. § 1221e-3 delates general authority to the Secretary, and states:

---

[24] As stated above, prior to 2024 the "best interest of the Federal Government" requirement was in 34 C.F.R. § 75.253(a)(4) and had minor differences in phrasing.

> The Secretary, in order to carry out functions otherwise vested in the Secretary by law or by delegation of authority pursuant to law, and subject to limitations as may be otherwise imposed by law, is authorized to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department.

20 U.S.C. § 3474 states:

> The Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department.

191.    Again, 20 U.S.C. § 1070a-11(a) states that the Secretary "**shall . . . carry out**" TRIO programs.

192.    And 20 U.S.C. § 1070a-11(b)(2) requires the Secretary to award grants for a five-year period, which necessitates the issuance of continuation awards.

193.    Interpreting and applying 34 C.F.R. § 75.253(a)(5) in an unfettered manner to instead deny continuation awards and reduce the number of TRIO projects is contrary to the plain terms of 20 U.S.C. § 1070a-11(a).

194.    Section 75.253(b) limits the Department's "best interest" determination under § 75.253(a)(5) to considering information "regarding grantee performance."

195.    Although 34 C.F.R. § 75.253(b) contains an open-ended reference to "any other relevant information," that reference is cabined by the earlier use of "regarding grantee performance."

196.    This interpretation is confirmed by the use of *ejusdem generis*, a principle of statutory interpretation that requires a general term following a series of specific terms to be understood "as a reference to subjects akin to the one with specific enumeration." *United States v. Alford*, 89 F.4th 943, 952 (D.C. Cir. 2024).

197.    *Noscitur a sociis*, another canon of statutory interpretation meaning that a word is known by the company it keeps, also confirms this limited interpretation. This canon "avoid[s] ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Id.* (quoting *Yates v. United States*, 574 U.S. 528, 543 (2015)).

198.    Accordingly, "any other relevant information" refers to information similar to "reports required by § 75.118," "performance measures established under § 75.110," and "financial information required by 2 CFR part 200," which all relate to a grantee's performance.

199.    Moreover, Congress, not the Department unilaterally, determines what the "best interests of the federal government are."

200.    A "fundamental problem" with the Department's stated reason for discontinuing the grants is that "the 'federal interest' does not necessarily mean" the federal interest as determined by [the agency]." *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 660–61 (D. Md. 2018). "The ultimate touchstone for all agency action is not its own guidance documents, or even regulations, but the power delegated to it by Congress." *Id.*; *see also id.* at 660 (an agency "cannot provide just any reason for its decision, that reason must be a change in the federal interest. HHS provides no evidence a change in the federal interest motivated its decision here.").

201.    The federal government's interest in the TRIO programs is evident in 60-plus years of legislation and appropriations towards the TRIO programs. *See supra* Background § I.b–I.d

202.    Congress has declared the federal government's "priority" and interest in grant programs like TRIO that increase disadvantaged students' *access* to educational opportunities more generally. Congress in 1974 declared its "National Policy with Respect to Equal Educational Opportunity" as follows: "Recognizing that the Nation's economic, political, and social security

require a well-educated citizenry, the Congress (1) reaffirms, as a matter of high priority, the Nation's goal of equal educational opportunity, and (2) declares it to be the policy of the United States of America that every citizen is entitled to an education to meet his or her full potential without financial barriers." Education Amendments of 1974, Pub. L. No. 93-380, § 801, 88 Stat. 484, codified at 20 U.S.C. § 1221-1.

203.    The Department's Notices of Non-Continuation completely ignore the federal government's interest in the TRIO programs and the benefits they provide.

204.    Where an agency does "not offer a rational connection between the facts and the choice made, but merely articulate[s] policy concerns and [its] own discretion to terminate the program for whatever reason," its "reasoning or lack thereof is arbitrary and capricious." *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of HHS*, 328 F. Supp. 3d 1133, 1149 (E.D. Wash. 2018).

205.    For these reasons, the Department's interpretation and use of 34 C.F.R. § 75.253 is in excess of statutory authorization, and is contrary to law.

## **CAUSES OF ACTION**

### **Count I – Administrative Procedures Act**
**Contrary to Law, In Excess of Statutory Authority, and Without Observance of Procedure (Title VI and Title IX)**

206.    COE incorporates the preceding allegations as if set forth fully herein.

207.    The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. A Court is required to "hold unlawful and set aside agency action" that is "not in accordance with law," "in excess of statutory . . . authority," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

208.    Before denying or terminating federal funding for noncompliance with Title VI, an agency or department must first seek voluntary compliance from the recipient. *See* 42 U.S.C.§ 2000d-1.

209.    Before denying or terminating federal funding for noncompliance with Title IX, an agency or department must first seek voluntary compliance from the recipient. *See* 20 U.S.C. § 1682.

210.    The Department did not seek voluntary compliance from any Affected Program before sending a Notice of Non-Continuation or follow any of the other procedures required by Title VI and Title IX prior to discontinuing a grant. *See supra* ¶¶ 173–186.

211.    Each Affected Program has been harmed from the Department's failure to comply with civil rights law. Each Affected Program is no longer receiving grant funding, will be unable to seek its prior award amount, and may be ineligible to receive prior experience points during the next applicable grant competition.

212.    COE is entitled to a declaration that the Department acted contrary to law, in excess of statutory authority, and without observance of procedure, and a preliminary injunction vacating and setting aside the Notice of Non-Continuation and directing the Department to immediately reconsider its action on the Affected Programs' respective TRIO grants, in accordance with the HEA, Title VI and Title IX, and the applicable Department regulations.

**Count II –Administrative Procedures Act**
**Contrary to Law, In Excess of Statutory Authority, and Without Observance of Procedure**
**(Notice-and-Comment)**

213.    COE incorporates the preceding allegations as if set forth fully herein

214.   The Department is required under GEPA to follow the APA's notice-and-comment rulemaking procedure when setting the policies, priorities and other rules for grant awards. *See* 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d).

215.   "The APA generally requires that before a federal agency adopts a rule it must first publish the proposed rule in the Federal Register and provide interested parties with an opportunity to submit comments and information concerning the proposal." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citing 5 U.S.C. § 553).

216.   "Failure to abide by these requirements renders a rule procedurally invalid." *Id.*; *AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 84 (D.D.C. 2007) ("The APA puts the agency to a simple either/or choice: either notice-and-comment procedures or the good-cause exception.").

217.   The Department did not follow the statutorily required notice-and-comment rulemaking procedures to replace or otherwise rescind the selection criteria and/or competitive preference priorities in the NIAs.

218.   In general, "an utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure." *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1338 (D.C. Cir. 2023).

219.   The Department did not follow the statutorily required notice-and-comment rulemaking procedures for establishing the new policies and priorities set forth in the Notices of Non-Continuation that it relied on to discontinue the Affected Programs' TRIO grants.

220.   The Department improperly applied new policies, including those set forth in the Trump Administration's DEI Executive Orders, as a basis to discontinue the Affected Programs' grants.

221.    Accordingly, the Department did not comply with notice-and-comment rulemaking as required by GEPA and the APA, and the Department further acted contrary to law, in excess of statutory authority, and without observance of procedure.

222.    Further, the Department further acted contrary to law, in excess of statutory authority, and without observance of procedure because it penalized the Affected Programs for making statements and including information in applications that was responsive to the selection criteria and/or competitive preference priorities in the Department's NIAs from 2024 and earlier that applied to the Affected Members' respective TRIO grants.

223.    Further, the Department's Notices of Non-Continuation are contrary to law and in excess of statutory authority because the Department penalized the Affected Programs for complying with the GEPA Equity Directive required by law.

224.    COE is entitled to a declaration that the Department acted contrary to law, in excess of statutory authority, and without observance of procedure, and a preliminary injunction vacating and setting aside the Notices of Non-Continuation and directing the Department to immediately reconsider its action on the Affected Programs' respective TRIO grants, in accordance with the HEA, Title VI and Title IX, and the applicable Department regulations.

### Count III – Administrative Procedures Act
**Arbitrary and Capricious**

225.    COE incorporates the preceding allegations as if set forth fully herein.

226.    The Department's Notice of Non-Continuation is arbitrary and capricious because it did not reasonably explain how the Affected Programs violated federal civil rights law.

227.    The "well-worn arbitrary-and-capricious standard ensures that an administrative agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *FDA v. Wages &*

*White Lion Invs.*, 604 U.S. 542, 567–68 (2025) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

228.    The Department's Notices of Non-Continuation are arbitrary and capricious because they did not reasonably explain how the Affected Programs' projects were not consistent with the Department's new policies or priorities.

229.    In discontinuing the Affected Programs' TRIO grants, the Department entirely disregarded the Affected Programs' reliance interests in the Department's use of the selection criteria and priorities in the NIAs from 2024 and earlier.

230.    The Department's Notices of Non-Continuation are arbitrary and capricious because the Department relied on factors that it was not entitled to consider.

231.    The Department's Notices of Non-Continuation are arbitrary and capricious because they reflect the Department's change in position that it did not explain or even acknowledge.

232.    Under the "change-in-position doctrine . . . agencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016).

233.    The Department's Notices of Non-Continuation are arbitrary and capricious because the Department expressly encouraged the Affected Programs to respond to the competitive preference priorities in the NIAs from 2024 and earlier and has now penalized them for doing so.

234.    The Department's Notices of Non-Continuation are arbitrary and capricious because the Department encouraged the Affected Programs to exercise discretion in preparing their

applications responding to the GEPA Equity Directive required by law and has now penalized them for doing so.

235.    The Department's interpretation and application of 34 C.F.R. § 75.253(a)(5) is arbitrary and capricious. In discontinuing the Affected Programs' TRIO grants, the Department entirely disregarded the Affected Programs' reliance interests in the previous interpretation of § 75.253(a)(5). *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–33 (2020).

236.    COE is entitled to a declaration that the Department's Notice of Non-Continuation was arbitrary and capricious, and a preliminary injunction vacating and setting aside the Notice of Non-Continuation and directing the Department to immediately reconsider its action on the Affected Programs' respective TRIO grants, in accordance with the HEA, Title VI and Title IX, and the applicable Department regulations.

**Count IV – Administrative Procedures Act**
**In Excess of Statutory Jurisdiction and Authorization**

237.    COE incorporates the preceding allegations as if set forth fully herein.

238.    Under 5 U.S.C. § 706(2)(c), "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"

239.    "Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quotations and citation omitted).

240.    The Department's interpretation and application of 34 C.F.R. § 75.253(a)(5) is not authorized by statute.

241.    34 C.F.R. § 75.253(a)(5) and its predecessor 34 C.F.R. § 75.253(a)(4) have granted the Department the power to determine whether a continuation award is "in the best interest of the

Federal government" since the first implementing regulations were created after the Department was formed in 1979. *See* 45 Fed. Reg. 22,494, 22,510 (Apr. 3, 1980).[25]

242.    The Department has given no explanation whatsoever (other than a vague reference to the Trump Administration's new policies and priorities) to support its decision to reinterpret 34 C.F.R. § 75.253(a)(5) to give itself unfettered authority to not continue a grant.

243.    All of the statutes authorizing TRIO programs overwhelmingly require the Department to issue continuation awards. The Department issues five-year and two-year grants, and the statutory scheme does not contemplate "reapplying" during that period. Instead, the statutory scheme shows that the Department is supposed to issue continuation awards provided that a grantee has met a number of performance metrics. *Cf.* Education Department General Administrative Regulations and Related Regulatory Provisions, 89 Fed. Reg. 70,300, 70,316 (Aug. 29, 2024) ("In general, we do not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance and often cite no concerns if they do not receive a continuation award.").

244.    Instead of cabining its use of 34 C.F.R. § 75.253(a)(5) to the "best interest of the Federal government" with respect to the grantees' performance, as is the case with all other subsections of 34 C.F.R. § 75.253(a) and as is required by § 75.253(b), it has instead applied (a)(5) in a manner that gives itself complete discretion to deny continuation awards based on the Department's policies and priorities that exist nowhere in the applicable law.

---

[25] After the Department of Education was split from the Department of Health, Education, and Welfare, these Direct Grant regulations were transferred from Chapter 45 to Chapter 34, and 45 C.F.R. Part 100 became 34 C.F.R. Part 75. *See* Transfer and Redesignation of ED Regulations, 45 Fed. Reg. 77,368 (Nov. 21, 1980).

245. The Department acted in excess of statutory jurisdiction and authority because it failed to consider grantee's performance in the Notices of Non-Continuation and instead relied on factors it was not entitled to consider.

246. COE is entitled to a declaration that the Department acted in excess of statutory jurisdiction and authority, and a preliminary injunction vacating and setting aside the Notice of Non-Continuation and directing the Department to immediately reconsider its action on the Affected Programs' respective TRIO grants, in accordance with the HEA, Title VI and Title IX, and the applicable Department regulations.

### Count V – Violation of the U.S. Constitution
**Void for Vagueness under the 5th Amendment**

247. COE incorporates all paragraphs by reference as if set forth fully herein.

248. 34 C.F.R. § 75.253(a)(5) is clear on its face in that the "best interest of the Federal government" must be assessed by the Department in relation to grantee performance.

249. The Department's interpretation and application of 34 C.F.R. § 75.253(a)(5) is unlawful because the Department's interpretation renders the regulation impermissibly vague and thus void.

250. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

251. "The Due Process Clause thus 'requires the invalidation of laws that are impermissibly vague'—specifically, a law is void for vagueness if it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127 (D.D.C. 2025) (quoting *Fox Television Stations*, 567

U.S. at 253). The void for vagueness doctrine "addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* (quoting *Fox Television Stations*, 567 U.S. at 253).

252.    The Department's interpretation and application of 34 C.F.R. § 75.253(a)(5) gives it unlimited and unpredictable discretion to deny continuation awards that the authorizing statute contemplates for four years following the initial one-year grant term (5 years total).

253.    The Department has never used 34 C.F.R. § 75.253(a)(5) before in this completely open-ended manner. Given the vagueness of the regulation as interpreted by the Department, the Department may not rely on it to take action against the Affected Programs.

254.    COE is entitled to a declaration that the Department's Notice of Non-Continuation was not entitled to rely on its interpretation of 34 C.F.R. § 75.253(a)(5) because the Department's interpretation renders the regulation void for vagueness, and a preliminary injunction vacating and setting aside the Notice of Non-Continuation and directing the Department to immediately reconsider its action on the Affected Programs' respective TRIO grants, in accordance with the HEA, Title VI and Title IX, and the applicable Department regulations.

## Count VI – Violation of the U.S. Constitution
### Separation of Powers & the Delegation Doctrine

255.    COE incorporates the preceding allegations as if set forth fully herein.

256.    The U.S. Constitution states: "All legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1.

257.    The Department is required to carry out the TRIO programs under the HEA.

258.    Congress appropriated to the Department $3,080,952,000 in fiscal year 2025 funds for carrying out the programs within the Higher Education budget account, including the TRIO programs.

259.    Congress intended that at least $1.19 billion appropriated in the Higher Education budget account for the 2025 fiscal year be allocated to the TRIO programs.

260.    Upon information and belief, the Department has not obligated the full amount of fiscal year 2025 funds appropriated by Congress towards the TRIO programs.

261.    The Department's failure to obligate and spend the full amount of fiscal year 2025 funds for the TRIO programs is in violation of the Separation of Powers.

262.    The Department's Notices of Non-Continuation violate the Delegation Doctrine.

263.    "The fundamental precept of the delegation doctrine is that the lawmaking function belongs to Congress, and may not be conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996) (internal citations omitted).

264.    When the Department interpreted and applied 34 C.F.R. § 75.253(a)(5) to give itself unfettered, unbounded authority to deny continuation awards that are statutorily mandated by Congress, it violated the Delegation Doctrine as established by the U.S. Constitution and explained by the U.S. Supreme Court.

265.    COE is entitled to a declaration that the Department's Notices of Non-Continuation were in violation of the Constitution, that the failure to obligate and expend fiscal year 2025 funds towards carrying out the TRIO programs was in violation of the Constitution, and a preliminary injunction extending the period of availability for fiscal year 2025 funds, beyond September 30, 2025, for any remaining unobligated fiscal year 2025 funds of the $3,080,952,000 that Congress appropriated to the Department's Higher Education budget account, and further, vacating and

setting aside the Notices of Non-Continuation and directing the Department to immediately reconsider its action on the Affected Programs' respective TRIO grants, in accordance with the HEA, Title VI and Title IX, and the applicable Department regulations.

## Count VII – Violation of the U.S. Constitution
### Violation of The Take Care Clause

266.    COE incorporates the preceding allegations as if set forth fully herein.

267.    The U.S. Constitution states, "All legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. "Every Bill" shall be passed by both the House of Representatives and the Senate and signed by the President "before it [may] become a Law." *See* U.S Const. art I, § , cl. 1–2. And the President "shall take Care that the Laws be faithfully executed[.]" *See* U.S. Const. art. II, § 3.

268.    "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).

269.    The Department is required to carry out the TRIO programs under the HEA.

270.    Congress appropriated to the Department $3,080,952,000 in fiscal year 2025 funds for carrying out the programs within the Higher Education budget account, including the TRIO programs.

271.    Congress intended that at least $1.19 billion appropriated to the Department in the Higher Education budget account for the 2025 fiscal year be allocated to the TRIO programs.

272.    Upon information and belief, the Department has not obligated the full amount of fiscal year 2025 funds towards the TRIO programs.

273.    The Department's failure to obligate the full amount of fiscal year 2025 funds for the TRIO programs is in violation of the Take Care Clause.

274.    The Executive Branch cannot act under the guise of enforcing a congressional enactment to create new policies and enforce those policies with the force of federal law. *Youngstown Sheet & Tube*, 343 U.S. at 587–88 ("The President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President."); *see also Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 613 (1838) (rejecting the notion that "the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution.")

275.    The Department's implementation of 34 C.F.R. § 75.253(a)(5) is not a faithful use of congressionally enacted laws. 20 U.S.C. § 1070a-11(a) states that the "Secretary shall . . . carry out a program of making grants."

276.    Accordingly, the Department's implementation and use of 34 C.F.R. § 75.253(a)(5) violates the President's duty to ensure that the law is faithfully executed.

277.    COE is entitled to a declaration that the Department's Notice of Non-Continuation was in violation of the Constitution, a declaration that the failure to obligate and expend fiscal year 2025 funds towards carrying out the TRIO programs was in violation of the Constitution, and a preliminary injunction extending the period of availability for fiscal year 2025 funds, beyond September 30, 2025, for any remaining unobligated fiscal year 2025 funds of the $3,080,952,000 that Congress appropriated to the Department's Higher Education budget account, and a preliminary injunction vacating and setting aside the Notice of Non-Continuation and directing the Department to immediately reconsider its action on the Affected Programs' respective TRIO grants, in accordance with the HEA, Title VI and Title IX, and the applicable Department regulations.

## Count VIII: Ultra vires

278.    COE incorporates the preceding allegations as if set forth fully herein

279.    *Ultra vires* review of the Department's action, which is proper when (1) review is not expressly precluded by statute, (2) there is no alternative procedure for review of the statutory claim and (3) the challenged action is "plainly" in "excess of [the agency's] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022).

280.    If this Court does not grant a preliminary injunction pursuant to COE's APA or standalone Constitutional claims, COE is entitled to a declaration that by sending the Notices of Non-Continuation to the Affected Programs, the Department acted *ultra vires*, in excess of its statutory authorities under the HEA, and a preliminary injunction vacating and setting aside the Notices of Non-Continuation and directing the Department to immediately reconsider its action on the Affected Programs' respective TRIO grants, in accordance with the HEA, Title VI and Title IX, and the applicable Department regulations.

## Count IX: Writ of Mandamus

281.    COE incorporates the preceding allegations as if set forth fully herein

282.    "The peremptory common-law writs are among the most potent weapons in the judicial arsenal." *Will v. United States*, 389 U.S. 90, 107 (1967).

283.    A district court has original jurisdiction in the nature of mandamus only if (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff. *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022); 28 U.S.C. § 1361.

284.    The Department must issue continuation awards to recipients based on performance, and not based on information in recipients' applications (which have already been selected), and not based on new policies or priorities not published in the notices of invitation. The Department cannot retroactively replace priorities in the grant solicitations with new policies and priorities that have not gone through the requisite notice-and-comment rulemaking procedure.

285.    If the Court determines that COE's requested injunction is appropriate, it need not consider this mandamus claim. Otherwise, COE is entitled to a writ of mandamus ordering the Department to vacate and set aside the Notice of Non-Continuation and directing the Department to immediately reconsider its action on the Affected Programs' respective TRIO grants, in accordance with the HEA, Title VI and Title IX, and the applicable Department regulations.

## **PRAYER FOR RELIEF**

286.    COE seeks the following relief:

a.    An order and declaration that the Department's Notices of Non-Continuation to the Affected Programs are in excess of statutory authority and jurisdiction and contrary to law;

b.    An order and declaration that the Department's Notices of Non-Continuation to the Affected Programs are arbitrary and capricious;

c.    An order and declaration that the Department's Notices of Non-Continuation to the Affected Programs are not in observance of procedure required by law;

d.    An order and declaration that the Department's interpretation and application of 34 C.F.R. § 75.253(a)(5) with respect to the Notices of Non-Continuation to the Affected Programs is void for vagueness;

e.    An order and declaration that the Department's interpretation and application of 34 C.F.R. § 75.253(a)(5) with respect to the Notices of Non-Continuation to the Affected Programs violated the Separation of Powers doctrine, the Delegation Doctrine, and the Take Care Clause of the U.S. Constitution;

f.    An order and declaration that the Department's Notices of Non-Continuation to the Affected Members constituted *ultra vires* actions in excess of statutory authority;

g. In the alternative, a writ of mandamus ordering and declaring that the Department's Notices of Non-Continuation to the Affected Members were in violation of the HEA, Title VI and Title IX, and the applicable Department regulations;

h. A preliminary injunction vacating and setting aside the Notices of Non-Continuation to the Affected Programs and directing the Department to immediately reconsider its action on the Affected Programs' respective TRIO grants, in accordance with the HEA, Title VI and Title IX, and the applicable Department regulations;

i. A preliminary injunction directing the Department to take the necessary steps, in accordance with applicable laws and regulations, to award prior experience points to the Affected Programs for future TRIO grant competition cycles, including but not limited to competition cycles in 2026;

j. A preliminary injunction directing the Department to take the necessary steps, in accordance with applicable laws and regulations, to set the minimum award amount for the Affected Members no lower than the Affected Members' awards for their respective TRIO grants in fiscal year 2024, for future TRIO grant competition cycles, including but not limited to competitions cycles in 2026;

k. A preliminary injunction prohibiting the Department in the future from denying or termination federal financial assistance to Plaintiff's Affected Programs without satisfying the requirements under Title VI and Title IX;

l. A preliminary injunction extending the period of availability for fiscal year 2025 funds, beyond September 30, 2025, for any remaining unobligated fiscal year 2025 funds of the $3,080,952,000 that Congress appropriated to the Department's Higher Education budget account, without prior notice and approval from the Court, and further, prohibiting the Department from obligating or spending any such remaining unobligated funds without notice and Court approval, and further, directing that the funds will not be considered lapsed as of October 1, 2025, and further, directing the Department to provide an accounting of all such funds, that have been obligated and unobligated, spent or unspent, and the purposes for which the funds have been obligated and spent;

m. An order awarding COE its attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

n. Any further relief as the Court may deem just and proper.

Dated: September 30, 2025

Respectfully submitted,

**THOMPSON COBURN LLP**

<u>/s/</u> Jayna Marie Rust
Jayna Marie Rust (D.C. Bar No. 998326)
1909 K Street N.W., Suite 600
Washington, D.C. 20006
P.        (202) 585-6929
E.        jrust@thompsoncoburn.com

Brandt P. Hill (*Pro hac vice* forthcoming)
Lorrie L. Hargrove (*Pro hac vice* forthcoming)
2311 Highland Avenue, Suite 330
Birmingham, Alabama 35205
P.        (205) 769-4303
E.        bhill@thompsoncoburn.com
          lhargrove@thompsoncoburn.com

*Attorneys for the Council for Opportunity in Education*