**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **COUNCIL FOR OPPORTUNITY** | ) | |
| **IN EDUCATION**, 1025 Vermont Avenue | ) | |
| NW, Suite 400, Washington, D.C. 20005 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:25-cv-03514 |
| v. | ) | |
| | ) | |
| **U.S. DEPARTMENT OF EDUCATION** | ) | |
| **and LINDA MCMAHON**, 400 Maryland | ) | |
| Avenue SW, Washington, D.C. 20202 | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF COUNCIL FOR OPPORTUNITY IN EDUCATION'S MOTION FOR
PRELIMINARY INJUNCTION WITH MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Council for Opportunity in Education ("**COE**") moves for a preliminary injunction under Federal Rule of Civil Procedure 65 seeking immediate relief due to recent actions of Defendants U.S. Department of Education (the "**Department**" or "**ED**") and Linda McMahon, in her official capacity as Secretary of Education (the "**Secretary**").[1]

All of the elements for injunctive relief are met here. COE is likely to succeed on the merits of its claims under the Administrative Procedure Act because the Department's Notices of Non-Continuation (as defined below) are contrary to law, in excess of statutory authority, without observance of procedure, and arbitrary and capricious. The Notices of Non-Continuation, which discontinued grants to the Affected Programs (as defined below) are unlawful because the Department impermissibly relied on new, proposed policies that did not undergo required notice-and-comment; retroactively applied these policies after admitting that it could only apply them prospectively; penalized Affected Programs for addressing the priorities in the Department's own invitations and for submitting the statutorily-required GEPA Equity Directive (as defined below); failed to comply with strict procedures before denying federal funding based on purported violations of federal civil rights laws; and asserted authority to unilaterally determine the "best interests of the Federal government" in a way that is inconsistent with the regulatory scheme at issue. The Department also violated the prohibition on agency action contrary to the Constitution.

In addition to COE's likelihood of success on the merits, the other two preliminary injunction factors also favor its request. COE and its Affected Members will (1) suffer irreparable injury without an injunction and (2) the injunction will not substantially injure other interested parties and it will further the public interest. The Department, through its unlawful Notices of Non-

---

[1] This Motion and accompanying brief refer to the Department and the Secretary collectively as "the Department" unless specified otherwise.

Continuation, has caused injury of the greatest magnitude. The Affected Programs' TRIO projects are closing, employees are being eliminated, and students are losing resources. The public has an interest in seeing agencies follow the law, and the Department will not be harmed by doing so.

For these reasons, detailed below, the Department has violated numerous laws and regulations. COE therefore requests that the Court enter a preliminary injunction vacating the Notices of Non-Continuation issued to the Affected Programs and direct the Department to reconsider its decisions, following a lawful process under the applicable statutes and regulations.

## <u>TABLE OF CONTENTS</u>

MOTION FOR PRELIMINARY INJUNCTION..................................................................ii

TABLE OF CONTENTS.........................................................................................................i

TABLE OF AUTHORITIES .................................................................................................iv

**INTRODUCTION**............................................................................................................ **1**

**BACKGROUND** ............................................................................................................... **1**

    I.    Legal Background of the federal TRIO programs ........................................... 1

        A.    Congress creates grant programs to support disadvantaged college students ...................................................................................................... 1

        B.    Overview of the TRIO programs ........................................................ 1

        C.    Congressional appropriations for TRIO programs ............................. 3

        D.    Federal laws applicable to TRIO programs ........................................ 4

        E.    The process for evaluating, scoring, and awarding new TRIO grants................... 4

        F.    The Department's process for issuing continuation awards .................... 6

        G.    The procedures the Department must follow before refusing to provide or terminate federal funding based on alleged noncompliance with civil rights laws ............................................................... 8

    II.    Factual Background ....................................................................................... 9

        A.    Between 2020 and 2024, the Department invites applications for new TRIO grants .................................................................................. 9

        B.    The NIAs require applicants to submit a GEPA Equity Directive ...................... 10

        C.    Affected Programs successfully apply for new TRIO grants .............................. 11

        D.    The Trump Administration's new policies and priorities ................................... 12

        E.    The Trump Administration's proposal to eliminate funding for TRIO ............... 13

        F.    The Department issues Notices of Non-Continuation to the Affected Programs ........................................................................................ 14

**ARGUMENT**..................................................................................................... **16**

    I.    COE has demonstrated a substantial likelihood that it has both organizational and associational standing to sue ............................................. 16

        A.    COE has organizational standing to sue ......................................... 16

        B.    COE has associational standing to sue.............................................. 18

    II.    The Court has jurisdiction over COE's claims ............................................. 19

        A.    The APA's waiver of sovereign immunity ...................................... 20

        B.    The Tucker Act does not bar COE from bringing these claims in this Court. ........................................................................................ 20

      1.     *California* and *APHA* are factually distinguishable because they involved grant terminations, not discontinuations ................... 20

      2.     Per *Megapulse*, COE's claim is not "at essence" a contract dispute ............. 22

          a.     COE's claims are founded upon statutes and regulations, not a contract ............................................................................ 22

          b.     COE is seeking specific injunctive relief, not money damages ................ 24

  C.     Title VI's and Title IX's waiver of sovereign immunity ....................................... 26

  D.     The *Larson-Dugan* exception to sovereign immunity ........................................... 27

III.    COE has satisfied all the requirements for the Court to issue a preliminary injunction. .......................................................................................................................... 28

  A.     COE has established a likelihood of success on the merits. ................................. 28

    1.     The APA and final agency action. .................................................................. 28

          a.     Count I: Agency action contrary to law, in excess of statutory authority, and without observance of procedure (Title VI and Title IX) ........................................................... 29

          b.     Count II: Agency action contrary to law, in excess of statutory authority, and without observance of procedure (Notice-and-Comment) ........................................................ 29

          a.     Count III: Arbitrary and capricious agency action ................................... 32

          i.     The Department relied on improper factors in the Notices of Non-Continuation ................................................................................... 32

          ii.     The Notices of Non-Continuation are not reasonably explained ................. 33

          iii.     The Department changed positions without considering reliance interests ................................................................................ 33

          b.     Count IV: Agency interpretation and application of 34 C.F.R. § 253(a)(5) in excess of statutory jurisdiction and authorization..... 35

          c.     Counts VI – VII: Violations of constitutional rights ............................... 38

    2.     Count VIII: *Ultra vires* ................................................................................ 39

    3.     Count IX: Writ of mandamus under 28 U.S.C. § 1361............................... 39

  B.     COE and Affected Programs will suffer irreparable harm without an injunction ......................................................................................................................... 40

    1.     Harm to COE ................................................................................................ 40

    2.     Harm to Affected Programs ......................................................................... 41

    3.     Harm to Students.......................................................................................... 42

    4.     Harm to Affected Programs in future grant competitions ............................. 43

    5.     No harm to the Department........................................................................... 45

  C.     The balance of equities favors COE. ................................................................... 45

D.    No bond should be required. ................................................................ 45

**CONCLUSION** ................................................................................................. **45**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014)......................................................................27

*Abigail All. for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129 (D.C.
    Cir. 2006) ........................................................................................................................16

*Adams v. Bell*, 711 F.2d 161 (D.C. Cir. 1983) .............................................................................26

*AFL-CIO v. Chao*, 496 F. Supp. 2d 76 (D.D.C. 2007) .................................................................30

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615 (D.C. Cir. 2020) ...................16

*Am. Assoc. of Physc. Teachers v. Nat'l Sci. Found.*, 2025 WL 2615054 (D.D.C.
    2025) ...............................................................................................................................43

*Bennett v. Spear*, 520 U.S. 154 (1997) .......................................................................................28

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)............................................................................25

*Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716 (D.C. Cir. 2022) ...................................38

*Chicago Women in Trades v. Trump*, 778 F. Supp. 3d. 959 (N.D. Ill. 2025)...............................38

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ...................................37

*City of Houston v. HUD*, 24 F.3d 1421 (D.C. Cir. 1994) .......................................................3, 38

*Climate United Fund v. Citibank, N.A.*, No. 25-5122, 2025 WL 2502881 (D.C.
    Cir. Sept. 2, 2025) ...........................................................................................................37

*Clinton v. City of New York*, 524 U.S. 417 (1998)........................................................................37

*Colwell v. Dep't of HHS*, 558 F.3d 1112 (9th Cir. 2009) ............................................................26

*Com. of Pa. v. Weinberger*, 367 F.Supp. 1378 (D.D.C. 1973) ....................................................38

*Commc'ns & Control v. FCC*, 374 F.3d 1329 (D.C. Cir. 2004)...................................................33

*Cox v. Kijakazi*, 77 F.4th 983 (D.C. Cir. 2023) ..........................................................................30

*Crowley Gov't Servs. v. GSA*, 38 F.4th 1099 (D.C. Cir. 2022) ...................................19, 20, 22, 24

*Dalton v. Specter*, 511 U.S. 462 (1994).......................................................................................37

*Dep't of Com. v. New York,* 588 U.S. 752 (2019)....................................................18, 32

*Dep't of Educ. v. California*, 604 U.S. 650 (2025).....................................................20, 21

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ................................31

*Dugan v. Rank,* 372 U.S. 609 (1963) ......................................................................27

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n*, 878 F.3d 371 (D.C. Cir. 2017) ........................................................................16

*Elev8 Baltimore v. Corp. for Nat'l & Cmty.*, No. 25-cv-1458, 2025 WL 1865971 (D. Md. July 7, 2025)..............................................................29

*FCC v. Fox Television Stations*, 556 U.S. 502 (2009)..................................................33

*FCC v. Fox Television Stations*, 567 U.S. 239 (2012)..................................................37

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)..............................................32, 33

*FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367 (2024)..................................................16, 18

*FDA v. Wages & White Lion Invs.*, 145 S. Ct. 898 (2025) .............................................32

*Global Health Council v. Trump*, No. 25-5097, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025) .............................................................37, 43

*Goodluck v. Biden*, 104 F.4th 920 (D.C. Cir. 2024) ......................................................3

*Harris Cnty. v. Kennedy*, 1:25-cv-1275-CRC, 2025 WL 1707665 (D.D.C. June 17, 2025) ..............................................................19

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ..............................................16, 17

*Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647 (D. Md. 2018).....................................36, 37

*Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333 (1977) ..............................18

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013).......................................................37

*In re Nat'l Nurses United*, 47 F.4th 746 (D.C. Cir. 2022) .............................................39

*Int'l Union, United Auto., Aerospace & Agr. v. Brock*, 477 U.S. 274 (1986) ..............................19

*John T. v. Delaware Cnty. Intermediate Unit*, No. 98-cv-5781, 2000 WL 558582 (E.D. Pa. May 8, 2000) ..............................................................40

*Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020)........................................................44

*Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682 (1949).................................27

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)....................44

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ............................................28

*Martin Luther King, Jr. Cnty. v. Turner*, 2025 WL 2322763 (W.D. Wash. 2025).......................30

*Megapulse v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ..............................................20, 22

*Michigan v. EPA*, 268 F.3d 1075 (D.C. Cir. 2001)..................................................29

*Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .....................32

*N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62 (1st Cir. 2018)..................................................29

*Nat. Res. Def. Council v. EPA*, 464 F.3d 1 (D.C. Cir. 2006)........................................23

*Nat'l HEP–CAMP Ass'n v. U.S. Dep't of Educ.*, No. 1:25-cv-2730 (CJN) (D.D.C) ...................24

*Nat'l Treasury Emps. Union v. Vought*, No. 25-5091, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) ...........................................................................37

*New York v. McMahon*, 2025 WL 1463009 (D. Mass. 2025) ........................................42

*New York v. McMahon*, 784 F. Supp. 3d. 311 (D. Mass. 2025) ....................................40

*NIH v. Am. Pub. Health Ass'n ("APHA")*, 145 S. Ct. 2658 (2025) ...........................20, 21, 22, 26

*Pa. Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785 (2001) ...............................23

*Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of HHS*, 328 F. Supp. 3d 1133 (E.D. Wash. 2018) ............................................................35

*Pollack v. Hogan*, 703 F.3d 117 (D.C. Cir. 2012) ..................................................27

*President & Fellows of Harvard Coll. v. U.S. Dep't of HHS*, No. 25-CV-10910, 2025 WL 2528380 (D. Mass. Sept. 3, 2025) ............................................26, 27, 42

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 1:25-cv-306-RDM, 2025 WL 1825431 (D.D.C. July 2, 2025)....................................................16

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002) ................................................18

*U.S. Dep't of Educ. v. Am. Ass'n of Colls. for Teacher Educ.*, No. 25-1281, 2025 WL 2376288 (Aug. 6, 2025)......................................................30

*United Food & Commercial Workers Union v. Brown Grp.*, 517 U.S. 544 (1996) .....................18

*United States v. Alford*, 89 F.4th 943 (D.C. Cir. 2024) .......................................................36

*Will v. United States*, 389 U.S. 90 (1967)...........................................................................38

*Wis. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) .......................................................39

**Statutes and Constitutional Provisions**

5 U.S.C. § 553 .................................................................................................................5, 29

5 U.S.C. § 706(2) ...................................................................................................................28

20 U.S.C. § 1070(b) .................................................................................................................2

20 U.S.C. § 1070a-11 .................................................................................................... *passim*

20 U.S.C. § 1070a-13 .............................................................................................................37

20 U.S.C. § 1070a-14 .............................................................................................................37

20 U.S.C. § 1070a-16 .............................................................................................................37

20 U.S.C. § 1221(b)(1) & (c)(1) .............................................................................................4

20 U.S.C. § 1221e-3 ...............................................................................................................34

20 U.S.C. § 1221e-4 .....................................................................................................5, 29, 31

20 U.S.C. § 1228a .......................................................................................................4, 10, 33

20 U.S.C. § 1232(a)(2), (d) .........................................................................................5, 29, 31

20 U.S.C. § 1681 ..................................................................................................................4, 8

20 U.S.C. § 1682 ......................................................................................................................8

20 U.S.C. § 1683 ...........................................................................................................8, 26, 27

20 U.S.C. § 3474 .....................................................................................................................34

28 U.S.C. § 1361 .....................................................................................................................38

29 U.S.C. § 794a(a)(2) .............................................................................................................8

42 U.S.C. § 2000d................................................................................................................ *passim*

42 U.S.C. § 6102 ......................................................................................................................8

Economic Opportunity Act of 1964, Pub. L. No. 88-452, § 2, 78 Stat. 508, 508...........................1

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9 (2025) ....................................................................................................3

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. d, tit. III, 138 Stat. 460, 689 (2024) ..................................................................................3

General Education Provisions Act ......................................................................................4

Higher Education Act of 1965, Pub. L. No. 89-329, § 408, 79 Stat. 1235–36 ...........1, 2

Pub. L. No. 90-575, § 105(a), 82 Stat. 1014, 1018 ..........................................................1

Pub. L. No. 99-498, § 401(a), 100 Stat. 1268, 1339 ........................................................1

Section 504 of the Rehabilitation Act of 1973 and the Age Discrimination Act of 1975 ...............................................................................................................................8

U.S. Const. art. II, § 3, cl. 5 ...........................................................................................37

United States Constitution ..............................................................................................37

**Rules**

Federal Rule of Civil Procedure 65(c) ...........................................................................44

**Other Authorities**

2 C.F.R. Part 200 .......................................................................................................7, 36

2 C.F.R. § 200.342 ...........................................................................................................7

34 C.F.R. § 75.253 .........................................................................................................23

34 C.F.R § 100.10 ..........................................................................................................29

34 C.F.R. Part 75 .............................................................................................................4

34 C.F.R. Part 100 ...........................................................................................................8

34 C.F.R. § 75.105(b)(1)–(2) ...........................................................................................4

34 C.F.R. § 75.105(c)(1)-(3) .............................................................................................4

34 C.F.R. § 75.118 ......................................................................................................7, 36

34 C.F.R. § 75.200 ...........................................................................................................5

34 C.F.R. § 75.251(a) .......................................................................................................6

34 C.F.R. § 75.253 ........................................................................ *passim*

34 C.F.R. § 75.500(a) ................................................................... 4, 8

34 C.F.R. § 100.6 ............................................................................ 29

34 C.F.R. § 100.8(c) ....................................................................... 29

34 C.F.R. § 100.9(b) ....................................................................... 29

34 C.F.R. § 106.81 ....................................................................... 8, 9

34 C.F.R. § 643.20(a)(2) ................................................................ 43

34 C.F.R. § 645 ................................................................................ 2

34 C.F.R. § 645.10(a) ...................................................................... 2

34 C.F.R. § 646.22(e)(1)–(5) .......................................................... 5

34 C.F.R. § 646.24(c) ...................................................................... 5

59 Fed. Reg. 30,258 (June 10, 1994) ............................................. 7

85 Fed. Reg. 84,324 (Dec. 28, 2020) ............................................. 9

86 Fed. Reg. 2,658 (Jan. 13, 2021) ................................................ 9

86 Fed. Reg. 70,612 (Dec. 10, 2021) ..................................... 9, 10, 34

86 Fed. Reg. 71,460 (Dec. 16, 2021) ............................................. 9

87 Fed. Reg. 13,280 (Mar. 9, 2022) ............................................... 9

87 Fed. Reg. 23,170 (Apr. 19, 2022) ............................................. 9

87 Fed. Reg. 24,537 (Apr. 26, 2022) ............................................. 9

87 Fed. Reg. 47,733 (Aug. 4, 2022) ............................................. 11

89 Fed. Reg. 12,325 (Feb. 16, 2024) ............................................. 9

89 Fed. Reg. 35,080 (May 1, 2024) ............................................... 9

89 Fed. Reg. 70,300 (Aug. 29, 2024) ...................................... 7, 36

90 Fed. Reg. 8,339 (Jan. 20, 2025) .............................................. 12

90 Fed. Reg. 8,633 (Jan. 11, 2025) .............................................. 12

90 Fed. Reg. 21,710 (May 21, 2025) ............................................................................12, 13

90 Fed. Reg. 43,514 (Sept. 9, 2025) ...................................................................................13

COE, TRIO Fast Facts ...........................................................................................................3

Discretionary Grantmaking at ED, ........................................................................................6

Exec. Order No. 14242, *Improving Education Outcomes by Empowering Parents, States, and Communities* (Mar. 20, 2025) EO 14242 ............................................12

*Trump Administration After Rejecting Demands*, CNBC (Apr. 15, 2025), https://www.cnbc.com/2025/04/14/trump-harvard-deal-funding-billion-dei.html ....................................................................................................................26

## INTRODUCTION

The U.S. Department of Education has taken aim at 60-year-old TRIO grant programs designed to help low-income, first-generation college students that are so frequently left behind. The Department elected to not continue dozens of grants previously awarded to COE members (the "**Affected Programs**") that were not scheduled to expire until 2026 or later. It did so with no regard for Congress's intent that these highly successful grant programs continue, for the grantees' reliance interests, or for the real-world consequences its actions have. COE therefore seeks immediate relief on behalf of itself and its Affected Programs.

## BACKGROUND

### I.     Legal Background of the federal TRIO programs

#### A.     Congress creates grant programs to support disadvantaged college students

In the wake of the War on Poverty, the federal government established a number of safety-net programs across all sectors to support poor communities across America. *See* ECF No. 1, ¶¶ 14–46. Among them were a "trio" of education programs designed to help students from low-income families pursue a college degree. Congress authorized the first two programs, Upward Bound and Talent Search, in 1964 and 1965, respectively,[2] and the program that is known today as Student Support Services a few years later.[3] This group of three programs eventually expanded to eight, but the "TRIO" name stuck. *See* 20 U.S.C. §§ 1070a-11 – 18. All TRIO programs share a common goal: to help disadvantaged students prepare for and graduate from college.

#### B.     Overview of the TRIO programs

All TRIO programs are at issue in this case: Upward Bound ("UB"), Upward Bound Math-

---

[2] *See* Economic Opportunity Act of 1964, Pub. L. No. 88-452, § 2, 78 Stat. 508, 508 (creating Upward Bound); Higher Education Act of 1965, Pub. L. No. 89-329, § 408, 79 Stat. 1235–36 (creating Talent Search).

[3] *See* Education Amendments of 1968, Pub. L. No. 90-575, § 105(a), 82 Stat. 1014, 1018; Higher Education Amendments of 1986, Pub. L. No. 99-498, § 401(a), 100 Stat. 1268, 1339.

Science ("UBMS"), Veterans Upward Bound ("VUB"), Educational Opportunity Centers ("EOC"), Talent Search ("TS"), Student Support Services ("SSS"), Ronald E. McNair Postbaccalaureate Achievement ("McNair"), and Training Program for Federal TRIO Programs Staff ("Staff Training"). All are authorized under Title IV, Part A of the HEA. *See* 20 U.S.C. § 1070a-11 (TRIO authority); *see id.* §§ 1070a-12 to 1070a-18. And all have program-specific regulations. 34 C.F.R. §§ 645 (UB, VUB, UBMS); 643 (TS); 646 (SSS); 647 (McNair); 644 (EOC); and 642 (Staff Training).

The Department is *required* to carry out the TRIO programs. It has *no* discretion to get rid of them. Congress directed that:

> The Secretary *shall* . . . carry out a program of making grants and contracts designed to identify qualified individuals from disadvantaged backgrounds, to prepare them for a program of postsecondary education, to provide support services for such students who are pursuing programs of postsecondary education, to motivate and prepare students for doctoral programs, and to train individuals serving or preparing for service in programs and projects so designed.

20 U.S.C. § 1070a-11(a) (emphasis added); *see also* 20 U.S.C. § 1070(b).

Each TRIO program serves a different demographic. UB serves high school students, providing intensive preparation services to pursue postsecondary education. *See* 34 C.F.R. § 645.10(a). UBMS helps those high school students who want to study math and science in college. *Id.* § 645.10(b). VUB assists military veterans in preparing for postsecondary education. *Id.* § 645.10(c). TS mainly serves students and out-of-school youth to support high school completion and postsecondary enrollment. *Id.* § 643.3. EOC primarily serves adults in need of assistance with secondary school completion and pursuing postsecondary education. *Id.* § 644.3. SSS helps existing college students complete their undergraduate education. *Id.* § 646.3. McNair prepares undergraduate students for doctoral study. *Id.* § 647.3. Finally, Staff Training provides training to TRIO project staff to be more effective. *Id.* § 642.3.

The national network of TRIO programs is the largest federal infrastructure serving the expansion of educational opportunities for low-income, first-generation college students. Every year, around 3,400 TRIO projects, located at over 1,000 colleges, universities, community-based agencies and other organizations across all 50 states, plus Washington D.C., Puerto Rico, and the Pacific Islands, operate today, serve approximately 900,000 students. *See* ED, TRIO Footprint in 2023-24[4]; ED, Fiscal Year 2026 Budget Request, at 85 ("**FY 2026 Budget Request**").[5]

The TRIO programs work. TRIO participants consistently achieve higher rates of high school graduation, college enrollment, retention, and degree attainment compared to peers from similar backgrounds who do not receive TRIO services.[6]

## C.    Congressional appropriations for TRIO programs

TRIO programs today are funded in annual discretionary spending bills. For fiscal year 2024, Congress appropriated at least $1.19 billion to TRIO programs.[7] For fiscal year 2025, Congress passed, and President Trump signed, a continuing resolution in March 2025 that level funded TRIO.[8] The last day of the 2025 fiscal year is today—Tuesday, September 30, 2025.[9]

---

[4] *Available at* https://ope.ed.gov/programs/mapED/storymaps/trio/. All hyperlinks cited throughout this brief were last accessed on September 29, 2025.

[5] *Available at* https://ed.gov/media/document/fy-2026-congressional-justification-higher-education-110154.pdf.

[6] Adam K. Edgerton, Congr. Rsch. Serv., R42724, *The TRIO Programs: A Primer* (updated January 6, 2025); *see also* COE, TRIO Fast Facts, *available at* https://coenet.org/wp-content/uploads/2025/09/TRIO_Fast_Facts-Research-Brief_v7.pdf.

[7] Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. d, tit. III, 138 Stat. 460, 689 (2024) ("**2024 Appropriations Act**").

[8] *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9 (2025) ("**2025 CR**").

[9] It is unknown whether the Department has obligated the full amount of fiscal year 2025 funds that Congress appropriated to the Higher Education account or whether any funds remain. In any event, although a new federal fiscal year starts on October 1, any funds that Congress appropriated for fiscal year 2025 that the Department has not obligated and spent will not lapse and will remain available for obligation until this case is resolved. *See Goodluck v. Biden*, 104 F.4th 920, 927–28 (D.C. Cir. 2024) ("[I]n the appropriations context, Congress has expressly authorized courts to suspend the lapse of budget authority while lawsuits play out." (quoting 31 U.S.C. § 1502(b)); *id.* ("We have held that a court may 'award funds based on an appropriation even after the date when the appropriation lapses, so long as the lawsuit was instituted on or before that date.'" (quoting *City of Houston v. HUD*, 24 F.3d 1421, 1426 (D.C. Cir. 1994) (cleaned up)); *City of Houston*, 24 F.3d at 1427 ("[T]o avoid having its case mooted, a plaintiff must both

D.    **Federal laws applicable to TRIO programs**

Several federal laws applicable to TRIO programs are important here. The TRIO programs are an "applicable program of the Department" under the General Education Provisions Act ("**GEPA**"), for which the Department has "administrative responsibility." *See* 20 U.S.C. § 1221(b)(1) & (c)(1). All TRIO grant applicants must satisfy GEPA's requirement to address in their applications "equitable access" and "equitable participation" by students in their proposed projects who face "barriers based on gender, race, color, national origin, disability, and age." *Id.* § 1228a(b).

Title VI and Title IX also apply to TRIO. For any program receiving federal funds, Title VI prohibits discrimination on the basis of race, color, or national origin, and Title IX prohibits discrimination based on sex. *See* 42 U.S.C. § 2000d; 20 U.S.C. § 1681. All applicants are required to provide assurances that they will comply with Titles VI and IX. *See* 34 C.F.R. § 75.500(a).

E.    **The process for evaluating, scoring, and awarding new TRIO grants**

The grantmaking process for TRIO programs begins when the Department announces a "competition" for a new grant by publishing in the Federal Register a notice of invitation to apply for the grant. 34 C.F.R. § 75.105(b)(1)–(2). The notice describes the "selection criteria" and "priorities" that applicants will be evaluated and scored against. "Selection criteria" are based on the authorizing statutes, program-specific regulations, and the Department's discretionary grantmaking regulations. *See* 20 U.S.C. § 1070a-11; 34 C.F.R. Part 75. "Priorities" are based on the Department's objectives and goals for the TRIO program. There are three types of "priorities"; relevant here are "competitive preference" priorities. 34 C.F.R. § 75.105(c)(1)-(3). Applicants are encouraged, but not required, to address competitive-preference priorities in their applications. *Id.*

---

file its suit before the relevant appropriation lapses *and* seek a preliminary injunction preventing the agency from disbursing those funds.") (emphasis in original).

§ 75.105(c)(2)(ii). Applicants successfully addressing them, however, receive "additional" points, giving them a "competitive" advantage over those that do not. *Id.* GEPA requires all selection criteria and priorities first undergo APA notice-and-comment rulemaking. *See* 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d); 5 U.S.C. § 553.

Upon receiving applications, the Department relies on at least three peer reviewers to evaluate applications against the selection criteria and priorities and awards points based on how well applicants address them. *See* 20 U.S.C. § 1070a-11(c)(3)–(4). Peer reviewers "are not employees of the Federal Government." *Id.* § 1070a-11(c)(4)(B). Peer reviewers' scores are combined and averaged. *See* 34 C.F.R. § 75.200; *id.* § 217.

Then, "the Secretary shall consider each applicant's prior experience of high quality service delivery . . . under the particular program for which funds are sought." 20 U.S.C. § 1070a-11(c)(2). "Prior experience" points are available only for those applicants with an existing project for the same type of TRIO grant they are applying for. Prior experience considers whether the existing project met or exceeded its objectives for each of the three years designated in the notice; the Secretary awards points for each such year and averages them. *See id.* § 1070a-11(f)(1)–(3); 34 C.F.R. § 646.22(e)(1)–(5). The Secretary "adjust[s]" the peer reviewers' averaged score by adding any prior experience points. This number is the applicant's final score.

Applicants are ranked by final score, and the Secretary "shall award" new grants "in th[at] order." 20 U.S.C. § 1070a-11(c)(3). Final scores must be "determined in an accurate and transparent manner." *Id.* § 1070a-11(g). After notifying a first "slate" of successful applicants, the Secretary notifies unsuccessful applicants who are eligible to request "secondary review." *Id.* § 1070a-11(8)(C)(i). The Department "sets aside" funds for a second slate of grantees successful on secondary review. *Id.*; 20 U.S.C. § 1070a-11(c)(8)(C)(iv)(V)(aa)–(bb); 34 C.F.R. § 646.24(c).

**F.      The Department's process for issuing continuation awards**

TRIO grants are awarded for two-year (Staff Training) or five-year (all other TRIO programs) periods (the "project period"). The Department obligates and disburses funds to recipients in 12-month "budget periods." 34 C.F.R. § 75.251(a) (when ED makes a "multiyear grant award," it "approves a budget period of not more than 12 months"). "The grant obligates both the Federal Government and the grantee to the requirements that apply to the grant." *Id*. § 75.236.

When awarding a new grant, the Secretary also "[i]ndicates his or her intention to make continuation awards to fund the remainder of the project period." *Id.* § 75.251(b). Unlike when applying for a new grant, "[a] grantee does not have to compete with other applicants to receive" a continuation award."[10] However, grantees must meet performance and other requirements to receive a continuation award. Specifically, per 34 C.F.R. § 75.253(a), a recipient must:

(1) Either—

    (i) Demonstrate that it has made substantial progress in achieving—

        (A) The goals and objectives of the project; and

        (B) The performance targets in the grantee's approved application, if the Secretary established performance measurement requirements for the grant in the application notice; or

    (ii) Obtain the Secretary's approval for changes to the project that—

        (A) Do not increase the amount of funds obligated to the project by the Secretary; and

        (B) Enable the grantee to achieve the goals and objectives of the project and meet the performance targets of the project, if any, without changing the scope or objectives of the project;

(2) Submit all reports as required by § 75.118;

(3) Continue to meet all applicable eligibility requirements of the grant program;

(4) Maintain financial and administrative management systems that meet the requirements in 2 CFR 200.302 and 200.303; and

---

[10] *See* Discretionary Grantmaking at ED, at 50, available at https://ed.gov/sites/ed/files/2021/07/grantmaking421.pdf.

- 6 -

(5) Receive a determination from the Secretary that continuation of the project is in the best interest of the Federal Government.[11]

In deciding if a grantee meets these requirements, the Secretary considers "information regarding grantee performance," including "reports required by § 75.118[[12]], performance measures established under § 75.110, financial information required by 2 CFR part 200, and any other relevant information." 34 C.F.R. § 75.253(b). Provided the requirements for a continuation award are met, "[t]he Secretary makes the award under §§ 75.231 through 75.236; and (2) The new budget period begins on the day after the previous budget period ends." 34 C.F.R. § 75.253(d).

"The Secretary may decide not to make a continuation award if . . . (1) A grantee fails to meet any of the requirements in paragraph (a) of this section." *Id.* § 75.253(f). If the Secretary "decides not to make a continuation award . . . the Secretary will notify the grantee of that decision, the grounds on which it is based, and, consistent with 2 C.F.R. § 200.342, provide the grantee with an opportunity to request reconsideration of the decision." 34 C.F.R. § 75.253(g).[13] However, the Department—prior to January 2025—rarely decided to *not* issue a continuation award. *See* Education Department General Administrative Regulations and Related Regulatory Provisions, 89 Fed. Reg. 70,300, at 70,316 (Aug. 29, 2024) ("In general, we do not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance"); Direct Grant Programs; Final Rule, 59 Fed. Reg. 30,258, at 30,259 (June 10, 1994) (cut-off in continuation award funding is "extremely rare in practice").

---

[11] An earlier version of 34 C.F.R. § 75.253(a) had the "best interest of the Federal Government" requirement in § 75.253(a)(4) and stated that "The Secretary may make a continuation award for a budget period after the first budget period of an approved multi-year project if . . . [c]ontinuation of the project is in the best interest of the Federal Government."

[12] Recipients specifically must submit an Annual Performance Report ("APR") after the prior budget period that details their project activities, participants, and spending during that budget period. *See* 34 C.F.R. § 75.118.

[13] The Department does not maintain a deadline in its regulations or guidance for acting on requests for reconsideration.

**G.      The procedures the Department must follow before refusing to provide or terminate federal funding based on alleged noncompliance with civil rights laws**

As noted above, applicants for and recipients of TRIO grants and all entities seeking or receiving federal financial assistance are subject to federal civil rights laws, including (but not limited to) laws prohibiting discrimination based on race, color, and national origin (Title VI) and on sex (Title IX). *See* 42 U.S.C. § 2000d-1; 20 U.S.C. § 1681.[14] Under these laws, an agency may refuse to continue grants based on civil rights violations, but only after certain statutorily-required procedures are followed.

Specifically, no agency action refusing to provide (or terminate) funding "shall be taken until" the agency "has advised" the applicant or recipient "of the failure to comply" with the pertinent law or "has determined that compliance cannot be secured by voluntary means." 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682. If the agency cannot secure voluntary compliance, then it may refuse to provide (or terminate) funding, but that action requires "an express finding on the record, after opportunity for hearing, of a failure to comply." 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682. In addition, the agency "shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action." 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682. Any action refusing to provide (or terminating) financial assistance does not "become effective until thirty days have elapsed after the filing of such report." 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682.

The Department did not follow any of these procedures in discontinuing the Affected Programs' grants based on purported Title VI and Title IX violations. Titles VI and IX provide for federal district court of agency decisions "refusing to grant . . . financial assistance upon a finding

---

[14] Applicants and recipients must also comply with Section 504 of the Rehabilitation Act of 1973 and the Age Discrimination Act of 1975. *See* 34 C.F.R. § 75.500(a). Both laws require an agency seeking to end federal funding to first seek voluntary compliance. *See* 42 U.S.C. § 6102; 29 U.S.C. § 794a(a)(2).

of failure to comply" under the APA. 42 U.S.C. § 2000d-2; 20 U.S.C. § 1683. These statutory requirements are mirrored in the Department's regulations. 34 C.F.R. § 75.500(a); 34 C.F.R. Part 100; 34 C.F.R. § 106.81.

## II.     Factual Background

### A.     Between 2020 and 2024, the Department invites applications for new TRIO grants

Annually between 2020 and 2024, the Department issued notices inviting applications for new grants for the individual TRIO programs ("**NIAs**").[15] The NIAs described the selection criteria and competitive preference priorities that the Department would use to evaluate and score applications and ultimately award new grants. *Id.* The NIAs expressly incorporated several "competitive preference" priorities that the Department previously established in 2021 through notice-and-comment rulemaking. *See* Final Priorities and Definitions, 86 Fed. Reg. 70,612 (Dec. 10, 2021) ("**2021 Final Priorities**").[16]

The 2021 Final Priorities established six priorities, with several expressing the Department's preference for awarding grants that would inure to the benefit of "underserved students." For example, the priority titled "Meeting Student Social, Emotional, and Academic Needs" asks how projects would meet the social, emotional, and academic needs of students, including underserved students, and including inclusivity with respect to race. 2021 Final Priorities, 86 Fed. Reg. at 70,638. A second priority, titled "Increasing Postsecondary Education Access, Affordability, Completion, and Post-Enrollment Success" asks how projects would

---

[15] *See* 86 Fed. Reg. 71,460 (Dec. 16, 2021) ("Upward Bound NIA"); 87 Fed. Reg. 24,537 (Apr. 26, 2022) ("Veterans Upward Bound NIA"); 87 Fed. Reg. 23,170 (Apr. 19, 2022) ("Upward Bound MS NIA"); 89 Fed. Reg. 35,080 (May 1, 2024) ("Student Support Services NIA"); 87 Fed. Reg. 13,280 (Mar. 9, 2022) ("McNair NIA"); 89 Fed. Reg. 12,325 (Feb. 16, 2024) ("Staff Training NIA").

[16] The Department published the NIAs for Talent Search and EOC grant competitions during the final days of the first Trump Administration, so they do not incorporate any competitive preference priorities from the 2021 Final Priorities. *See* 85 Fed. Reg. 84,324 (Dec. 28, 2020) ("Talent Search NIA"); 86 Fed. Reg. 2,658 (Jan. 13, 2021) ("EIC NIA").

increase postsecondary access, affordability, completion, and success for underserved students. *Id.* at 70,629. A third, titled "Strengthening Cross-Agency Coordination and Community Engagement to Advance Systemic Change," asks how projects "take a systemic evidence-based approach to improving outcomes for underserved students." *Id.* at 70,633. The fourth, titled "Promoting Equity in Student Access to Educational Resources and Opportunities," asks whether a project promotes educational equity and opportunity for underserved students or examines the sources of inequity in education and implements responses. *Id.* at 70,636.

The Department's 2021 Final Priorities defined "underserved student" to include "[a] student of color" and "[a] lesbian, gay, bisexual, transgender, queer or questioning, or intersex (LGBTQI+) student." 2021 Final Priorities, 86 Fed. Reg. at 70,639–70,640.

The NIAs expressly incorporated one or more of these four priorities concerning "underserved students," and told applicants that the Department would use them as "competitive preference" priorities when evaluating and scoring their applications. Each such priority was assigned a maximum number of points that, if successfully addressed, would contribute to an applicant's final score.

**B.      The NIAs require applicants to submit a GEPA Equity Directive**

The NIAs and the accompanying application packages ED issued required applicants to address the GEPA Equity Directive. 20 U.S.C. § 1228a require that all grant applicants:

> develop and describe . . . the steps such applicant proposes to take to ensure equitable access to, and equitable participation in, the project or activity to be conducted with such assistance, by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age.

20 U.S.C. § 1228a(b).

In response to President Biden's January 25, 2021 EO 13985, Advancing Racial Equity

and Support for Underserved Communities Through the Federal Government, the Department proposed changing this form to its current four-question format. *See* Agency Information Collection Activities; Comment Request; GEPA Section 427 Guidance for All Grant Applications, 87 Fed. Reg. 47,733 (Aug. 4, 2022). The current GEPA Equity Directive form asks: (1) "Describe how your entity's existing mission, policies, or commitments ensure equitable access to, and equitable participation in, the proposed project or activity"; (2) "Based on your proposed project or activity, what barriers may impede equitable access and participation of students, educators, or other beneficiaries?" (3) "Based on the barriers identified, what steps will you take to address such barriers to equitable access and participation in the proposed project or activity?" and (4) "What is your timeline, including targeted milestones, for addressing these identified barriers?" ED, GEPA Section 427 Form.[17]

### C.    Affected Programs successfully apply for new TRIO grants

The Affected Programs timely applied for new TRIO grants. All their applications addressed the selection criteria, contained the mandatory GEPA Equity Directive, and many addressed the competitive preference priorities. Their applications, as required, also assured their compliance with Titles VI and IX. Between 2021 and 2024, the Department awarded the Affected Programs new TRIO grants. These facts are set forth in declarations by several Affected Programs, which include (but are not limited to) the following declarants: Augsburg University, Marquette University, Suffolk University, South Seattle College, The Research Foundation for SUNY ("SUNY-Plattsburgh"), and University of New Hampshire ("UNH").[18]

---

[17] *Available at* https://sites.ed.gov/idea/files/Grants-Part-C-GEPA-Section-427-Form.pdf.

[18] *See* Declaration of Augsburg University ¶¶12-15 ("**Augsburg Decl**."), attached as Ex. 2; Dr. Marcus Arrington ¶¶12-15 ("**Marquette Decl**."), attached as Ex. 3; Declaration of Abraham Peña ¶¶14-17 ("**Suffolk Decl**."), attached as Ex. 4; Declaration of South Seattle College ¶¶12-21 ("**S. Seattle Decl**."), attached as Ex. 5; Declaration of Brian Post ¶¶12-14 ("**SUNY-Plattsburgh Decl**."), attached as Ex. 6; Declaration of Rebecca Barbour ¶¶12-15 ("**UNH-**

As those declarations detail, the Affected Programs satisfied the performance and other requirements to obtain continuation awards in subsequent budget years. Before this year, they all received continuation awards, which all contain the same substantive terms, differing only in the identity of the recipient, type of TRIO grant, award amount, and project and budget periods.[19] All their project periods were not scheduled to expire until 2026 or later.

### D.    The Trump Administration's new policies and priorities

President Trump assumed office on January 20, 2025 and immediately directed federal agencies to eliminate DEI practices and initiatives from all aspects of the federal government. *See* Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8,633 (Jan. 21, 2025) ("**EO 14173**"); Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8,339 (Jan. 20, 2025) ("**EO 14151**") (EO 14173 & EO 14151 collectively, the "**DEI Executive Orders**").

EO 14173 "directs" the U.S. Office of Management and Budget ("**OMB**") to "[e]xcise references to DEI and DEIA principles under whatever name they may appear," including in federal grants. 90 Fed. Reg. at 8,634. EO 14151 instructs "each agency" to identify "[f]ederal grantees who received [f]ederal funding to provide or advance DEI . . . programs, services, or activities since January 20, 2021." 90 Fed. Reg. at 8,339–40. EO 14151 further directs agencies to assess the impact and cost of those grants and to "terminate . . . all . . . 'equity-related' grants." *Id*.

President Trump also announced plans to shutter the Department itself. *See* Exec. Order No. 14242, *Improving Education Outcomes by Empowering Parents, States, and Communities* (Mar. 20, 2025) ("**EO 14242**"). EO 14242 directed the Secretary to "take all necessary steps to

---

**McNair Decl**."), attached as Ex. 7; Declaration of Melissa Goyait-Heikkinen ¶¶12-15 ("**UNH-TS Decl**."), attached as Ex. 8.

[19] *See* Augsburg Decl. ¶¶15-20; Marquette Decl. ¶¶19-22; Suffolk Decl. ¶¶21-25; S. Seattle Decl. ¶¶14-19; SUNY-Plattsburgh Decl. ¶¶ 16-20; UNH-McNair Decl. ¶¶15-22; UNH-TS Decl. ¶¶16-23.

facilitate the closure of the Department" and to "return authority over education to the States and local communities while ensuring the effective and uninterrupted delivery of services, programs, and benefits on which Americans rely." *Id.*

As part of the Administration's plan to reduce funding on federal grant programs out of line with its "core mission," the Department in May 2025 announced proposed priorities and definitions for use in grantmaking. *See* 90 Fed. Reg. 21,710 (May 21, 2025) ("**2025 Proposed Priorities**"). The 2025 Proposed Priorities *themselves* are not relevant to this case. But they are relevant because they were "intended to replace the [2021 Final Priorities]." *Id.* Notably, the Department said that the proposed "replace[ment]" of the 2021 Final Priorities would apply *prospectively*, explaining that "those [2021 Final Priorities] ***remain in effect*** for notices inviting applications (NIAs) published before the U.S. Department of Education (Department) finalizes the proposed priorities in this document." *Id.* (emphasis added). But prospective application is not what the Department did here.

The Department finalized the new priorities and definitions and published them in the Federal Register on September 9, 2025. Final Priorities and Definitions, 90 Fed. Reg. 43,514 (Sept. 9, 2025) ("**2025 Final Priorities**").

In addressing the planned rescindment of the 2021 Final Priorities, the Department stated:

> These priorities do not change the enforcement of Federal civil rights laws. Rather, it is necessary to repeal the 2021 priorities because they encourage recipients to violate Federal civil rights law—particularly Title VI of the Civil Rights Act of 1964—by using race-based preferences and stereotypes, and racial exclusion in their programs and to use Federal funds to promote or endorse gender ideology and political activism.

*Id.* The 2025 Final Priorities are scheduled to become effective on October 9, 2025. *Id.*

**E.     The Trump Administration's proposal to eliminate funding for TRIO**

Also in May 2025, the Trump Administration announced plans to end TRIO programs

entirely. In a fiscal year 2026 budget request to Congress, the Secretary proposed eliminating

funding for TRIO programs, stating in part that "TRIO has failed to meet the vast majority of its

performance measures" and that "States, localities, and institutions of higher education, not the

Federal government, are best suited to determine whether to support the activities authorized under

this program." FY 2026 Budget Request, *supra* n.5, at 42.

> Similarly, OMB, in a letter to the Chair of the Senate Committee on Appropriations stated:

> TRIO and GEAR UP are a relic of the past when financial incentives were needed
> to motivate Institutions of Higher Education (IHEs) to engage with low-income
> students and increase access. . . . Today, the pendulum has swung and access to
> college is not the obstacle it was for students of limited means. . . . A renewed focus
> on academics and scholastic accomplishment by IHEs, rather than engaging in
> woke ideology with Federal taxpayer subsidies, would be a welcome change for
> students and the future of the Nation.

Letter from Russell Vought, Director of OMB, to the Honorable Susan Collins, Chair, Senate

Committee on Appropriations (May 2, 2025).[20]

### F.     The Department issues Notices of Non-Continuation to the Affected Programs

The Affected Programs, beginning in summer 2025 and continuing through September,

received "Notice of Non-Continuation" letters from the Department. The Notices of Non-

Continuation told Affected Programs that "the United States Department of Education has

determined not to continue your federal award . . . in its entirety" at the end of their respective

budget periods in 2025.[21] According to the Department, continuing their grants was "not in the

best interest of the Federal Government" under 34 C.F.R. § 75.253(a)(5).

The Notices of Non-Continuation generally stated the following stock language:

> Continuation requires "a determination from the Secretary that continuation of the
> project is in the best interest of the Federal Government." *Id.* The Department has

---

[20] *Available at* https://www.whitehouse.gov/wp-content/uploads/2025/05/Fiscal-Year-2026-Discretionary-Budget-Request.pdf.

[21] *See* Augsburg Decl. at Ex. E; Marquette Decl. at Ex. E; Suffolk Decl. at Ex. G; S. Seattle Decl. at Ex. E; SUNY-Plattsburgh Decl. at Ex. D; UNH-McNair Decl. at Ex. E; UNH-TS Decl. at Ex. E.

undertaken a review of grants and determined that the grant specified above provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds. The grant is therefore inconsistent with, and no longer effectuates, the best interest of the Federal Government and will not be continued.

The Notices of Non-Continuation identified language in the Affected Programs' grant application materials and/or their responses to the GEPA Equity Directives, that were all submitted between 2020 and 2024, that "may conflict with the Department's policy of prioritizing merit, fairness, and excellence in education" or that may "violate the letter or purpose of Federal civil rights law."

For example, in a letter to SUNY-Plattsburgh, the Department noted that its "application for funding [sic] indicates that the program may be providing services relating to gender orientation," citing its GEPA Equity Directive. *See* SUNY-Plattsburgh Decl. at Ex. D. Similarly, in a letter to UNH's Talent Search program, the Department found its "application states that it will coordinate with target school departments and faculty and community organizations for assistance in proactively identifying and recruiting students of color and non-Caucasians." UNH-TS Decl. at Ex. E. And in a letter to Suffolk, the Department said its grant was discontinued because its "application for funding states that res[t]orative social justice activities will be a part of" its VUB project. Suffolk Decl. at Ex. G. Similar explanations were provided in the Notices of Non-Continuation to other Affected Programs.[22] Affected Programs were told they could request

---

[22] *See* Marquette Decl. at Ex. E ("application for funding … features 'professional and leadership development presentations that centralize issues on diversity, equity and inclusion'"); South Seattle Decl. at Ex. E ("application for funding states that the goal is to recruit and hire the most capable and diverse staff possible"); Augsburg Decl. at Ex. E ("In the Plan for involving faculty in the design of research activities for participants the grantee states, 'All faculty involved … are expected to completed the Diversity and Inclusion Certificate Program & annual Anti-Racism training.").

reconsideration within seven days.[23] Affected Programs timely requested reconsideration, but the Department had not granted their requests before the date of this filing.[24]

The Affected Programs have lost their TRIO grants. Long reliant on grant funding the sudden loss of their grants means they are shuttering their TRIO projects and are laying off employees. The funding loss also has inevitable effects on the Affected Programs' students. These harms are real, are happening every day, and warrant immediate relief.

## ARGUMENT

### I.    COE has demonstrated a substantial likelihood that it has both organizational and associational standing to sue

COE has two routes for establishing standing: asserting an injury to its members (associational standing) or asserting its own injury (organizational standing). *See Abigail All. for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006). COE has both.

#### A.    COE has organizational standing to sue

To have standing "in its own right," an organization must make "the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020). "To demonstrate injury in fact, an organization must allege a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'" *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982)).

The Supreme Court recently restated the *Havens* holding as requiring "actions that directly

---

[23] One Affected Program had 30 days to request reconsideration, which it did. SUNY-Plattsburgh Decl. ¶¶26-30; *id.* at Ex. E.

[24] Augsburg Decl. ¶¶27-33; *id.* at Ex. G; Marquette Decl. ¶¶27-33; *id.* at Ex. H; Suffolk Decl. ¶¶32-39; *id.* at Ex. H; S. Seattle Decl. ¶¶25-26; *id.* at Ex. G; UNH-McNair Decl. ¶¶25-32; *id.* at Ex. F; UNH-TS Decl. ¶¶27-33; *id.* at Ex. F.

affected and interfered with [an organizational plaintiff's] core businesses activities." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 396 (2024). The D.C. Circuit has interpreted *Havens* as instituting "two important limitations." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n*, 878 F.3d 371, 378 (D.C. Cir. 2017).[25] "First, the plaintiff must show that the defendant's action or omission to act injured the organization's interest. Second, the plaintiff must show that it "used its resources to counteract that harm." *Id.*

Here, COE's organizational purpose has been frustrated and its core business activities have been affected by the Department's Notices of Non-Continuation. COE is the sole national membership organization for TRIO grantees, and its core business activity is providing professional development and experiential learning opportunities to educators and students affiliated with these programs. *See* Declaration of Kimberly Jones ¶9 ("**Jones Decl.**"), attached as Ex. 1. Also, COE members pay dues, which COE uses towards its business operations. *Id.* If the Affected Programs shut down and drop their membership, that will undermine COE's ability to perform these core business activities. *See* Jones Decl. ¶38. This prospective injury to COE is concrete—it is not merely an "abstract social interest" or "setback" to its interests. *See Havens*, 455 U.S. at 379. Rather, the Notices of Non-Continuation—in complete disregard of the authorizing statutes and applicable regulations—inflict the precise type of existential threat that COE exists to counter. *See* Jones Decl. ¶¶34-40.

Second, COE has dedicated significant resources to counteract the harm caused by the Notices of Non-Continuation. Since receiving them, COE and the Affected Programs have been

---

[25] Other district courts in the District of Colombia have recently questioned whether a plaintiff is still required to show the use of resources to counteract harm after the Supreme Court's ruling in *Alliance for Hippocratic Medicine*. *See Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 1:25-cv-306-RDM, 2025 WL 1825431, at *22 n.7 (D.C.C. July 2, 2025). COE will assume that the Supreme Court did not intend to broaden the scope of organizational standing. *See Alliance for Hippocratic Med.*, 602 U.S. at 396 ("*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context.").

in daily contact. *Id.* ¶37. COE has diverted resources away from its core business activities of supporting and expanding TRIO programs to address the Department's action. *Id.* ¶39. Accordingly, COE satisfies the requirements for organizational standing.

### B. COE has associational standing to sue

Even in the absence of injury to itself, an association may have standing by showing a cognizable injury to one or more of its members. "To show associational standing, an organization must demonstrate that: '(1) at least one of its members would have standing to sue in his own right; (2) the interests the association seeks to protect are germane to its purpose; and (3) neither the claim asserted, nor the relief requested, requires that an individual member of the association participate in the lawsuit.'" *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (citing *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 342–43 (1977)). The first two *Hunt* prongs are constitutional, and the third is prudential. *United Food & Commercial Workers Union v. Brown Grp.*, 517 U.S. 544, 555–57 (1996). To establish standing, a plaintiff must show injury in fact; causation; and redressability. *Alliance for Hippocratic Med.*, 602 U.S. at 380.

Here, not just "one" but all Affected Programs have standing. Jones Decl. ¶28. There is no question they suffered "injury" that was "caused by" the Department: each received a Notice of Non-Continuation and their injuries—loss of funding—flow directly from it. "Los[ing] out on federal funds . . . is a sufficiently concrete and imminent injury to satisfy Article III." *Dep't of Com. v. New York,* 588 U.S. 752, 767 (2019).

Second, the interests that COE seeks to protect are not simply "germane" to its purpose but are central to it. COE's core mission *is* the viability and success of its members' TRIO projects and their students. This mission is *the* reason COE was formed. Jones Decl. ¶¶12-13. Without grants and funding they rely on, these projects will cease to exist. COE's interests threatened by the Department's discontinuation of their grants are as "germane" to its purpose as can be.

Third, nothing about the asserted claims or requested relief require the Affected Programs to participate as plaintiffs. All Affected Programs are in the same boat—they were denied continuation awards using the Department's same form letter—many of which were sent on the same day. The Notices of Non-Continuation—all of them—stated the grants were being discontinued because they "provide[] funding for programs that reflect the prior Administration's priorities and policy preferences," based on "potential conflicts with applicable nondiscrimination requirements," and because they were not in the "best interest of the Federal government." *E.g.*, Suffolk Decl. ¶29; *id.* at Ex. G; *see supra* n.21. The central issues here revolve around procedure, not facts unique to the Affected Programs. All were subject to the Department's retroactive application of new policies that did not undergo notice-and-comment rulemaking or penalized for statements made in applications or GEPA Equity Directives submitted prior to 2025, all their grants were found to be not "in the best interests of the Federal government," and all were denied funding for allegedly violating civil rights laws despite the Department not following the procedures required before doing so.

Enjoining the Department as COE requests—vacating the Notices of Non-Continuation and directing it to reconsider—will offer all Affected Programs complete relief. *See Int'l Union, United Auto., Aerospace & Agr. v. Brock*, 477 U.S. 274, 288 (1986) (reasoning this requirement is met where "the remedy, if granted, will inure to the benefit" of members). Accordingly, their participation as plaintiffs is not necessary. *See Harris Cnty. v. Kennedy*, 1:25-cv-1275-CRC, 2025 WL 1707665, at *3 (D.D.C. June 17, 2025) (associational standing satisfied in grant termination case and member participation not required since "association seeks prospective or injunctive relief for its members"). COE satisfies these requirements.

## II.    The Court has jurisdiction over COE's claims

Here, the Court has jurisdiction through the APA's waiver of sovereign immunity and

through Title VI's and Title IX's waivers of sovereign immunity.

## A.    The APA's waiver of sovereign immunity

"Congress has provided a limited waiver of sovereign immunity for claims against the United States 'seeking relief other than money damages.'" *Crowley Gov't Servs. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). This waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.* at 1106. Accordingly, the Tucker Act, which also waives sovereign immunity for breach of contract claims, impliedly forbids a plaintiff from bringing a contract claim against the government in district court under the APA. *Id.* Here, the Court has jurisdiction under the APA because COE is not making a breach of contract claim and is seeking prospective injunctive relief—not money damages—and the Tucker Act does not impliedly forbid this relief.

## B.    The Tucker Act does not bar COE from bringing these claims in this Court.

In recent months, Tucker Act jurisdiction in grant litigation has been hotly contested and the Supreme Court has twice stayed a lower court's decision to exercise jurisdiction over grant termination cases. *See Dep't of Educ. v. California ("California")*, 604 U.S. 650 (2025); *NIH v. Am. Pub. Health Ass'n ("APHA")*, 145 S. Ct. 2658 (2025). These cases are largely distinguishable because they involved mid-cycle grant terminations rather than discontinuations. COE and the Affected Programs have no active GAN that can be analogized to a contract. COE's claims are not "at their essence" contractual under the D.C. Circuit's longstanding *Megapulse* test that considers the source of the right and the form of relief requested by a plaintiff. *See Crowley Gov't Servs.*, 38 F.4th at 1102 (quoting *Megapulse v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982).

### 1.    *California* and *APHA* are factually distinguishable because they involved grant terminations, not discontinuations

In *California*, the Supreme Court stayed enforcement of a district court's temporary

restraining order that required the government to pay past-due grant money as well as to resume ongoing grant obligations as they accrued. 604 U.S. at 650. Then, in *APHA*, the Court expressly stated, "[t]he Administrative Procedure Act's 'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money'" pursuant to those grants. 145 S. Ct. at 2659 (quoting *California*, 604 U.S. at 651). The Court's reasoning in *California* and *APHA* relied on the existence of a grant that the Court analogized to a contract, fitting in with the Court's broader Tucker Act jurisprudence. *See APHA*, 145 S. Ct. at 2665 (Kavanaugh, J., concurring) ("The core of plaintiffs' suit alleges that the Government unlawfully terminated their grants. That is a breach of contract claim."); *California*, 604 U.S. at 651 ("APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money'") (quoting *Great-West Life & Annuity v. Knudson*, 534 U.S. 204, 212 (2002))).

Because *California* and *APHA* involved grant termination rather than grant discontinuation, they are distinguishable. Justice Barrett recognized the distinction in *APHA*: "That the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the CFC can hear." 145 S. Ct. at 2661. And Chief Justice Roberts, and Justices Sotomayor, Kagan, and Jackson all would have ruled that "relief—which has prospective and generally applicable implications beyond the reinstatement of specific grants—falls well within the scope of the District Court's jurisdiction under the Administrative Procedure Act." *Id.* at 2663 (Roberts, C.J., concurring in part and dissenting in part). Justice Barrett expressly stated her view that "the Government is not entitled to a stay of the judgments insofar as they vacate the guidance documents" because the order with respect to vacating guidance did not necessarily lead to the payment of funds. *Id.* at 2660. The

same situation exists here—ordering reconsideration of the discontinuation decisions will not necessarily lead to the payment of funds. It will lead to the Department following the law.

The *per curiam* majority in *California* stated, "[t]rue, a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." 604 U.S. at 651 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)). At the end of the day, the Department discontinued the Affected Programs' grants rather than terminated the grants, which distinguishes *California* and *APHA*. Existing Tucker Act precedent puts this case in federal district court, not in the Court of Federal Claims.

### 2.    Per *Megapulse*, COE's claim is not "at essence" a contract dispute

*Megapulse* recognizes that "[c]ontract issues may arise in various types of cases where the action itself is not founded on a contract." *Crowley*, 38 F.4th at 1106–07 (quoting *Megapulse*, 672 F.2d at 967). But "the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." *Id.* at 1107 (quoting *Megapulse*, 672 F.2d at 968). The court first examines "the source of the rights upon which the plaintiff bases its claims," and second "the type of relief sought." *Id.* at 1106–07 (quoting *Megapulse*, 672 F.2d at 968).

### a.    COE's claims are founded upon statutes and regulations, not a contract

COE's claims arise from the Department's improper application of regulations, specifically, 34 C.F.R. § 75.253(a)(5), not a contract or any contractual provision. Under *Megapulse*'s first prong, courts "make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds." *Id.* (quoting *Megapulse*, 672 F.3d at 969–70). They consider whether "the plaintiff's asserted rights and the government's purported authority arise from statute . . . , whether the plaintiff's rights exist[ ] prior to and apart from rights

created under the contract, and whether the plaintiff seek[s] to enforce any duty imposed upon the government by the . . . relevant contracts to which the government is a party." *Id.*

Here, the Affected Programs successfully applied and received a GAN or multiple GANs.[26] *See* discussion *supra* Background § II.C. Those GANs entitled the Affected Programs to one year of funding.[27] Every subsequent year of funding arose not from the original GAN, but from regulations that govern continuation awards, resulting in new GANs. Indeed, the original GANs *expressly disclaim* any guarantee of future funding:

> THIS AWARD SUPPORTS ONLY THE BUDGET PERIOD SHOWN IN BLOCK 6. . . . THE SECRETARY ANTICIPATES FUTURE FUNDING FOR THIS AWARD ACCORDING TO THE SCHEDULE IDENTIFIED IN BLOCK 6. THESE FIGURES ARE ESTIMATES ONLY AND DO NOT BIND THE SECRETARY TO FUNDING THE AWARD FOR THESE PERIODS OR FOR THE SPECIFIC AMOUNTS SHOWN. THE RECIPIENT WILL BE NOTIFIED OF SPECIFIC FUTURE FUNDING ACTIONS THAT THE SECRETARY TAKES FOR THIS AWARD.

Nor could the original GANs create any right to ongoing funding because that would violate the Anti-Deficiency Act—the Department cannot obligate future funding without Congressional appropriations. It makes no difference that each program received new GANs annually for continuation awards because the original GANs did not create an ongoing right to funding.[28] Not only do the original GANs expressly disclaim any future funding, they point at 34 C.F.R. § 75.253 to determine future funding: "IN ACCORDANCE WITH 34 CFR 75.253, THE SECRETARY CONSIDERS, AMONG OTHER THINGS, CONTINUED FUNDING IF" Congress appropriates funding and the Department finds the grantee met the requirements of 34 C.F.R. § 75.253.[29] Expressly disclaiming future funding and "considering" continued funding only "if" conditions

---

[26] Whether a program received one GAN or multiple GANs depends on what year the specific TRIO program held its competition. *See* Jones Decl. ¶24.

[27] *See, e.g.*, Marquette Decl. ¶18; *id.* at Ex. B (Original GAN); Suffolk Decl. at Ex. A (same).

[28] *See, e.g.*, Marquette Decl. ¶20; *id.* at Ex. D (continuation GANs); Suffolk Decl. at Ex. D (same).

[29] Marquette Decl. at Ex. D p. 2.

are met is the type of "agreement to agree" that binds neither party. *Nat. Res. Def. Council v. EPA*, 464 F.3d 1, 10 (D.C. Cir. 2006) ("'Agreements to agree' are usually not enforceable in contract.").

"To constitute a contract under the Tucker Act, an agreement with the government must meet four requirements: (1) 'mutual intent to contract," (2) 'an offer and acceptance,' (3) 'consideration,' and (4) 'a Government representative who had actual authority to bind the Government.'" *Pa. Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 790 (2001) (quoting *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997)). COE's claims regarding continuation awards meet none of these requirements. The Department cannot meet the first three because it disclaimed any ongoing intent in the original GANs. Any "intent," "offer and acceptance," and "consideration" arises purely from 34 C.F.R. § 75.253 that governs continuation awards. And again, no government representative had authority to bind the Department to these future funding periods without violating the Anti-Deficiency Act.[30] Because COE's claims arise from the Department's application of 34 C.F.R. § 75.253(a), this case belongs here, not the Court of Federal Claims.

### b. COE is seeking specific injunctive relief, not money damages

Moreover, COE is not seeking money damages on behalf of any Affected Program, precluding Tucker Act jurisdiction. "Exclusive jurisdiction in Claims Court under the Tucker Act does not lie 'merely because [a plaintiff] hints at some interest in a monetary reward from the federal government or because success on the merits may obligate the United States to pay the complainant.'" *Crowley Gov't Servs.*, 38 F.4th at 1108 (quoting *Kidwell v. Dep't of Army, Bd. for*

---

[30] The Department has recently deployed a tactic called "frontloading" where it funds future budget periods using current fiscal year appropriations. *See Nat'l HEP–CAMP Ass'n v. U.S. Dep't of Educ.*, No. 1:25-cv-2730 (CJN) (D.D.C), Doc. 18 ("As part of its continuation awards, the Department has frontloaded certain grants, meaning that the Department has awarded grants for multiple budget years with the proviso that grantees must expend all funds in one budget year before drawing down funds for the next budget year."). This technique to spend all currently available appropriations is an implicit recognition that an original GAN does not entitle any grantee to future funding.

*Corr.*, 56 F.3d 279, 284 (D.C. Cir. 1995)). "Narrowing our focus further, a plaintiff does *not* 'in essence' seek monetary relief "as long as [the] complaint only requests non-monetary relief that has 'considerable value' independent of any future potential for monetary relief" and "as long as the sole remedy requested is declaratory or injunctive relief that is not 'negligible in comparison' with the potential monetary recovery." *Id.* (quoting *Kidwell*, 56 F.3d at 284).

Here, COE seeks specific injunctive relief—vacatur and reconsideration of the Notices of Non-Continuation, following the correct process, including compliance with Titles VI and IX. COE is pursuing this nonmonetary injunctive relief in large part due to the Affected Programs' interest in prior experience points and base funding levels. As detailed below, *see* discussion *infra* § III.B.4, without relief the Affected Programs will be at a competitive disadvantage in future grant competitions because they will be ineligible for prior experience points and will only be eligible for the minimum base funding amount because they will not have an existing TRIO grant. These two harms have considerable value, independent from whether the Department ultimately disburses funds after reconsideration. For example, prior experience points may be the determining factor in receiving a future grant or not. And an applicant funded at the base level versus an ongoing level could result in a difference of several hundred thousand dollars in future grant funding.

As recognized by the *California per curiam* majority, a plaintiff is not punted to the Court of Federal Claims simply due to the "possibility" that an order vacating an agency's decision "may result in the disbursement of funds." Justice Scalia's dissent in *Bowen v. Massachusetts* supports this view. The point of contention in *Bowen* was the meaning of "money damages," which the majority reasoned did not include grant-related funds because 1) the plaintiff was seeking declaratory and injunctive relief, not money damages, and 2) the monetary relief was a form a specific relief for reimbursement of funds to which the state was entitled rather than "money

damages." 487 U.S. 879, 909 (1988). Justice Scalia took an opposing view regarding the meaning

of "money damages," but he did not disagree with the validity of a claim for prospective relief:

> I agree with the Court that sovereign immunity does not bar respondent's actions
> insofar as they seek injunctive or declaratory relief with prospective effect. An
> action seeking an order that will prevent the wrongful disallowance of future claims
> is an action seeking specific relief and not damages, since no damage has yet
> occurred.

487 U.S. 879, 921–22. COE does not seek "reimbursement" on behalf of the Affected Programs,

nor for any past "losses." COE seeks only injunctive or declaratory relief with prospective effect—

allowing the Affected Programs reconsideration under proper legal standards that would allow

them to resume and/or reopen their TRIO programs. For all of these reasons, the Tucker Act does

not limit the jurisdiction of this court.

### C.    Title VI's and Title IX's waiver of sovereign immunity

Even if *California* and *APHA* apply to grant discontinuations, which they do not, Titles VI

and IX provide a separate basis for the Court's jurisdiction that the Supreme Court did not opine

on. *See* 42 U.S.C. § 2000d-2; 20 U.S.C. § 1683.

In April 2025, the Trump administration froze $2.2 billion in grants to Harvard University

relating to its purported failure to address antisemitism in addition to its DEI programs.[31] After

initiating a lawsuit regarding the freeze, the district court distinguished *California* and *APHA* for

three reasons. *See President & Fellows of Harvard Coll. v. U.S. Dep't of HHS* ("*Harvard*"), No.

25-CV-10910, 2025 WL 2528380, at *12–13 (D. Mass. Sept. 3, 2025).

First, the court found the rights at issue, including Title VI claims, "do not ordinarily fall

within the ambit of the Tucker Act," and the Tucker Act's waiver of sovereign immunity was not

---

[31] *See Harvard Has $2.2 Billion in Grants Frozen by Trump Administration After Rejecting Demands*, CNBC (Apr. 15, 2025), https://www.cnbc.com/2025/04/14/trump-harvard-deal-funding-billion-dei.html.

relevant to Title VI that separately authorizes judicial review.[32] *Id.* at \*13. Second, Harvard sought relief beyond the simple enforcement of a monetary obligation, including prospective relief mandating the Administration comply with Title VI's procedural requirements. *Id.* Third, Harvard's claims could not be "split" like in *APHA* because doing so would be procedurally unworkable. *Id.* Ultimately, "people and entities receiving federal funding are shielded against being labeled with the 'irreversible stigma' of 'discriminator' until a certain level of agency process has determined that there was misconduct that warranted termination." *Id.* at \*29.

This reasoning applies with even more force here. First, as in *Harvard*, COE's claims based on Title VI and Title IX fall within the framework of the APA, and accordingly, belong in an Article III court. *See* 42 U.S.C. § 2000d-2; 20 U.S.C. § 1683. Second, COE's requests *purely* prospective injunctive relief. There is *no* monetary obligation at issue; the Affected Programs received a discontinuation of awards rather than "termination" of them. Third, there are no claims to "split." As discussed above, COE has no cause of action to assert in the Court of Federal Claims because its claims relate to the discontinuation of grants rather than a monetary obligation such as a grant or contract.

### D.    The *Larson-Dugan* exception to sovereign immunity

Separately from the APA claims, this Court has jurisdiction over COE's *ultra vires* claim under the *Larson-Dugan* exception to sovereign immunity. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949); *Dugan v. Rank,* 372 U.S. 609, 621–22 (1963); *see also Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012).

---

[32] *See* discussion *infra* Section I.G; *see also Colwell v. Dep't of HHS*, 558 F.3d 1112, 1128 (9th Cir. 2009) ("Judicial review of any [Title VI] funding termination is available in an Article III court."); *Adams v. Bell*, 711 F.2d 161, 189 (D.C. Cir. 1983) (Wright, J., dissenting) (noting that "the traditional mode" for review under 42 U.S.C. § 2000d-2 is "the APA").

**III.    COE has satisfied all the requirements for the Court to issue a preliminary injunction.**

**A.    COE has established a likelihood of success on the merits.**

"In this circuit, it remains an open question whether the 'likelihood of success' factor is 'an independent, free-standing requirement,' or whether, in cases where the other three factors strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal question' on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014). In this case, COE has shown that there is at least a serious legal question on the merits.

**1.    The APA and final agency action.**

Section 706 of the APA provides in part that "[t]he reviewing court shall": . . .

> hold unlawful and set aside agency action, findings, and conclusions found to be—
> (A)    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B)    contrary to constitutional right, power, privilege, or immunity;
> (C)    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D)    without observance of procedure required by law . . . .

5 U.S.C. § 706(2). For purposes of these claims, the Notice of Non-Continuation is final agency action subject to challenge under section 706(2). An agency action is "final" if: (1) it marks the "'consummation' of the agency's decision making process," and (2) determines rights or obligations or creates legal consequences. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

There can be little dispute that the Notice of Non-Continuation constitutes final agency action. The Affected Programs sought continuation awards, and the Department decided to not issue them. The Affected Programs requested reconsideration, and the Department failed to grant them. Given that the budget period for a continuation award would have begun no later than October 1, 2025, the Department has necessarily denied the reconsideration requests.

      **a.**    <u>**Count I**</u>**: Agency action contrary to law, in excess of statutory authority, and without observance of procedure (Title VI and Title IX)**

Count I claims that the Department's actions were contrary to law, in excess of statutory authority, and did not observe procedure required by law. "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

Here, the Department ignored Title VI's and Title IX's specific procedures before it discontinued the Affected Programs' grants. *See* discussion *supra* Background § I.G. No Affected Program was contacted by the Department about their noncompliance with Titles VI and IX or to seek their voluntary compliance before receiving the Notices of Non-Continuation. *See* 42 U.S.C. § 2000d-1; 34 C.F.R. § 100.6; 34 C.F.R. § 100.8(c).[33] The Department never determined that voluntary compliance was not possible, never provided them an opportunity for a hearing, and never made findings of any noncompliance on the record. *See* 34 C.F.R §§ 100.9(b), 100.10. And the Affected Programs do not believe that the Department, through the Secretary, filed a written report of the circumstances and grounds for discontinuing their grants with the relevant Senate or House Committees. In sum, the Department ignored Title VI and IX requirements from top to bottom. COE is likely to succeed on this claim.

      **b.**    <u>**Count II**</u>**: Agency action contrary to law, in excess of statutory authority, and without observance of procedure (Notice-and-Comment)**

Count II brings a claim under the same APA provisions as Count I, but based on the Department's failure to comply with notice-and-comment rulemaking. "The APA generally

---

[33] *See, e.g.*, Marquette Decl. ¶27 ("Prior to receiving the non-continuation letter, ED did not inform Marquette University of any civil rights law compliance concerns relating to its McNair project"); Suffolk Decl. ¶37 (stating that "Prior to receiving ED's letter on September 12, 2025, ED never communicated to Suffolk any concern that its VUB project activities 'violate the letter or purpose of Federal civil rights law'"); *see also* UNH-McNair Decl. ¶28; Augsburg Decl. ¶¶29, 32.

requires that before a federal agency adopts a rule it must first publish the proposed rule in the

Federal Register and provide interested parties with an opportunity to submit comments and

information concerning the proposal." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018);

5 U.S.C. § 553. GEPA requires all Department rules used for grant decisions go through notice-

and-comment rulemaking. *See* 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d); 5 U.S.C. § 553. Agencies

act "contrary to law" and without "observance of procedure" when they bypass notice-and-

comment "required" by Congress. *Michigan v. EPA*, 268 F.3d 1075, 1088 (D.C. Cir. 2001); *Elev8

Baltimore v. Corp. for Nat'l & Cmty.*, No. 25-cv-1458, 2025 WL 1865971 (D. Md. July 7, 2025).

Here, the Notices of Non-Continuation relied on policies to discontinue the Affected

Programs' grants without following notice-and-comment rulemaking to establish them.[34] In

response to NIAs, the Affected Programs applied for and were awarded new TRIO grants in 2024

or earlier. Their applications addressed the selection criteria and competitive preference priorities

in the NIAs, including priorities from the 2021 Final Priorities encouraging applicants to address

how their projects would help "underserved students" and "students of color." The Department

awarded these grants following a peer review evaluation and scoring process.

In May 2025, the Department proposed to "replace" these priorities. Yet it acknowledged

that in proposing to replace them, the Department would only apply its planned rescindment

*prospectively*. The Department elsewhere recently admitted that it could not abandon the 2021

Final Priorities without finalizing the 2025 Proposed Priorities via notice-and-comment

rulemaking. *See U.S. Dep't of Educ. v. Am. Ass'n of Colls. for Teacher Educ.*, No. 25-1281, ECF

Doc. 39, 2025 WL 2376288, at *19 (Aug. 6, 2025) (Department stating "plaintiffs are correct that

---

[34] *See* UNH-TS Decl. ¶30 (explaining that its Talent Search project "was consistent with ED's priorities that were set forth in the notice of invitation to apply for the Talent Search award"); *see also, e.g.*, Augsburg Decl. ¶30; Marquette Decl. ¶30; Suffolk Decl. ¶35.

this list of priorities can only be changed by notice-and-comment rulemaking").

So in later issuing the Notices of Non-Continuation, the Department treated the 2021 Final Priorities as having been rescinded. There are two problems with this. First, the 2025 Proposed Priorities were not even in effect when the Department issued Notices of Non-Continuation. "Failure to abide by these requirements renders a rule procedurally invalid." *AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 84 (D.D.C. 2007). Second, the Department *retroactively* rescinded the 2021 Final Priorities by discontinuing grants that responded to the competitive preference priorities, but such retroactive action is not permitted.  "An administrative rule is retroactive if it 'takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past.'" *Cox v. Kijakazi*, 77 F.4th 983, 991 (D.C. Cir. 2023) (quoting *Nat'l Mining Ass'n v. Dep't of the Interior*, 177 F.3d 1, 8 (D.C. Cir. 1999); *Martin Luther King, Jr. Cnty. v. Turner*, 2025 WL 2322763, at *18 (W.D. Wash. 2025). Here, the Department retroactively applied the 2025 Proposed Priorities' proposed "replacement" of the 2021 Final Priorities by penalizing the Affected Programs for responding to the competitive preferences that the NIAs in 2024 and earlier had asked for.

 The Department similarly did not undergo notice-and-comment rulemaking for the policies it invoked in the Notice of Non-Continuation to deny continuation awards to Affected Programs. The Notices state that the Affected Programs' grants "conflict with the Department's policy of prioritizing merit, fairness, and excellence in education." This "policy," and the policies in the DEI Executive Orders, did not undergo notice-and-comment rulemaking, and they appear nowhere in the NIAs issued in 2024 or earlier years. GEPA required that any rules, policies, selection criteria, and priorities used to make grant decisions go through notice-and-comment rulemaking. 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d). Because the "policies" in the Notices of Non-

Continuation, and those in the DEI Executive Orders which it relied on, were not established through this process, the Department acted contrary to law, in excess of statutory authority, and without observance of procedure.

        **a.**      **<u>Count III</u>: Arbitrary and capricious agency action**

Count III alleges that the Notices of Non-Continuation were arbitrary and capricious. The APA "requires agencies to engage in 'reasoned decisionmaking,' and directs that agency actions be 'set aside' if they are 'arbitrary' or 'capricious.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020). The Department's actions are arbitrary and capricious for three primary reasons.

        **i.**      **The Department relied on improper factors in the Notices of Non-Continuation**

First, the Notices of Non-Continuation relied on factors—its own DEI policies that had not gone through the required notice-and-comment and the not yet in effect 2025 Proposed Priorities—that the Department was not entitled to consider when deciding whether to issue continuation awards. An agency rule is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As already discussed, the Department relied on factors that Congress did not intend for the Department to consider when it admittedly relied on unpublished policies.

The Notices of Non-Continuation further relied on factors that Congress did not intend for the Department to consider by looking at Affected Programs' *applications* that had already been selected. *See* discussion *supra* Background § I.F. In making continuation awards, the Department does not review already-approved applications to determine whether they meet *new* policies and priorities; it instead reviews grantees' performance and APRs to determine whether they are making substantial progress in their project's objectives.

### ii.    The Notices of Non-Continuation are not reasonably explained

The Notices of Non-Continuation are also arbitrary and capricious because they were not reasonably explained. The "well-worn arbitrary-and-capricious standard ensures" that an agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *FDA v. Wages & White Lion Invs.*, 145 S. Ct. 898, 917–18 (2025). In other words, an agency must act "within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

The Notices of Non-Continuation are far outside the "zone of reasonableness." None conducted a meaningful individualized analysis, and none pointed to "evidence" of Affected Programs' noncompliance with "civil rights law." Even if it had, none of the Notices of Non-Continuation explained how the Affected Program purportedly violated civil rights laws beyond citing language in the Affected Programs' applications submitted in 2024 or earlier years. Indeed, each letter is practically the same. The Department can hardly claim that it made any form of individualized assessment when it sent form letters to each Affected Program.

### iii.    The Department changed positions without considering reliance interests

Third, the Notices of Non-Continuation are also arbitrary and capricious because they reflect a sudden change in position without explanation or consideration for Affected Programs' reliance interests. Under the "change-in-position doctrine," agencies must "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *Id.* (quoting *Encino Motorcars v. Navarro*, 579 U.S. 211, 221–22 (2016)).

Here, the Department abruptly abandoned the competitive preference priorities in the NIAs from 2024 and earlier, invoked new, unarticulated policies adopted in 2025, and acted as if the existing priorities did not exist. "An agency may not . . . depart from a prior policy *sub silentio* or

simply disregard rules that are still on the books." *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009). The Department could not retroactively change "positions" on the Affected Programs' grants for all the reasons already discussed. *See* discussion *supra* § III.A.1.b. Yet even if it could have, at the very least, the Department had to acknowledge the sudden change. "[D]eparture from [past] practice, with no explanation, renders its void *ab initio* rationale arbitrary and capricious." *Commc'ns & Control v. FCC*, 374 F.3d 1329, 1336 (D.C. Cir. 2004). Its failure to do so disregards the Affected Programs' reliance interests. The Notices of Non-Continuation are arbitrary and capricious for this additional reason.

Finally, the Notices of Non-Continuation are arbitrary and capricious because they are contrary to the GEPA Equity Directive that applicants must submit in which they "describe" the "steps" they will take to "ensure equitable access to, and equitable participation in" their TRIO projects, including by "addressing the special needs of students . . . in order to overcome barriers to equitable participation," including barriers based on "gender" and on "race" and "color." 20 U.S.C. § 1228a(b). Remarkably, the Department gave examples to the Affected Programs when it invited them to apply that "illustrate how an applicant may comply with" GEPA. One of the examples told Affected Programs seeking a UB grant that "[a]n applicant that proposes to carry out a model science program for secondary students and is concerned that girls may be less likely than boys to enroll in the course, might indicate how it intends to conduct 'outreach' efforts to girls, to encourage their enrollment."[35] Yet now the Department has discontinued Affected Programs with UB projects *because* their GEPA Equity Statements proposed to "strive for a 50/50 gender distribution."[36]

---

[35] ED, FY 2022 Upward Bound Application, a*vailable at* https://apply07.grants.gov/apply/opportunities/instructions/PKG00270968-instructions.pdf.

[36] SUNY-Plattsburgh Decl. at Ex. D.

Likewise, the NIAs invited Affected Programs' applications to address how their projects would benefit "underserved students" and "students of color." 86 Fed. Reg. at 70,639–70,640; *see* discussion *supra* Background § II.A, NIAs. But now the Department has discontinued Affected Programs' grants for "proactively identifying and recruiting students of color."[37]

The hypocrisy is evident. If the Department wants to change its regulations, policies, and interpretations, it can certainly do so. But it cannot do so without going through the proper processes, and even then, it cannot apply them retroactively.

**b.    <u>Count IV</u>: Agency interpretation and application of 34 C.F.R. § 75.253(a)(5) in excess of statutory jurisdiction and authorization**

Count IV alleges that the Department's application of 34 C.F.R. § 75.253(a)(5) violates the APA as well.

Title 20 authorizes the Secretary to prescribe regulations necessary to "administer and manage" the functions of the Department. 20 U.S.C. § 3474. It also delegates general authority to the Secretary to "to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department." 20 U.S.C. § 1221e-3. The Department promulgated 34 C.F.R. § 75.253(a)(5) in purported exercise of this authority, which states, "A grantee, in order to receive a continuation award from the Secretary for a budget period after the first budget period of an approved multiyear project, must . . . [r]eceive a determination form the Secretary that continuation of the project is in the best interest of the Federal Government."

The Department's broad and sweeping interpretation of 34 C.F.R. § 75.253(a)(5) that it used to deny continuation awards is not authorized by these provisions. First, interpreting and applying 34 C.F.R. § 75.253(a)(5) in an unfettered manner to deny continuation awards and reduce

---

[37] UNH-TS Decl. at Ex. E.

the number of TRIO projects is contrary to the plain terms of 20 U.S.C. § 1070a-11(a). 20 U.S.C. § 1070a-11(a) states that the Secretary "**shall . . . carry out**" TRIO programs. And 20 U.S.C. § 1070a-11(b)(2) requires the Secretary to award grants for a five-year period, which necessitates the issuance of continuation awards. Where an agency "merely articulate[s] policy concerns and their own discretion to terminate the program for whatever reason," its "reasoning or lack thereof is arbitrary and capricious." *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of HHS*, 328 F. Supp. 3d 1133, 1149 (E.D. Wash. 2018).

Second, interpreting and applying 34 C.F.R. § 75.253(a)(5) in an unfettered manner ignores the language in 34 C.F.R. § 75.253(b) that cabins the "best interests of the Federal Government" determination to those based on *performance*. 34 C.F.R. § 75.253(b) states:

> In determining whether the grantee has met the requirements described in [§ 75.253(a)] of this section, the Secretary may consider any relevant information regarding grantee performance. This includes considering reports required by § 75.118, performance measures established under § 75.110, financial information required by 2 CFR part 200, and any other relevant information.

Although 34 C.F.R. § 75.253(b) contains an open ended reference to "any other relevant information," that reference expressly cabins 34 C.F.R. § 75.253(a)(5) and limits the Department's "best interests" determination to considering information "regarding grantee performance." Accordingly, "any other relevant information" refers to information similar to "reports required by § 75.118," "performance measures established under § 75.110," and "financial information required by 2 CFR part 200," which all relate to a grantee's performance.

The soundness of this interpretation is confirmed by *ejusdem generis*, a canon of statutory interpretation that requires a general term following a series of specific terms to be understood "as a reference to subjects akin to the one with specific enumeration." *United States v. Alford*, 89 F.4th 943, 952 (D.C. Cir. 2024). *Noscitur a sociis*, another canon, also confirms this limited

- 36 -

interpretation. This canon "avoid[s] ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Id.* (quoting *Yates v. United States*, 574 U.S. 528, 543 (2015)). Instead of cabining its use of 34 C.F.R. § 75.253(a)(5) to the "best interests of the Federal Government" with respect to grantee performance, as is the case with all other subsections of § 75.253(a) and as is required by § 75.253(b), the Department instead applied subsection (a)(5) to give itself complete discretion to deny continuation awards.

All statutes authorizing the TRIO programs require the Department to issue continuation awards. The Department issues five-year grants, and the statutory scheme does not contemplate "reapplying" during that period. Instead, the scheme contemplates the Department issuing continuation awards provided grantees meet performance metrics. *Cf.* 89 Fed. Reg. at 70,316 ("In general, we do not deny a large number of non-competing continuation awards. . . .").

Third, Congress, not the Department unilaterally, determines what the "best interests of the federal government are." A "fundamental problem" with the Department's stated reason for discontinuing the grants is that "the 'federal interest' does not necessarily mean 'the federal interest as determined by [the agency].'" *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 660–61 (D. Md. 2018). "The ultimate touchstone for all agency action is not its own guidance documents, or even regulations, but the power delegated to it by Congress." *Id.*; *see also id.* at 660 (an agency "cannot provide just any reason for its decision, that reason must be a change in the federal interest."). The federal government's "interest" in the TRIO programs is evident in Congress repeatedly appropriated funds to them for decades, including specifically for this continuation award year.[38]

---

[38] Insofar as the "best interest of the Federal government" confers the Department with unbridled discretion, which it does not, Count V alleges a claim under the APA for violation of the Constitution under the void-for-vagueness

c.     <u>Counts VI – VII</u>: Violations of constitutional rights[39]

Count VI alleges a claim for violation of the Separation of Powers and Non-Delegation doctrine, and Count VII alleges a claim for violation of the Take Care Clause.

Under the Separation of Powers, it is axiomatic that "[t]he United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). The Executive Branch "does not have unilateral authority" to refuse to spend funds appropriated by Congress. *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). And under the Take Care Clause, the President is required to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, cl. 5, and "agencies are there to serve that same end," *Clinton v. City of New York,* 524 U.S. 417, 438 (1998).

Here, the Secretary "shall" carry out the TRIO programs. 20 U.S.C. § 1070a-13, 14, 16. "Statutory language that an official "shall" perform an act has been repeatedly held to be mandatory in nature. It deprives the official of discretion and makes the commanded act a duty, a ministerial act." *Com. of Pa. v. Weinberger*, 367 F.Supp. 1378, 1381 (D.D.C. 1973); *Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959 (N.D. Ill. 2025). Congress's directive is coupled with at least $1.19 billion in fiscal year 2025 TRIO appropriations. *See supra* Background § I.C.

As noted earlier, it is unclear at this time whether that amount has been properly obligated towards the TRIO programs. If unobligated funds remain available, the Department is required by

---

doctrine and the Due Process Clause. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations*, 567 U.S. 239, 253 (2012).

[39] Although COE has alleged standalone constitutional claims as Counts VI and VII in its Complaint, such claims are currently barred by D.C. Circuit precedent that treats a separation of powers claim as a statutory claim under *Dalton v. Specter*, 511 U.S. 462 (1994). *See Global Health Council v. Trump*, No. 25-5097, 2025 WL 2480618, at *9 (D.C. Cir. Aug. 28, 2025); *Nat'l Treasury Emps. Union v. Vought*, No. 25-5091, 2025 WL 2371608, at *20 (D.C. Cir. Aug. 15, 2025); *Climate United Fund v. Citibank, N.A.*, No. 25-5122, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025) (same). If this line of cases is reversed in the Supreme Court or by the D.C. Circuit *en banc*, COE respectfully requests leave to brief this issue.

law to spend them, and cannot avoid doing so by delaying beyond the end of the fiscal year. Such funds should remain available, notwithstanding the expiration of the fiscal year. *Supra* n.9; *City of Houston*, 24 F.3d at 1426 ("[A] court may award funds based on an appropriation even after the date when the appropriation lapses, so long as the lawsuit was instituted on or before that date").

### 2. <u>Count VIII</u>: *Ultra vires*

COE is also likely to succeed on its claim seeking *ultra vires* review of the Department's action, which is proper when (1) review is not expressly precluded by statute, (2) there is no alternative procedure for review of the statutory claim and (3) the challenged action is "plainly" in "excess of [the agency's] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022). If this Court does not grant a preliminary injunction pursuant to COE's APA or standalone Constitutional claims, the Court should find that Department acted *ultra vires*, in excess of its statutory authorities under the HEA.

### 3. <u>Count IX</u>: Writ of mandamus under 28 U.S.C. § 1361

Count IX brings a claim for writ of mandamus. "The preemptory common-law writs are among the most potent weapons in the judicial arsenal." *Will v. United States*, 389 U.S. 90, 107 (1967). A district court has original jurisdiction in the nature of mandamus only if (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff. *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022).

This case clearly meets the first two requirements for mandamus. It is unquestionable that the Department must award continuation awards to recipients based on performance, and the Department cannot retroactively substitute new priorities that have not gone through the requisite procedures or discontinue funding without following Titles VI or IX. If this Court does not enter an injunction, COE will have no alternative remedy at law, and therefore should issue a writ of

mandamus compelling the Department to act as required by law.

**B.      COE and Affected Programs will suffer irreparable harm without an injunction**

COE, Affected Programs, and students will suffer immediate harm without relief, and these harm "directly result[s] from the Department's action. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

### 1.      Harm to COE

COE will suffer immediate harm without an injunction. COE is the largest TRIO membership organization in the country. Since 1981, COE has been—as Marquette put it—an "indispensable ally" to its 1,000-plus members and a "national voice for TRIO." Marquette Decl. ¶42; *id.* (detailing COE's "vital work" and "tireless advocacy"). Many Affected Programs have been members since COE's inception. *Id.* ¶42 & SUNY-Plattsburgh Decl. ¶39.[40]

COE has a keen interest in the Department following TRIO's statutory and regulatory scheme, and has recently expended enormous time, energy, and resources to that end. Jones Decl. ¶¶35-40. The Department's discontinuation of dozens of TRIO grants—and the manner in which it has done so—directly threatens its interest and its ability to serve its members. If the Department can flout the law without repercussion, COE cannot meaningfully advise its members on how to structure their operations to be compliant. Members like Suffolk rely on COE's guidance "interpreting federal legislation and regulations" to "ensure" their "alignment with Department of Education directives." Suffolk Decl. ¶ 48; Jones Decl. ¶¶38-40. The utility of other services COE long has provided to members like South Seattle College, including "professional development, priority training that address meeting grant objectives, technical assistance with annual reports," is lessened if COE cannot help members maintain their grants. S. Seattle Decl. ¶35.

---

[40] *See also* UNH-TS Decl. ¶41 (1984); S. Seattle Decl. ¶34 (1998); UNH-McNair Decl. ¶40 (1984); Augsburg Decl. ¶40 (2008).

The Department's blatant disregard for the carefully constructed laws and regulations applicable to the TRIO programs is deeply troubling to COE and undermines its core mission. "The detriment to Plaintiffs' organizational missions . . . cannot be remedied through retroactive relief." *New York v. McMahon*, 784 F. Supp. 3d. 311, 362 (D. Mass. 2025); *John T. v. Delaware Cnty. Intermediate Unit*, No. 98-cv-5781, 2000 WL 558582, at *8 (E.D. Pa. May 8, 2000).

### 2.    Harm to Affected Programs

The harm to the Affected Programs is no less "immediate" and irreparable. The 2025-2026 academic year (and budget year) has begun and Affected Programs are closing their doors. Some are closing today or tomorrow.[41] Without relief requiring the Department to reconsider the Notices of Non-Continuation in a lawful manner that follows its procedures for issuing continuation awards, Affected Programs will not have TRIO projects for the foreseeable future. *E.g.*, Suffolk Decl. ¶41 ("no longer operating its VUB project"); Marquette Decl. ¶¶35-37. Most Affected Programs rely *entirely* on federal grant funding to operate. S. Seattle Decl. ¶28; SUNY-Plattsburgh Decl. ¶32.[42] For many, "the grim fact" is they lack "independent financial resources to operate the project." Marquette Decl. ¶35. Simply put, without relief, Affected Programs will stop operating projects.

The Department's actions have real consequences for everyday working Americans. Colleges, universities, and other organizations around the country have recently eliminated positions entirely and laid off employees. *E.g.*, SUNY-Plattsburgh Decl. ¶33 (over a dozen positions eliminated).[43] At some colleges and universities, layoffs are happening *today. See*

---

[41] Augsburg Decl. ¶35 (temporarily discontinuing project); S. Seattle Decl. ¶28 (closing Sept. 30, 2025); SUNY-Plattsburgh Decl. ¶32;

[42] Others rely heavily on grant funding. *See* Suffolk Decl. ¶41; Marquette Decl. ¶¶35-37.

[43] *See also* UNH-TS Decl. ¶36 (seven roles eliminated); Marquette Decl. ¶36 (McNair program coordinator and other positions "will be eliminated"); S. Seattle Decl. ¶28 (three full-time employees and several part-time staff being eliminated);

Suffolk Decl. ¶42 (multiple roles "will be eliminated effective September 30, 2025"). Many more are expected soon. Marquette Decl. ¶36 (Associate Director "very likely" to be eliminated). And for those not laid off, their salaries are still being reduced. *Id.* ¶¶36, 40.

Beyond closing down, the Department's action will disturb Affected Programs and their institutions' ties to local communities. In upstate New York, "[l]ocal business are losing a pipeline for local students to remain in the region." SUNY Plattsburgh Decl. ¶36. Eliminating these projects has ripple effects, and detracts from schools' efforts to recruit and attract new students and to recruit alumni to return to their institutions as instructors and employees. Marquette Decl. ¶23.

### 3.    Harm to Students

The Department's actions, of course, harm the beneficiaries of TRIO projects—the students—and lots of them. South Seattle College's EOC project planned to serve over 1,000 adult students. *Id.* ¶18; S. Seattle Decl. ¶29. UNH's Talent Search program planned to serve 1,600 high school students. UNH-TS Decl. ¶37. At Suffolk, its VUB project had been serving 125 eligible military veterans every year. Suffolk Decl. ¶16. SUNY-Plattsburgh's UB project will no longer serve "29 New Hampshire schools … increasing the burden on already under-resourced public schools." SUNY-Plattsburgh Decl. ¶34. Many of these students just enrolled expecting these projects to be there. Now institutions must reverse their commitments to students in need. Marquette Decl. ¶40 (17 student applications to participate in project will be denied).

All these students have lost access to critical academic tutoring, educational resources, financial assistance, and other resources. Students in the McNair project at Marquette can no longer attend "seminars structured to strengthen doctoral readiness," and cannot participate in "graduate school visits to help them determine" where to continue their doctoral studies. Marquette Decl. ¶38. Students are losing opportunities for "summer internships," (*id.* ¶38) "weekly, intensive pre-college counseling," "public speaking" and many other opportunities (SUNY Plattsburgh Decl.

¶22). This is just "a sampling" of what their TRIO projects offered. *Id.* Students will also be in the dark when it comes to practical aspects of being a college student, something first-generation college students are not familiar with. *Id.* For example, the deadline to apply for student financial aid for the 2025-2026 year is October 1, 2025. But now, at South Seattle for example, "students are challenged with navigating the … funding process." S. Seattle Decl. ¶21. The best it and others can do is "create new procedures" and "fill the gaps left" without their grants. *Id.* ¶31.

Students are being impacted in other ways too that while, perhaps more subtle, are meaningful. They are losing face time with faculty, peer support and networking opportunities. These opportunities to collaborate and develop relationships are fleeting and cannot be remedied years down the road. Marquette Decl. ¶38 ("Mentorship is a critical factor in graduate school preparation."). And most are losing services at critical times in their lives. "The detriment to student education . . . cannot be remedied through retroactive relief." *New York v. McMahon*, 2025 WL 1463009, at *31 (D. Mass. 2025). Perhaps most importantly, students are losing support that will propel them to become the *first member of their families to earn a college degree*.

There are other harms beyond those associated with closing projects. The Department concluded that the Affected Programs had *proposed* to discriminate against others, including against their students, based on race and sex. This finding greatly damages their reputations. "[P]eople and entities receiving federal funding are shielded against being labeled with the 'irreversible stigma' of 'discriminator' until a certain level of agency process has determined that there was misconduct that warranted termination." *Harvard*, 2025 WL 2528380, at *29.

### 4. Harm to Affected Programs in future grant competitions

Affected Programs with discontinued EOC and TS grants will be concretely injured in other ways that are immediate. The Department is required to issue a notice of invitation to apply for new EOC and TS grants in the coming months—the five-year grant cycles expire in 2026.

Those applications will be submitted and then undergo the peer review evaluation and scoring process in spring and be awarded by early summer 2026. *See* 20 U.S.C. § 1070a-11(c)(3). If an EOC or TS grant applicant proposes to "continue" serving substantially the same target population as under an existing "expiring project," the Department allows the applicant to earn prior experience points. *See* 34 C.F.R. § 643.20(a)(2); § 644.20(a)(2). Because of the Department's decision, Affected Programs with discontinued EOC or TS grants, like South Seattle and UNH, can no longer propose to "continue" to serve substantially the same population that they are serving under an "expiring" grant. *See also* Augsburg Decl. ¶38 (Augsburg "stands to lose Prior Experience Points" when it applies for a McNair grant). Accordingly, it and other Affected Programs with discontinued EOC and TS grants appear to be ineligible for prior experience points in the 2026 competitions. Jones Decl. ¶43. This harms them: because selection criteria are worth 100 points, and prior experience points are worth 15 points, they will be at a competitive disadvantage if they can only earn 100 of 115 points. Moreover, Affected Programs with discontinued EOC and TS grants will be harmed in the 2026 competitions *even if* they are credited prior experience points because the maximum amount of new TS and EOC grants in 2026 would be suppressed by hundreds of thousands of dollars for the same reason: they would not have an existing EOC or TS grant.

While the D.C. Circuit has recognized the lost opportunity to "compete for [] funds" as a form of injury, it has said that "if the later opportunity to compete for additional grants could fix the harm, it would not be irreparable." *Global Health Council*, 2025 WL 2480618, at *5, *13. Here though, the Affected Programs will not have a realistic "opportunity to compete" for new TS and EOC awards in 2026. The 2026 competition is around the corner and warrants immediate relief vacating the Notices of Non-Continuation and directing the Department to reconsider. *See Am.*

*Assoc. of Physc. Teachers v. Nat'l Sci. Found.*, 2025 WL 2615054, at *14 (D.D.C. 2025).

**5.    No harm to the Department**

The Department will suffer no harm from an order vacating the Notices of Non-Continuation and directing it to reconsider. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* To the extent the Department has to spend effort and time reconsidering its Notices of Non-Continuation, that is a problem of its own making.

**C.    The balance of equities favors COE.**

The balance-of-equities and public-interest factors merge if the government is the opposing party. *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020). COE and Affected Programs will suffer significant harm, and the Department will suffer none. The public has an interest in seeing the Department obey the law.

**D.    No bond should be required.**

This Court has discretion under Federal Rule of Civil Procedure 65(c) to waive the bond requirement for preliminary injunctions, particularly for nonprofits serving the public interest.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should enter a preliminary injunction in COE's favor ordering the Department and the Secretary to vacate the Notices of Non-Continuation and reconsider the Affected Programs' continuation awards according to relevant regulations, including 34 C.F.R. § 75.253(a) and applicable law, including the HEA, in addition to following all proper procedures under Title VI and Title IX and applicable regulations.

Dated: September 30, 2025          Respectfully submitted,

**THOMPSON COBURN LLP**

- 45 -

*/s/* Jayna Marie Rust

Jayna Marie Rust (D.C. Bar No. 998326)
1909 K Street N.W., Suite 600
Washington, D.C. 20006
P. (202) 585-6929
E. jrust@thompsoncoburn.com

Brandt P. Hill (*Pro hac vice* forthcoming)
Lorrie L. Hargrove (*Pro hac vice* forthcoming)
2311 Highland Avenue, Suite 330
Birmingham, Alabama 35205
P. (205) 769-4303
E. bhill@thompsoncoburn.com
  lhargrove@thompsoncoburn.com

*Counsel for the Council for Opportunity in Education*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 30, 2025, I served the foregoing on all counsel of record using the Court's CM/ECF system or by U.S. Mail at the following addresses:

U.S. Department of Education
400 Maryland Avenue, S.W.
Washington, DC 20202

Linda McMahon
U.S. Secretary of Education
400 Maryland Avenue, S.W.
Washington, DC 20202

Assistant Attorney General for Administration
U.S. Department of Justice
Justice Management Division
950 Pennsylvania Avenue, NW
Room 1111
Washington, DC 20530

United States Attorney's Office for the District of Columbia
Attn: Civil Process Clerk
Civil Division
601 D Street, N.W.
Washington, DC 20530

/s/ Jayna Marie Rust
Jayna Marie Rust
Thompson Coburn LLP
1909 K Street N.W., Suite 600
Washington, D.C. 20006
P.      (202) 585-6929
E.      jrust@thompsoncoburn.com

- 47 -