# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **COUNCIL FOR OPPORTUNITY IN EDUCATION**<br><br>Plaintiff,<br><br>v.<br><br>**U.S. DEPARTMENT OF EDUCATION**, *et al.*<br><br>Defendants. | Civil Action No. 25-cv-03491 (TSC)<br>Civil Action No. 25-cv-03514 (TSC)<br>(Consolidated Cases) |

## MEMORANDUM OPINION

In passing the Higher Education Act of 1965 ("HEA") and its subsequent amendments, Congress recognized the need to overcome barriers to postsecondary education faced by students from disadvantaged backgrounds. *See* 20 U.S.C. § 1070. Congress therefore established a series of grant programs to identify, prepare, motivate, and support those students in their pursuit of higher education. *See* 20 U.S.C. § 1070a-11(a). The resulting programs, commonly referred to as federal "TRIO" programs, are administered by the Department of Education and subject to procedural and substantive requirements laid out in the HEA, the General Education Provisions Act, applicable federal civil rights laws, and accompanying federal regulations. Plaintiff Council for Opportunity in Education ("COE") is a nonprofit organization whose members are comprised of more than 1,000 colleges, universities, and nonprofit community-based agencies that participate in one or more federal TRIO grant programs. COE focuses on furthering the expansion of educational opportunities for disabled, low-income, and first-generation college students in the

United States who are served by TRIO programs, including the Student Support Services ("SSS") program.

These consolidated cases deal with Department of Education's recent decisions denying certain COE members' applications for new SSS grants, Case No. 25-cv-3491 ("SSS Case"), and discontinuing other members' TRIO grant funding, Case No. 25-cv-3514 ("TRIO Case"), all allegedly on the grounds that the proposed or funded activities conflicted with the Trump Administration's anti-DEI policies and interpretations of federal civil rights law. COE filed two separate lawsuits against the Department of Education and Secretary McMahon (collectively, "the Department"), both alleging, *inter alia*, violations of the Administrative Procedure Act ("APA"), constitutional violations, and *ultra vires* claims. SSS Case Compl., ECF No. 1; TRIO Case Compl., ECF No. 1. COE simultaneously moved for preliminary injunctions in both cases. SSS Case Mot. for Prelim. Inj. ("PI Mot."), ECF No. 2; TRIO Case Mot. for Prelim. Inj. ("PI Mot."), ECF No. 2. The Department opposed the motions and moved to dismiss the actions. SSS Case Mot. to Dismiss ("Def.'s Mot."), ECF Nos. 15/16; TRIO Case Mot. to Dismiss ("Def.'s Mot."), ECF Nos. 14/15. For the reasons below, COE's motions for preliminary injunctions will be **GRANTED**, though more limited in scope than COE requests.

## I.    BACKGROUND

### A.  Statutory and Regulatory Framework

In establishing a series of education grant programs to combat barriers to higher education faced by students from disadvantaged backgrounds, Congress explicitly tasked the Department of Education with administering "a program of making grants and contracts" designed to "identify qualified individuals from disadvantaged backgrounds," "prepare them for a program of postsecondary education," "provide support services for such students who are pursuing programs

of postsecondary education," "motivate and prepare students for doctoral programs," and "train individuals serving or preparing for service in programs and projects so designed." 20 U.S.C. § 1070a-11. The TRIO programs have expanded over time to eight: Upward Bound, Upward Bound Math-Science, Veterans Upward Bound, Educational Opportunity Centers, Talent Search, Student Support Services, Ronald E. McNair Postbaccalaureate Achievement, and the Training Program for Federal TRIO Programs Staff. These programs are all authorized under Title IV, Part A of the HEA, as amended, *see* 20 U.S.C. §§ 1070a-11–1070a-18, and administered through program-specific regulations, *see* 34 C.F.R. Parts 642–47.

TRIO grants are awarded through a peer-review process for project periods of two or five years, 20 U.S.C. § 1070a-11(b)(2), (c), with five years for the SSS grants, *see* 34 C.F.R. § 646.5. The SSS grant application and award process is outlined in the authorizing statutes, *see* 20 U.S.C. §§ 1070a-11, 1070a-14, and is implemented by the Department's SSS program regulations, *see* 34 C.F.R. pt. 646, in addition to general administrative grantmaking regulations, *id.* pt. 75; *id.* § 75.1(a)(1). Funds for all TRIO grants are awarded for an initial twelve-month budget period and continued thereafter in subsequent twelve-month budget periods if the recipient maintains eligibility, submits the requisite reports, and satisfies certain performance criteria. 34 C.F.R. §§ 75.251(a), 75.253(a). Continuation awards also require a finding by the Secretary that "the project is in the best interest of the Federal Government." *Id.* § 75.253(a)(5).[1]

TRIO programs are also considered "applicable program[s] of the Department" under the General Education Provisions Act ("GEPA"), over which the Department of Education has

---

[1] "In determining whether the grantee has met the requirements[,] . . . the Secretary may consider any relevant information regarding grantee performance. This includes considering reports required by § 75.118, performance measures established under § 75.110, financial information required by 2 CFR part 200, and any other relevant information." 34 C.F.R. § 75.253(b).

"administrative responsibility." *See* 20 U.S.C. § 1221(b)(1), (c)(1). TRIO grant applicants must therefore satisfy GEPA's requirement to address "equitable access" and "equitable participation" by students facing "barriers based on gender, race, color, national origin, disability, and age." *Id.* § 1228a(b). This requirement is commonly referred to as the GEPA Equity Directive. According to COE, GEPA also requires the Department to follow the APA's notice-and-comment process in creating or amending legally binding TRIO grant competition and selection procedures. *See id.* §§ 1221e-4, 1232(a)(2), (d); 5 U.S.C. § 553; *see also* 34 C.F.R. § 75.105(b).

As programs receiving federal funds, TRIO programs are also subject to Title VI of the Civil Rights Act of 1964 ("Title VI") and Title IX of the Education Amendments of 1972 ("Title IX"), which prohibit discrimination on the basis of race and gender, respectively. *See* 42 U.S.C. § 2000d; 20 U.S.C. § 1681. These statutes require the Department to (1) notify applicants and awardees of any non-compliance issues, (2) make an express finding on the record after opportunity for a hearing, and (3) allow the applicant or awardee to voluntarily cure any such non-compliance, prior to denying or discontinuing grant funding. *See* 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682; *see also* 34 C.F.R. §§ 100.6, 100.8(c), 100.9.

### B. Factual Background

#### a. *SSS Grant Application Rejections*

The Department solicited new applications for FY 2025 SSS grants in spring 2024. *See* Applications for New Awards; Student Support Services Program ("2024 Notice Inviting SSS Applications"), 89 Fed. Reg. 35,080 (May 1, 2024). The 2024 Notice Inviting SSS Applications incorporated two competitive preference priorities from 2021 for addressing the needs of underserved students, which, by definition, included "student[s] of color," and sponsoring activities designed to make college more affordable and accessible to said students as well as

supporting them.  *See id.* at 35,080–81; Final Priorities and Definitions-Secretary's Supplemental Priorities and Definitions for Discretionary Grants Programs ("2021 Final Priorities"), 86 Fed. Reg. 70,612 (Dec. 10, 2021).  Competitive preference priorities allow applicants to gain a specified number of bonus points in the selection process and must be published through a notice on the Federal Register, and subject to public comment.  *See* 34 C.F.R. § 75.105(b)(1)–(2), (c)(2).  The application period for new SSS grants closed in July 2024 during the Biden Administration.  *See* 2024 Notice Inviting SSS Applications, 89 Fed. Reg. 35,080.  According to the Complaint, the impacted COE members timely submitted their applications, all of which contained the mandatory GEPA Equity Directive, and many of which addressed the two competitive preference priorities. SSS Case Compl. ¶¶ 135–36.

In May 2025, the Department published a proposed rule in the Federal Register intended to replace the 2021 Final Priorities and other supplemental priorities issued under the prior Administration, *see* Proposed Priorities and Definitions-Secretary's Supplemental Priorities and Definitions on Evidence-Based Literacy, Education Choice, and Returning Education to the States ("2025 Proposed Priorities"), 90 Fed. Reg. 21,710 (May 21, 2025), because those priorities "encourage[d] recipients to violate Federal civil rights law" "by using race-based preferences and stereotypes, and racial exclusion in their programs."  Final Priorities and Definitions-Secretary's Supplemental Priorities and Definitions on Evidence-Based Literacy, Education Choice, and Returning Education to the States ("2025 Final Priorities"), 90 Fed. Reg. 43,514 (Sept. 9, 2025). The proposed rule nonetheless specified that the 2021 Priorities, as adopted in the 2024 Notice inviting new SSS applications, would remain in effect for notices soliciting applications that were published before the new priorities were finalized.  *See* 2025 Proposed Priorities, 90 Fed. Reg. 21,710.

In July 2025, the Department sent out virtually identical denial letters to certain COE members, informing them that their programs had "not been selected based on the Department's review for potential conflicts with applicable nondiscrimination requirements." SSS Case Compl. ¶¶ 157, 158. Specifically, the letters stated that "staff" had reviewed their applications and "identified information indicating that the proposed activities take account of race in ways that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education and the Department's commitment to upholding the letter and purpose of Federal civil rights law." *Id*. ¶ 159. According to the Department, such applications were "therefore inconsistent with applicable nondiscrimination statutes, regulations, policies, and other requirements applicable to the program. 34 C.F.R. § 75.500; *see also* 2 C.F.R. § 200.211(c)." *Id*.

### b. *TRIO Grant Discontinuations*

In summer 2025, the Department also issued notices of grant non-continuation to various COE members who had received awards between 2021-2024 and who remained in compliance with applicable requirements. TRIO Case Compl. ¶¶ 116, 119–23, 139. Using virtually identical language, the Department gave the following reasons for discontinuing the awards:

> The Department has undertaken a review of grants and determined that the grant specified above provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds.

*Id.* ¶¶ 143, 145. The notices went on to state that "staff" had reviewed the members' applications for funding and identified information in their previously selected applications "that may conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; or violate the letter or purpose of Federal civil rights law." *See* TRIO Case Decl. of Christopher McCaghren

("McCaghren Decl."), Ex. C, ECF No. 14-4.  Consequently, it concluded that the continuation of these members' programs was "inconsistent with, and no longer effectuates, the best interest of the Federal Government."  TRIO Case Compl. ¶ 145.

The letters advised the discontinued grantees that they could request reconsideration, but when COE members did so, the Department did not respond.  *Id.* ¶ 148.  The Department, however, submitted as exhibits the responses it sent to the affected members on the day COE filed suit, which generally restated the grounds the Department relied on in making its initial discontinuation decisions.  *See* McCaghren Decl., Ex. D, ECF No. 14-5.

The Department finalized its new priorities in September 2025, which went into effect October 9, 2025.  *See* 2025 Final Priorities, 90 Fed. Reg. 43,514.

### C.  Procedural History

On September 30, 2025, COE sued the Department of Education and Secretary of Education, Linda McMahon, in two separate actions, each seeking declaratory, injunctive, and mandamus relief.  In the first action, the SSS Case, COE asserts claims under the APA, Counts I–V, an *ultra vires* claim, Count VI, and, in the alternative, requests a writ of mandamus, Count VII. SSS Case Compl. at 56–69.  In the second action, the TRIO Case, COE asserts similar claims under the APA, Counts I–IV, an *ultra vires* claim, Count VIII, requests a writ of mandamus, Count IX, with the addition of several claims independently asserting constitutional violations under the Fifth Amendment,[2] Count V, Separation of Powers and the Non-Delegation Doctrine, Count VI, and the Take Care Clause, Count VII.  TRIO Case Compl. at 49–62.

---

[2] COE voluntarily withdrew this claim at the court's hearing on its preliminary injunction motions.  *See* SSS Case Dec. 15, 2025 Hr'g Tr. at 45 ("Dec. 15 Tr."), ECF No. 24.

On the same day COE filed its Complaints, it also moved for preliminary injunctions in both cases.  SSS Case PI Mot.; TRIO Case PI Mot.  Across those motions, COE generally requests that the court (1) vacate Defendants' denial and discontinuation decisions as to its affected members, (2) order Defendants to immediately reconsider those decisions and abide by operative statutes and regulations in so doing, (3) enjoin Defendants from obligating and disbursing its remaining FY 2025 funds from the Higher Education budget as well as from terminating or discontinuing grants for asserted civil rights violations without completing the procedures required by those laws, and (4) order Defendants to restore the affected programs' eligibility for prior experience points and higher base funding for future grant competitions.  *See* SSS Case PI Mot. Ex. 10 at 1–2; SSS Case Pl.'s Reply at 2, ECF Nos. 18/19; TRIO Case PI Mot. Ex. 9 at 1–2; TRIO Case Pl.'s Reply at 2–3, ECF Nos. 17/18.

Defendants filed joint motions to dismiss and responses to COE's preliminary injunction motions on November 10, 2025.  SSS Case Def.'s Mot.; TRIO Case Def.'s Mot.  On November 24, 2025, COE filed combined replies in support of its preliminary injunction motions and oppositions to Defendant's motions to dismiss.  SSS Case Pl.'s Reply; TRIO Case Pl.'s Reply. Defendants then filed their replies in support of its motions to dismiss on December 5, 2025, SSS Case Def.'s Reply, ECF No. 22; TRIO Case Def.'s Reply, ECF No. 21, and the court held a hearing on the motions for preliminary injunctions on December 15, 2025.  *See* Min. Entry (Dec. 15, 2025). At that hearing, the court consolidated the cases.  *Id.*

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A preliminary injunction is nonetheless

warranted where the moving party establishes that (1) it is likely to succeed on the merits,[3] (2) irreparable harm is likely in the absence of preliminary relief, (3) the balance of equities tips in the movant's favor, and (4) an injunction is in the public interest.  *Id.* at 20.  "The moving party bears the burden of persuasion and must demonstrate, 'by a clear showing,' that the requested relief is warranted."  *Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), and "to balance the equities as the litigation moves forward," *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (per curiam).  "The status quo is the last *uncontested* status which preceded the pending controversy."  *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (quoting *District 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969)).

## III.    ANALYSIS

### A.  COE Has Established Article III Standing[4]

---

[3] In the D.C. Circuit, it "remains an open question whether the 'likelihood of success' factor is 'an independent, free-standing requirement,' or whether, in cases where the other three factors strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal question' on the merits."  *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 393, 398 (D.C. Cir. 2011)).

[4] Defendants initially argued that COE's claims were mooted by prior obligations of FY 2025 funds and the September 30, 2025, lapse in appropriations, SSS Case Def.'s Mot. at 7–9; TRIO Case Def.'s Mot. at 9–10, but they withdrew this argument in their December 5, 2025, Replies based on new information regarding the lapse date for multi-year program funds within the Department's Higher Education account, *see* SSS Case Def.'s Reply at 1; TRIO Case Def.'s Reply at 1.

It is an "essential and unchanging part of the case-or-controversy requirement" that a plaintiff must establish Article III standing to sue in federal court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To do so, a party must show that: (1) they have suffered an injury in fact, (2) the injury is fairly traceable to defendant's action, and (3) it is likely that the injury will be redressed by a favorable decision. *Id.* at 560–61. A party seeking a preliminary injunction "must show a substantial likelihood of standing." *Green v. U.S. Dep't of Just.*, 54 F.4th 738, 744 (D.C. Cir. 2022) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)) (internal quotation marks omitted). As an organization, COE can demonstrate standing in two ways. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). The first is a type of organizational standing that allows an organization to sue on its own behalf. *See Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006). The second is associational standing, which allows an organization to sue on behalf of its members. *Id.* COE asserts that it has standing in both cases under either theory, *see* SSS Case PI Mot. at 14–19; TRIO Case PI Mot. at 16–19, and the court is inclined to agree. In light of the Department's concession in their briefing that COE demonstrated associational standing as to the members it identified, however, the court will only address COE's associational standing theory since COE need only satisfy Article III's standing requirement in one of the two ways. *See Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 169 (D.D.C. 2021).

To show associational standing, an organization must demonstrate that: "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted, nor the relief requested, requires that an individual member of the association participate in the lawsuit." *Sierra Club v.*

*EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977)).

In the TRIO Case, Plaintiff identified seven affected member programs, with each member submitting a declaration detailing their grant histories, the Department's discontinuation decisions, and the harms they are suffering or will imminently suffer because of those decisions, along with documentation. *See* TRIO Case Decl. of Augsburg University ("Augsburg Decl."), ECF No. 2-2; TRIO Case Decl. of Marcus Arrington ("Marquette Decl."), ECF No. 2-3; TRIO Case Decl. of Abraham Pena ("Suffolk Decl."), ECF No. 2-4; TRIO Case Decl. of South Seattle College ("South Seattle Decl."), ECF No. 2-5; TRIO Case Decl. of Brian Post ("SUNY Plattsburgh Decl."), ECF No. 2-6; TRIO Case Decl. of Rebecca Barbour ("UNH Decl. McNair"), ECF No. 2-7; TRIO Case Decl. of Melissa Goyait-Heikkinen ("UNH Decl. Talent Search"), ECF No. 2-8 .

In the SSS Case, COE identified at least three members that applied for and were denied grant funding, with attached declarations detailing the programmatic cuts and layoffs that have or will occur for those affected programs. *See* SSS Case Decl. of Sarah Postel ("Green River Decl."), ECF No. 2-2; SSS Case Decl. of Veronica Guadarrama ("Big Bend Decl. STEM"), ECF No. 2-7; SSS Case Decl. of Veronica Guadarrama ("Big Bend Decl. Classic"), ECF No. 2-8; SSS Case Decl. of Renada Greer ("SIU Carbondale Decl."), ECF No. 2-9.  The Department's sole response is that COE has not "identified all specific members who have been allegedly harmed by Defendants' actions" and therefore lacks associational standing to bring suit on behalf of any unnamed member. *See* TRIO Case Def.'s Mot. at 13.  But, as noted above, a plaintiff organization need not identify all impacted members; as long as one member has standing to sue, the requirement is met. *Sierra Club*, 292 F.3d at 898.

It is clear from COE's Complaints and the attached declarations to its preliminary injunction motions that its impacted members can readily demonstrate "concrete" injuries through their lost funding and subsequent adverse programmatic impacts, *see Glob. Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025) (explaining that "a plaintiff may be harmed by denial of the opportunity to compete for a pool of funds for which they are able and willing to compete"), that are "fairly traceable" to the Department's grant discontinuations and denials, *Lujan*, 504 U.S. at 560–61, and are redressable by the requested relief—vacatur of the Department's decisions and an order directing it reconsider those decisions in accordance with the law—even if such later funding is not guaranteed, *see N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 306 (D.D.C. 2025) (noting that "redressability does not require plaintiffs to demonstrate certainty or eliminate all hypothetical alternatives"); *Glob. Health*, 153 F.4th at 12 (standing satisfied where "even the prospect of competing for funds months later would partially redress the injuries to the grantees' finances").

It is also clear that COE's purpose in supporting its members' ability to participate in the TRIO grant programs renders its claims in both cases "germane" to its purpose. *See* TRIO Case Compl. ¶¶ 6–7 (explaining that COE is a nonprofit "dedicated to furthering the expansion of educational opportunities for low-income students, first-generation college students, students with disabilities, and veteran students who are served by the TRIO programs"); TRIO Case Decl. of Kimberly Jones ("Jones Decl.") ¶¶ 9–15, ECF No 2-1.  And, as COE points out, SSS Case Pl.'s Reply at 18, its allegations, as supported by attached declarations, also reveal a "discrete pattern of conduct" that the Department "applied equally" to members whose grants were discontinued or denied for purported noncompliance with antidiscrimination laws and anti-DEI policies and priorities, resulting in asserted "systemic violation[s]" of the law.  *Robertson v. District of*

*Columbia*, 762 F. Supp. 3d 34, 62 (D.D.C. 2025). Moreover, the remedies that COE seeks will "inure to the benefit" of all its affected members. *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 288 (1986) (internal quotations and citation omitted) (finding associational standing even though the state authority would have to consider the unique facts of members' claims). Consequently, individual participation is not necessary. *See Robertson*, 762 F. Supp. 3d at 62; *Harris Cnty., Texas v. Kennedy*, 786 F. Supp. 3d 194, 204 (D.D.C. 2025) (recognizing that individual participation is typically unnecessary where "an association seeks prospective or injunctive relief for its members").

Insofar as the Department suggests that individual participation is required because "some of these institutions may have alternate programs that serve the same functions as the TRIO Programs," TRIO Case Def.'s Reply at 5, their argument ignores the general rule that minor, identifiable impacts can satisfy standing, *see Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) ("A dollar of economic harm is still an injury-in-fact for standing purposes."); *Mass. Credit Union Share Ins. Corp. v. Nat'l Credit Union Admin.*, 693 F. Supp. 1225, 1228 (D.D.C. 1988) ("[A] minor but identifiable harm will suffice."). Further, a "minimal degree of individual participation by members" will not defeat the individual participation prong, which, in the end, is merely a prudential consideration, not a constitutional one. *Robertson*, 762 F. Supp. 3d at 61.

Given the identified programmatic and procedural harms suffered by COE's named members, COE has demonstrated associational standing.

**B. This Court Has Jurisdiction Over COE's Claims**

The Department also argues that the court lacks jurisdiction over COE's claims[5] because they are, in essence, contract claims that belong in the Court of Federal Claims. *See SSS Case Def.'s Mot. at 15–19; TRIO Case Def.'s Mot. at 16–23.* Under the Tucker Act, 28 U.S.C. § 1491, the Court of Federal Claims has exclusive jurisdiction over claims founded "upon any express or implied contract with the United States" for over $10,000. As a result, federal district courts lack jurisdiction under the APA "to enforce a contractual obligation to pay money." *California*, 604 U.S. at 651. Even if they are not expressly identified as such, claims that are "essentially contractual" cannot "avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act by simply asking for injunctive relief in district court." *Climate United*, 154 F.4th at 820 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)).

As a threshold matter, COE suggests that TRIO grants are not contracts at all, and therefore not subject to the Tucker Act, because the operative statutes differentiate between grants and contracts and there is no consideration. *See* TRIO Case Pl.'s Reply at 24–26; SSS Case Pl.'s Reply at 24–26. These arguments are foreclosed by precedent. Recently, the Supreme Court identified instances in which the Tucker Act's vesting of exclusive jurisdiction in the Court of Federal Claims

---

[5] While the Department does not appear to differentiate among COE's claims in making this argument, the theory upon which precedent has developed in this area generally relates to jurisdictional limits on APA review. *See Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam); *Nat'l Insts. of Health* ("*NIH*") *v. Am. Pub. Health Ass'n*, 606 U.S. ---, 145 S. Ct. 2658 (2025) (mem.). Therefore, insofar as the Department challenges COE's Fifth Amendment, Separation of Powers, Take Care Clause, and *ultra vires* claims under this theory, its argument is misplaced. *See Climate United Fund v. Citibank, N.A.*, 154 F.4th 809, 826–29 (D.C. Cir. 2025), *reh'g en banc granted and judgment vacated,* No. 25-5122, 2025 WL 3663661, at *1 (D.C. Cir. Dec. 17, 2025) (per curiam) (addressing plaintiff's *ultra vires* and constitutional claim separately from its Tucker Act jurisdiction analysis); *see also Harris Cnty.*, 786 F. Supp. 3d at 207; *Amica Ctr. for Immigrant Rts. v. U.S. Dep't of Just.*, 25-cv-298, 2025 WL 1852762, at *15 (D.D.C. July 6, 2025).

barred APA challenges to prior grant terminations in federal district courts. *See NIH*, 145 S. Ct. at

2661 (Barrett, J., concurring); *California*, 604 U.S. at 651.

This general bar applies even where the challenge is based on the APA and does not turn

on the specific terms of the terminated grants. *See NIH*, 145 S. Ct. at 2664 (Gorsuch, J., concurring

in part and dissenting in part); *see also Climate United*, 154 F.4th at 823–26. Nonetheless, the

Court did not go so far as to suggest that the Tucker Act precludes federal district court jurisdiction

over *all* claims relating to grant terminations. As Justice Barrett explained in her controlling

concurrence, courts can still prospectively enjoin agencies from exercising unlawful authority over

the termination of grants. *See NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring). In a partial dissent,

Chief Justice Roberts went further, suggesting that district courts' authority to vacate unlawful

policies "falls well within the scope of the District Court's jurisdiction under the Administrative

Procedure Act," which, in turn provides jurisdiction to vacate resulting grant terminations. *Id.* at

2662–63 (Roberts, C. J., concurring in part and dissenting in part); *see also id.* at 2671 (Jackson,

J., concurring in part and dissenting in part).

It appears, then, that it remains an open question as to whether federal district courts are

precluded from entertaining *any* APA claims relating to prior grant determinations that seek to

vacate or enjoin enforcement of those past decisions. For instance, the Supreme Court previously

denied the Government's emergency request to administratively stay a district court's order

temporarily enjoining the Government from enforcing its suspension of foreign aid grants. *See*

*Dep't of State v. AIDS Vaccine Advoc. Coal.*, 606 U.S. ---, 145 S. Ct. 753 (2025) (mem.). Other

judges in this Circuit have made the same observation, albeit prior to the Court's decision in *NIH*.

*See Harris Cnty.*, 786 F. Supp. 3d at 215–17; *Widakuswara v. Lake*, No. 25-5144, 2025 WL

1288817, at *13–14 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting) (noting distinctions between

the claims at issue in *California* and *Aids Vaccine Advocacy Coalition*).  The claims here appear to fall within this gray area.  Nonetheless, with the Supreme Court's direction and concerns in mind, the court finds that COE is likely to succeed in establishing this court's jurisdiction.

### a.  SSS Case

Relying on the "longstanding test" established in *Megapulse, Inc. v. Lewis*, courts in this Circuit look to the source of the rights upon which the plaintiff bases its claim as well as the type of relief sought to determine whether the claim sounds in contract.  672 F.2d at 968.  As COE points out, SSS Case Pl.'s Reply at 22, however, the Department's decisions denying COE members' SSS grant applications cannot be rooted in any "rights" to funding because there is no express or implied "contract within the meaning of the Tucker Act."  *Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985).  The members' prior grants have expired, and COE does not seek to revive them.  Rather, its challenge is focused solely on the procedures that the Department was required to observe in the FY 2025 SSS grant funding cycle, in which it has no claim of right.  Thus, the *only* available "source of the rights" at issue in COE's APA claims are those contained in the operative regulations and statutes.  *Cf. Climate United*, 154 F.4th at 823–26.

The fact that COE sued after its members' grant applications were rejected does not "define the source or nature of their [claims]."  *See Harris Cnty*, 786 F. Supp. 3d at 206.  Moreover, the Supreme Court has recognized that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'"  *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988).  While it is true that the consequence of the relief COE seeks—vacatur of the denial decisions and reconsideration in accordance with the law—may lead to funding in the future, that possibility is not sufficient to transform COE's claims into ones

seeking money damages.  And because there is no operative grant agreement that entitles COE or its members to funding, there can be no specific performance of that agreement.  *Cf. Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985).  Nor does COE seek as much.  The court therefore concludes that COE's APA claims in this case are not "in essence" contract claims, and the court retains jurisdiction to adjudicate them.

### b.  TRIO Case

As for the TRIO Case and challenges to the Department's assertedly unlawful and arbitrary discontinuation of grants, the question is somewhat closer, but an analogous case arising in the Western District of Washington and effectively affirmed, in relevant part, by the Ninth Circuit provides persuasive guidance.  *See Washington v. U.S. Dep't of Educ.*, No. 25-7157, 2025 WL 3486895, at *1 (9th Cir. Dec. 4, 2025) (per curiam).  In that case, sixteen plaintiff states sued for declaratory and injunctive relief, including for vacatur of discontinuation decisions, following the Department's discontinuation of certain TRIO grants.  *Id.*  The plaintiffs also sought a preliminary injunction, which the district court granted.  *Id.*  The court's Order enjoined the Department from "implementing or enforcing through any means the discontinuation decisions as to affected Grantees, including recompeting Program funds" and "reinstituting the discontinuation decisions based on the same or similar reasons."  *Washington v. U.S. Dep't of Educ.*, No. 25-cv-1228, 2025 WL 3004675, at *13 (W.D. Wash. Oct. 27, 2025).

On emergency appeal, the Ninth Circuit rejected the Department's request for an administrative stay.  *Washington*, 2025 WL 3486895, at *1–3.  The Court held that the Government was not likely to prevail on its claim that the Tucker Act precluded the district court's jurisdiction to issue its preliminary injunction because the TRIO grant discontinuations at issue were sufficiently dissimilar from the grant terminations in *California* and *NIH*.  *Id.* at *2.  In its analysis,

the Ninth Circuit highlighted that the plaintiffs "make no claim that they are automatically entitled to grant continuances," "unless the Secretary of Education affirmatively decides to continue their grants." *Id.* at *1. Moreover, the relief sought—"vacatur of the allegedly unlawful discontinuation decisions so the Secretary can make new decisions in accordance with Plaintiff States' theory of the law"—did "not cause any grant to be renewed because grant continuances are not automatic." *Id.* at *2 (citing 34 C.F.R. § 75.253). In contrast, the Court noted, the plaintiffs in *NIH* and *California* "explicitly sought, and the district courts ordered, the immediate payment of past-due grant obligations and the continued payment of ongoing obligations based on midyear grant terminations." *Id.* at *2. "Because Plaintiff States' claims seek purely prospective relief regarding multiyear grant discontinuations that do not take effect until December 31, 2025 . . . and vacatur would not result in the automatic reinstatement or continuance of those grants or the payment of any money to grantees," the Ninth Circuit concluded the Department was unlikely to succeed on its Tucker Act challenge. *Id.* at *2.

Here, as in *Washington*, COE does not argue that it is entitled to the discontinued funds, meaning that the source of their rights cannot be rooted in any implied and express contract or grant terms. *See generally*, TRIO Case PI Mot. at 23–24 (explaining how prior grant awards "expressly disclaim" any guarantee of future funding). Moreover, like the plaintiff states in *Washington*, COE does not seek money damages on behalf of any affected members' programs, reinstatement of their prior awards, or an order directing the Department to issue new determinations continuing their funding. Rather, it seeks another opportunity to be evaluated, which "would not result in the automatic reinstatement or continuance of those grants or the payment of any money to grantees." *Washington*, 2025 WL 3486895, at *2.

Any order by the court vacating the discontinuation decisions is therefore not an order for the Department to pay money from its budget or the Treasury, which would be subject to Tucker Act restrictions, because, in the absence of the discontinuation decisions, COE's members are not entitled to any funds. *Cf. Ingersoll-Rand*, 780 F.2d at 80 (explaining that "where [the] practical result of granting [a] plaintiff's request for declaratory and injunctive relief would be *reinstatement* of terminated contracts," that relief amounts to "specific performance" (citation omitted) (emphasis added)); *NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring) (differentiating the court's authority to vacate grant termination guidance on grounds that it "does not reinstate terminated grants" and "does not necessarily void decisions made under it," which would similarly reinstate those grants). And, as noted above, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893.

The court is of course aware that "it is important on the one hand to preserve the Tucker Act's limited and conditioned waiver of sovereign immunity in contract actions . . . ." *Megapulse*, 672 F.2d at 968. On the other hand, however, the court "must not do so in terms so broad as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government." *Id.* After weighing these considerations, the court concludes that it retains jurisdiction over COE's APA claims in the TRIO case as well.

## C. COE Is Entitled to a Preliminary Injunction

### a.  *This court can review COE's claims under the APA*

In addition to its Tucker Act argument, the Department challenges COE's ability to assert, and this court's jurisdiction over, the APA claims on the grounds that the Department's grant denial and discontinuation determinations are (1) subject to adequate alternative remedies, and (2)

constitute unreviewable actions committed to agency discretion.  *See* SSS Case Def.'s Mot. at 19–22; TRIO Case Def.'s Mot. at 23–27; *see* 5 U.S.C. §§ 701(a)(2), 704.  Both arguments are unavailing.  For one, the Department merely repackages its Tucker Act challenge as the basis for why alternative remedies exist.  *See* SSS Case Def.'s Mot. at 20; TRIO Case Def.'s Mot. at 24. For the same reasons as previously stated, however, this theory fails.  Second, the APA's bar on judicial review over agency decisions "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), is not applicable in instances, such as here, where a body of statutory and regulatory requirements provide for meaningful standards to apply on judicial review.

An action is committed to agency discretion, and therefore unreviewable, where "a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  In determining whether a matter has been committed to agency discretion, the court must "consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action."  *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011*)* (internal quotations and citation omitted).  Here, the HEA sets forth the TRIO grant selection process, including, among other things, application requirements, the considerations the Department may rely on in making its determination, the order of awards, the peer review process by which applications are scored, notice requirements, and procedures for review of any denial determinations.  20 U.S.C. § 1070a-11(c)(1)–(4), (8)(C).

In addition to the HEA's above requirements, GEPA, Title VI, and Title IX also mandate certain procedures in the context of education grantmaking, offering an even broader statutory backdrop against which the court can measure the Department's APA compliance.  *See id.* §§ 1221e-4, 1232(a)(2), (d) (requiring the Department engage in notice-and-comment rulemaking

before instituting a legally binding "regulation affecting any institution of higher education"); *id.* § 1228a(b) (establishing the GEPA Equity Directive); 42 U.S.C. § 2000d-1 (establishing procedures required to deny or discontinue funding for noncompliance with Title VI); 20 U.S.C. § 1682 (establishing procedures required to deny or discontinue funding for noncompliance with Title IX).  It is clear from these statutory restrictions that "Congress limited the [Department's] authority to disburse funds."  *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 752 (D.C. Cir. 2002). These limitations provide ample "statutory reference point[s] by which the court is able to review" the Department's decisions.  *Id.* (cleaned up).  Moreover, the Department's own regulatory schemes governing grant selection and discontinuation, *see* 34 C.F.R. pt. 646 (SSS grant application process); 34 C.F.R. § 75.253 (TRIO grant continuation process), offer yet another set of standards by which to judge its actions. *See Accrediting Council for Indep. Colleges & Schs. v. DeVos*, 303 F. Supp. 3d 77, 103 (D.D.C. 2018) ("[I]t is a fundamental principle of administrative law that an agency is [also] bound to adhere to its own regulations[.]" (quoting *Fuller v. Winter*, 538 F. Supp. 2d 179, 186 (D.D.C. 2008)).

The Department invokes *Lincoln v. Vigil* for the proposition that agency determinations on how to allocate lump-sum funds are excluded from judicial review.  *See* 508 U.S. 182, 193 (1993) ("[A]s long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, § 701(a)(2) gives the courts no leave to intrude.").  But the determinations at issue in *Lincoln* were not tied to any statutory or regulatory procedural requirements directing how the Department may carry out specific programs, as is the case here.  *See id.* (explaining that "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes").  Given the regulatory and statutory schemes governing the Department's TRIO grant

selection and continuation processes, the issue with judicial review in the committed-to-agency-discretion line of cases—that there would be no "meaningful standards" by which to judge COE's APA claims—is simply not present here.  *See id.* at 191; *Webster v. Doe*, 486 U.S. 592, 600 (1988); *Heckler*, 470 U.S. at 830.  "That 34 C.F.R. § 75.253(a)(5) requires 'a determination from the Secretary that continuation of the project is in the best interest of the Federal government' does not preclude judicial review because [courts] routinely treat discretion-laden standards as providing law to apply."  *Washington*, 2025 WL 3486895, at *2 (cleaned up).

### b. *COE is likely to succeed on the merits of at least one of its APA claims*

Having "satisf[ied] itself of its own jurisdiction" to consider COE's challenges to the Department's grant denial and discontinuation decisions, *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012) (cleaned up), the court turns to the merits of COE claims.

Section 706 of the APA provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be— (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law . . . ."  5 U.S.C. § 706(2).  Though review under the APA is highly deferential, agencies still "must operate within the legal authority conferred by Congress, and when those limits are transgressed, an individual may seek recourse in the Article III courts."  *Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 838 (D.C. Cir. 2024).  Nonetheless, "the court presumes the validity of agency action and must affirm unless the [agency] failed to consider relevant factors or made a clear error in judgment."  *Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 507 (D.C. Cir. 2020) (internal quotations and citation omitted).

Beyond its invocation of the APA's statutory limitations, as addressed above, the Department does not challenge the merits of COE's non-constitutional APA claims in either case. *See* SSS Case Def.'s Mot at 19–24, 28–29; TRIO Case Def.'s Mot. at 23–27, 38–39. The Department also does not contest that the SSS grant denial and TRIO grant discontinuation decisions are "final agency actions," subject to APA review. *See* 5 U.S.C. § 704. Nor does the Department contest that COE's claims fall within the relevant statutes' "zone of interest." *See Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496, 499 (D.C. Cir. 1994) ("To secure judicial review under the APA, [plaintiffs] must show that the injuries they assert fall within the 'zone of interests' of the relevant statute."). Notably, COE need only demonstrate a likelihood of success on the merits of one of their claims in each case to satisfy the first *Winter* factor for a preliminary injunction. *See, e.g., Mid-Atl. Equity Consortium v. U.S. Dep't of Educ.*, 793 F. Supp. 3d 166, 189 n.6 (D.D.C. 2025); *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 27 (D.D.C. 2024). COE has done so here.

### i. SSS Case

COE has demonstrated a likelihood of success that the Department's decisions denying SSS grant funding were arbitrary, capricious, and otherwise not in accordance with the law. 5 U.S.C. § 706(2).

### 1. The Department's denial decisions are impermissibly vague and conclusory (Count II)

A "fundamental" requirement of administrative law is that an agency "set forth its reasons" for its decision; failure to do so constitutes arbitrary and capricious agency action. *Tourus Recs., Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001). At a minimum, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*

*of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

COE asserts, and provides supporting documentation, that the Department's denial letters all stated that unnamed staff had "identified information indicating that the proposed activities take account of race in ways that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education and the Department's commitment to upholding the letter and purpose of Federal civil rights law."  SSS Case Compl. ¶ 159.  According to COE, these "virtually identical" denial letters all offered this same reasoning, except for a single citation to a page number from each of the members' application.  *Id.* ¶ 158.  Yet, some of these page numbers apparently did not correlate to any page in the applications, *see* Big Bend Decl. STEM, Exs. B, C; Big Bend Decl. Classic, Exs. B, C, while others did not reference any language that stated race would be used as a factor in the selection process for the programs, *see* SIU Carbondale Decl. ¶ 31; Green River Decl., Exs. F, G.  Though repeatedly asked, the Department has refused to offer any rational explanation for why it denied these members' SSS grant applications beyond "the Department's review for potential conflicts with applicable nondiscrimination requirements."  McCaghren Decl. ¶ 14; *see also* Dec. 15 Tr. at 29–32.  When pressed at the hearing on what policies and priorities the Department relied on, counsel simply stated they were not prepared to discuss the merits of the cases.  Dec. 15 Tr. at 30–31.[6]

---

[6] Notably, the Department agreed to provide a supplemental declaration by December 22, 2025, detailing its reasoning behind the denial decisions.  Consequently, the court allowed it to proceed without submitting an Administrative Record under Local Rule 7(n).  *See* Dec. 15 Tr. at 32–33, 62–63.  But the three-page supplemental declaration the Department submitted did not address the court's question regarding the agency's reasoning.  *See* SSS Case Supp. Decl. of Christopher McCaghren ¶¶ 1–9, ECF No. 25-1.

Even under the court's deferential standard of review, the Department's failure to articulate anything beyond conclusory statements regarding applicants' noncompliance with "federal civil rights laws" and the Administration's policies does not pass muster under the APA's reasonable explanation requirement. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947) (finding agency action arbitrary and capricious where a party is "compelled to guess at the theory underlying the agency's action"). Indeed, "[t]he letters strongly suggest that defendants identified grants for the chopping block via a blunt keyword search, without much, if any, further inquiry." *Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.*, No. 25-cv-1775, 2025 WL 2374528, at *35 (D.D.C. Aug. 14, 2025). But even if the denial letters were not impermissibly vague, the Department was not permitted to rely on any of the letters' stated grounds.

### 2. The Department was not permitted to deny applicants funding for noncompliance with Title VI without first satisfying its procedural requirements (Count III)

First, insofar as the Department rejected COE members' SSS grant applications for violations of Title VI, it failed to observe procedures required under the statute and its implementing regulations, codified at 34 C.F.R. Part 100. According to COE, its members' denial letters all stated that they had not been selected for funding based on the Department's review for potential conflicts with applicable nondiscrimination requirements, each citing 34 C.F.R. § 75.500. *See* SSS Case Compl. ¶¶ 157, 201. The denials went on to state that unnamed staff identified information indicating that "the proposed activities take account of race in ways that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education and the Department's commitment to upholding the letter and purpose of Federal civil rights law." SSS Case Compl. ¶¶ 157, 201; *see also* Green River Decl., Ex. F; Big Bend Decl. STEM, Ex. B; Big Bend Decl. Classic, Ex. B; SIU Carbondale Decl., Ex. B. Under Title VI and the Department's

own regulations, however, the Department was not permitted to deny the applications for asserted noncompliance with Title VI without first advising the applicants of any noncompliance issues, making an express finding of noncompliance on the record after an opportunity for a hearing, and attempting to secure voluntary compliance. *See* 42 U.S.C. § 2000d-1*;* 34 C.F.R. § 100.8(c). COE's declarations state, and the Department does not contest, that the Department did not follow any of these procedures. *See* SSS Case Compl. ¶¶ 208–10; Green River Decl. ¶¶ 28–29; Big Bend Decl. STEM ¶ 26; Big Bend Decl. Classic ¶ 26; SIU Carbondale Decl. ¶ 25. Thus, to the extent the Department relied on Title VI noncompliance to deny COE members' applications for SSS grant funding, COE is likely to succeed on its claim that the Department violated the APA by failing to follow the requisite procedures. *See* 5 U.S.C. § 706(2)(D).

### 3. Any reliance on the 2025 Final Priorities was not permitted (Counts I, II, and IV)

Agency action is also generally unlawful if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*, 463 U.S. at 43. As noted in the factual background above, *see supra* Part I.B.a., the applicable priorities for the FY 2025 SSS grant selection cycle required the Department to award bonus points based on the extent to which proposed projects assisted underserved students—who, by definition, included students of color—and activities designed to make college more affordable and accessible to these students. *See* 2024 Notice Inviting SSS Applications, 89 Fed. Reg. 35,080–81.[7] Similarly, under GEPA, all SSS grant applicants were required to explain

---

[7] The priorities specifically identified "[p]rojects that are designed to improve students' social, emotional, academic, and career development needs, with a focus on underserved students, by

how their proposed programs will address "equitable access" and "equitable participation" by students who face barriers based on, *inter alia*, race. *See* 20 U.S.C. § 1228a(b).

According to COE, however, the language used in certain members' denial letters—that the proposals "conflict with the Department's policy of prioritizing merit, fairness, and excellence in education and the Department's commitment to upholding the letter and purpose of Federal civil rights law"—suggests that the Department rejected applications *because* of the language that applicants used to satisfy the applicable priorities and requirements under GEPA. *See* Compl. ¶ 260, *see also* Green River Decl., Ex. F; Big Bend Decl. STEM, Ex. B; Big Bend Decl. Classic, Ex. B; SIU Carbondale Decl., Ex. B. If this inference was not sufficiently clear from the context and the Department's failure to contest the allegation, the court notes that the Department's wording is also the *exact* language used in the 2025 Final Priorities as a basis for why it rescinded the prior priorities, 2025 Final Priorities, 90 Fed. Reg. 43,514 ("[T]he 2021 priorities are not consistent with this Administration's focus on merit, fairness, and excellence."), which the Department explicitly stated would not be applied to the relevant application cycle in the proposed rule, *see* 2025 Proposed Priorities, 90 Fed. Reg. 21,710. To the extent the Department refused to credit applicants with the bonus points they should have received under the operative priorities or otherwise rejected applications on the basis of language mandated by GEPA, the Department's actions were arbitrary and capricious.

Moreover, under GEPA, the Department was required to follow the APA's notice-and-comment rulemaking procedure when setting generally applicable rules, regulations, or guidance

---

creating education and work-based settings that are supportive, positive, identity-safe and inclusive, including with regard to race, ethnicity, culture, language, and disability status, through" various listed activities, and "[p]rojects that are designed to increase postsecondary access, affordability, completion, and success for underserved students," including "student[s] of color." 2024 Notice Inviting SSS Applications, 89 Fed. Reg. 35,080–81.

with legally binding effects for TRIO grant administration.  Specifically, GEPA mandates, with few exceptions not applicable here, that "regulation[s]" affecting "any institution of higher education," 20 U.S.C. § 1221e-4, including any "generally applicable rule, regulation, guideline, interpretation, or other requirement" that "has legally binding effect in connection with, or affecting, the provision of financial assistance under any applicable program," *id.* § 1232(a)(2), go through notice-and-comment rulemaking, *id.* §§ 1221e-4, 1232(d).  This includes any priorities and other generally applicable criteria utilized in the TRIO grant selection process.  *See Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 854 (D. Md. 2025) ("All [non-exempt] Department regulations, including its 'agency priorities,' are subject to 5 U.S.C. § 553 notice and comment rule making."); *Washington v. U.S. Dep't of Educ.*, No. 25-cv-1228, 2025 WL 3690779, at *14–15 (W.D. Wash. Dec. 19, 2025) (concluding that the Department acted contrary to law by relying on unpublished criteria in making its TRIO grant continuation determinations).[8]

Because the 2025 Priorities did not take effect until *after* the Department denied COE members' SSS grant applications, the Department was not entitled to reject applications based on those priorities.  *See Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) ("Failure to provide the required notice and to invite public comment . . . is a fundamental flaw that 'normally' requires vacatur of the rule.").[9]

---

[8] When asked whether the Department was entitled to rely on priorities that did not go through notice-and-comment, counsel for the Department stated she was not prepared to respond.  *See* Dec. 15 Tr. at 31.  The Department has, however, "insist[ed]" that grant priorities issued at the beginning of a contest must be published in other cases challenging its TRIO determinations. *See Washington*, 2025 WL 3690779, at *14 n.11.

[9] Because the court concludes that COE has satisfied its burden to demonstrate a likelihood of success as to the above APA claims, it need not reach the other claims contained in its SSS Case Complaint.  *See TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 112 n.6 (D.D.C. 2020).  The same is true of the claims raised in the TRIO case beyond those addressed by the court below.  *Id.*

ii. **TRIO Case**

COE has also demonstrated a likelihood of success on its claims that the Department's decisions to discontinue members' TRIO grants were arbitrary, capricious, and otherwise not in accordance with the law.

### 1. The Department's Notices of Discontinuation are impermissibly vague (Count III).

As in the SSS Case, the reasons the Department offered in its discontinuation notices to COE members were nearly identical.  Compl. ¶¶ 143, 145.  Following a paragraph of stock language laying out the various grounds that *may* have led it to discontinue the grants, the letters stated that unnamed "staff" had reviewed the members' applications for funding and identified information "that may conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; or violate the letter or purpose of Federal civil rights law." *Id.* ¶ 146.  The notices went on to reference a sentence or two of the members' application materials, then simply concluded that funding was not in the government's "best interest."  *See, e.g.,* Augsburg Decl., Ex. E (citing Augsburg's requirement that "[a]ll faculty involved in the Project are expected to complete[] the Diversity and Inclusion Certificate Program & annual Anti-Racism Training"); Marquette Decl., Ex. F (citing Marquette's inclusion of "professional and leadership development presentations that centralize issues on diversity, equity and inclusion," in its programmatic offerings); Suffolk Decl., Ex. G (citing Suffolk's proposal to include "res[t]orative social justice activities" in its proposed activities).

Despite these citations, however, the court is left to guess *how* the excerpted sentences conflict with the Administration's policies, priorities, or violate civil rights law.  *See Chenery Corp.*, 332 U.S. at 196–97.  The court is similarly left to guess whether and how the Department analyzed the relevant data relating to grantee performance, as required under 34 C.F.R.

§ 75.253(b).  The Department's vague and conclusory language does not suggest that it "examined 'the relevant data,'" nor do its discontinuation letters offer "'a satisfactory explanation' for [the] decision, 'including a rational connection between the facts found and the choice made.'"  *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).  Rather, the application statements the Department identified strongly suggest that continuation determinations were made based on a keyword search for terms relating to diversity, equity, and inclusion, as opposed to any information regarding the discontinued grantees' actual performance.

### 2.  The Department was not permitted to rely on any of the potential grounds it invoked (Counts I and II).

As set forth above, the Department was not permitted to rely on Title VI as the basis for its discontinuation decisions without having satisfied the requisite procedures under the statute and its implementing regulations.  *See* 42 U.S.C. § 2000d-1*;* 34 C.F.R. § 100.8(c).  The same is true of any reliance on purported Title IX noncompliance.  *See* 20 U.S.C. § 1682.  COE has alleged, with supporting evidence, that the Department failed to (1) notify any members of their purported non-compliance with Title VI or Title IX, (2) seek their voluntary compliance, (3) provide an opportunity for a hearing, or (4) make any findings of non-compliance on the record, before sending the notices of non-continuation, *see* TRIO Case Compl. ¶¶ 183–84; Marquette Decl. ¶ 27; Suffolk Decl. ¶ 37, and the Department does not contest these assertions.  Additionally, to the extent that the Department relied on the 2025 Final Priorities in its discontinuation decisions, such reliance was also impermissible for the same reason as in the SSS Case—the Department's failure to satisfy GEPA's mandate that any "generally applicable rule, regulation, guideline, interpretation, or other requirement" with "legally binding effect" affecting "the provision of financial assistance" under the TRIO program go through notice-and-comment rulemaking.  20 U.S.C. §§ 1221e-4, 1232(a)(2), (d); *see also Washington*, 2025 WL 3690779, at *14–15.

3. **Even if the Department relied on its general discretion as to what constitutes the "best interest of the Federal Government," it provided no reasonable explanation for its change in position (Count III)**

Finally, despite the apparent discretion afforded to the Department to discontinue funding for programs that are not in "the best interest of the Federal Government," 34 C.F.R. § 75.253(a)(5), COE is likely to succeed on its claim that the Department's unexplained decision to shift its inquiry from grantee performance metrics to compliance with the Department's new policies was arbitrary and capricious under the change-in-position doctrine.  Under this doctrine, when agencies materially change existing policies, they must "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 568 (2025) (cleaned up).  The Department's lack of notice to affected COE members, who were already operating TRIO-funded programs, that their previously selected applications would be subject to new policy considerations in the funding continuation process suggests it did not consider those members' reliance interests.

Notably, the declarations from COE members identify their efforts to meet performance-related continuation criteria.  *See* TRIO Case Jones Decl. ¶ 31; Augsburg Decl. ¶¶ 19, 24; Marquette Decl. ¶¶ 19, 24; Suffolk Decl. ¶¶ 21, 26; South Seattle Decl. ¶¶ 18, 22; SUNY Decl. ¶¶ 19, 23; UNH Decl. McNair ¶¶ 19, 23; UNH Decl. Talent Search ¶¶ 19, 24.  This is consistent with 34 C.F.R. § 75.253(b), which states that the Department "may consider any relevant information regarding grantee performance."  There is no indication that the Department took the discontinued grantees' reliance on performance metrics into account before basing its decisions on their compliance with new policies and priorities.  And the Department's departure from prior practice seems particularly salient where, as here, to ensure continuity, the TRIO program's

authorizing statute mandates eight-month's advanced notice of the status of a continuation application from the expiration of the existing grant.  20 U.S.C. § 1070a-11(c)(7).

In the end, the court is left to wonder what considerations, if any, led to the change in continuation criteria because the Department has yet to explain itself.  *See Washington*, 2025 WL 3004675, at *8; *Commc'ns & Control v. FCC*, 374 F.3d 1329, 1335–36 (D.C. Cir. 2004) ("[D]eparture from [past] practice, with *no* explanation, renders its void *ab initio* rationale arbitrary and capricious.").  And as other judges on this court have explained, the APA, "which prohibits arbitrary and capricious agency action and requires agencies to explain themselves when they change course, may separately limit the government's ability to impose retroactive conditions on grant awards."  *Harris Cnty.*, 786 F. Supp. 3d at 212 n.7.

Given the procedural defects identified above, COE has sufficiently demonstrated a likelihood of success on its APA claims in the TRIO case as well.

### c.  *COE has made a sufficient showing of irreparable harm*

In order to succeed on the irreparable harm factor, a movant must show that their injury in the absence of a preliminary injunction is "both certain and great" as well as "actual and not theoretical," meaning that "there is a clear and present need for equitable relief to prevent" the claimed harm.  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (cleaned up).  The movant must also "substantiate [its] claim that irreparable injury is 'likely' to occur."  *Id.*  COE claims that it will suffer irreparable harm in the absence of preliminary relief, citing various injuries to the organization's mission as well as programmatic harms to its members and the students they serve.  *See* TRIO Case PI Mot. at 40–45.  Specifically, COE alleges that its affected members' TRIO programs are shutting down, that staff and faculty are being laid off, and that students are

losing resources designed to help them pursue their higher education.  TRIO Case Compl. ¶ 149; TRIO Case PI Mot. at 41–45; SSS Case PI Mot. at 36–41; SSS Case Compl. ¶¶ 225–47.

While these harms suffice for standing purposes, they are generally rooted in and tied to monetary harms resulting from a lack of federal funding.  And, as the Department correctly points out, TRIO Case Def.'s Mot. at 40, "[r]ecoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." *Wis. Gas*, 758 F.2d at 674.  Still, judges in this district have found that "economic loss may constitute 'irreparable harm' where a plaintiff's alleged damages are unrecoverable." *Clarke v. Off. of Fed. Hous. Enter. Oversight,* 355 F. Supp. 2d 56, 65 (D.D.C.2004) (citations omitted); *see also Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in chambers) ("If expenditures cannot be recouped, the resulting loss may be irreparable.").  "This issue often arises in suits against government defendants, where sovereign immunity or other laws or doctrines may preclude monetary relief." *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 114 (D.D.C. 2015).  Because the APA does not provide for monetary relief, and, as set forth above, the Tucker Act's vesting of jurisdiction in the Court of Federal Claims and concomitant waiver of sovereign immunity does not apply, COE and its members lack any avenue to receive funding from the United States through litigation. *Cf. Fredericks v. U.S. Dep't of the Interior*, 20-cv-2458, 2021 WL 2778575, at *18 (D.D.C. July 2, 2021).

As for future funding cycles, *see Glob. Health*, 153 F.4th at 21 ("if the later opportunity to compete for additional grants could fix the harm, it would not be irreparable"), the court agrees with the district court in *Washington* that, "although Defendants emphasize that Grantees may file new applications and could be awarded similar grants in the future, new funding could not remedy all of the harms flowing from the discontinuation decisions."  2025 WL 3004675, at

*10. Future funding "cannot remedy the lack of such services for this school year, and schools and graduate programs will be harmed by a loss of expertise in staff members, even if they could eventually rehire staff for those positions." *Id.*; *see also Ambach v. Bell*, 686 F.2d 974, 987 (D.C. Cir. 1982) (recognizing that later funding for educationally disadvantaged students would be a "Pyrrhic victory" because delays in the distribution of funds "cannot help but disrupt the efforts of educators and [hinder] the education of the disadvantaged children sought to be aided by the federal grants"). Moreover, COE avers, SSS Case Jones Decl. ¶ 48; TRIO Case Jones Decl. ¶ 43, that its members will face disadvantages in upcoming selection cycles for SSS and other TRIO grants based on their ineligibility for prior experience points under program-specific regulations, *see* 34 C.F.R. §§ 646.20(a)(2)(i), 645.30(a)(2)(i), 643.20(a)(2)(i), 647.20(a)(2)(i), 644.20(a)(2)(i), and, even if selected, may be subject to lower funding caps, *see* SSS Case Jones Decl. ¶ 48; TRIO Case Jones Decl. ¶ 43.

That COE's alleged injuries are unrecoverable does not, however, "absolve the movant from its considerable burden of proving that those losses are *certain, great and actual*." *Save Jobs USA*, 105 F. Supp. 3d at 114 (internal quotations and citation omitted). According to the Department, the harms COE has identified are "vague" and "speculative," TRIO Case Def.'s Mot. at 40; SSS Case Def.'s Mot. at 30, yet evidence submitted with COE's motions demonstrate that, while largely economically derived, the injuries its members will suffer are both certain and great. For instance, in the SSS Case, COE identified at least three members that applied for and were denied SSS grant funding, with attached declarations detailing the programmatic cuts those programs will suffer. Those members aver that, because of the Department's denial decisions, their programs will be discontinued due to their reliance on federal funding. *See* Green River Decl. ¶ 36; Big Bend Decl. STEM ¶ 32; Big Bend Decl. Classic ¶ 32; SIU-Carbondale Decl. ¶ 34. The

schools claim that without these programs, roles will be reduced or cut, and they will be unable to offer various support services to hundreds of underserved students, including tutoring, career guidance, and financial aid assistance, leading to increased risk of attrition. *See* Green River Decl. ¶¶ 37–39; Big Bend Decl. Classic ¶¶ 33–35; Big Bend Decl. STEM ¶¶ 33–35; SIU-Carbondale Decl. ¶¶ 35–39. COE has also identified seven affected member programs in the TRIO Case, with each member similarly declaring that they are temporarily unable to continue their grant-funded programs for students, *see* Augsburg Decl. ¶¶ 35, 37; Marquette Decl. ¶¶ 35, 37–38; Suffolk Decl. ¶¶ 41, 44; South Seattle College Decl. ¶¶ 28, 31; SUNY Plattsburgh Decl. ¶¶ 32, 35; UNH Decl. McNair ¶¶ 24, 34, 37; UNH Decl. Talent Search ¶¶ 24, 34, 37, and reporting subsequent staff terminations, Augsburg Decl. ¶ 36; Marquette Decl. ¶ 36; Suffolk Decl. ¶ 42; South Seattle College Decl. ¶ 29; SUNY Plattsburgh Decl. ¶ 33; UNH Decl. McNair ¶ 35; UNH Decl. Talent Search ¶ 36.

Lastly, COE claims that the organization and its members will suffer irreparable reputational harm because of the Department's conclusions that they discriminate "on account of race" against the students they are designed to serve. SSS Case PI Mot. at 39–40; SSS Case Jones Decl. ¶¶ 46–47; TRIO Case PI Mot. at 43, TRIO Case Jones Decl. ¶¶ 41–42. Taken with the programmatic impacts listed above, the court finds that the totality of injuries identified by COE and its members demonstrate a likelihood of imminent, irreparable harm in the absence of injunctive relief. *See S. Educ. Found. v. U.S. Dep't of Educ.*, 784 F. Supp. 3d 50, 72 (D.D.C. 2025) (irreparable harm where the defendants' actions threatened "the livelihoods of [plaintiff's] employees, its professional reputation, and the very existence of its programs"); *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 56–57 (D.D.C. 2025) (plaintiff organizations would have to shutter programs, causing "existential injuries"); *Urb. Sustainability Dirs. Network* , 2025 WL

2374528, at \*36–37 (listing program shutdowns, damages to plaintiffs' reputations and relationships, and staff layoffs as evidence of irreparable harm).  Accordingly, the court concludes that COE has satisfied this *Winter* factor in each case.

     **d.**   ***The balance of the equities and public interest favor preliminary injunctive relief***

When assessing the equities and public interest factors, courts "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Ramirez v. U.S. Immigr. & Customs Enft.*, 310 F. Supp. 3d 7, 32 (D.D.C. 2018). If the movant seeks to enjoin the government, the final two factors merge "because the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm.*, 831 F.3d 500, 511 (D.C. Cir. 2016).

As the D.C. Circuit has explained, there is "generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U. S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citations omitted).  To the contrary, there is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (internal quotations and citation omitted); *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA.").  Here, the public interest is served by ensuring that the Department complies with its operative statutory and regulatory frameworks governing the TRIO grant programs, particularly in light of Congress' stated goal for these programs to support students from disadvantaged backgrounds in their pursuit of higher education.  *See* 20 U.S.C. § 1070a-11(a). Moreover, the State Amici have identified several critical services that TRIO-funded programs provide to their citizens and economies as well as the harms they will face in the absence of

injunctive relief, including the abrupt cessation of essential avenues for educating state workforces. *See* TRIO Case States Amicus Br. 6–12, ECF No. 12.

The Department nonetheless claims that these factors favor it because, *inter alia*, it will suffer harm from providing COE "unfettered access to any remaining funding" since COE seeks to "hamstring the Government from lawfully effectuating policy decisions" and has not stated that its members will return the funds should the Department succeed in this litigation, meaning the funds will be irrevocably expended. *See* TRIO Case Def.'s Mot. at 42–44; SSS Case Def.'s Mot at 32–35. But COE does not request any money in either action. Rather, it seeks another opportunity for consideration of members' grant applications and performance metrics in accordance with the operative regulatory framework. *See* TRIO Case PI Mot., Ex. 9; SSS Case PI Mot., Ex. 10. That the Department may have to expend limited time and resources in complying with its procedural mandates on reconsideration of its denial and discontinuation decisions does not outweigh the harms COE has identified. The Department's arguments therefore fail, and COE will succeed on this factor as well.

**D. Scope of Relief**

A preliminary injunction must be both "limited to the inadequacy that produced the injury in fact that the plaintiff has established," *Gill v. Whitford*, 585 U.S. 48, 68 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)), and not be "more burdensome to the defendant than necessary to provide complete relief" to the plaintiff, *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); s*ee also Trump v. CASA, Inc*., 606 U.S. 831, 861 (2025) (holding that injunctive relief can be no "broader than necessary to provide complete relief to each plaintiff with standing to sue"). As set forth above, the court agrees with COE that it has established associational standing to sue and seek relief on behalf of its members without naming each injured party. The theory upon which

the court has determined that COE satisfies the irreparable harm factor set out in *Winter*, 555 U.S. at 20, however, relies, in substantial part, on the evidence submitted by COE, including the declarations submitted by its named members. Consequently, the court cannot conclude that a preliminary injunction as to all of COE's named and unnamed affected members is as narrow as "necessary to provide complete relief." *CASA*, 606 U.S. at 861.

Although a court may "engage in inductive reasoning to reach the conclusion that *every* plaintiff suffered the threat of irreparable harm" where evidence demonstrates that other plaintiffs are similarly situated in terms of that harm, *LaForest v. Former Clean Air Holding Co., Inc.*, 376 F.3d 48, 57–58 (2d Cir. 2004) (citation omitted), this court declines to infer that all of COE's members whose grant funding was denied or discontinued for the reasons at issue in this litigation face the level of harm that the court deems sufficient to warrant preliminary injunctive relief. *See Washington*, 2025 WL 3004675, at *12 (limiting the scope of a preliminary injunction to only those discontinued TRIO grantees for which the court had evidence of irreparable harm); *see also Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

The scope of the court's preliminary injunction is therefore tailored to include only COE and the members it has identified.

### E. The Court Will Not Require a Bond

Under Federal Rule of Civil Procedure 65(c), the court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). But Rule 65(c) gives this court "broad discretion" to determine the appropriate

amount of an injunction bond. *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). This includes "the discretion to require no bond at all." *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quoting *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)).

The Department requests that the court require a bond in the sum of the funds that COE's identified members would have received in the event their SSS programs were selected—$1,317,628, SSS Case Def.'s Mot. at 37, and their TRIO programs continued—$2,930,308, TRIO Case Def.'s Mot. at 45. Yet, as noted above, COE is not seeking monetary relief or specific performance on their denied and discontinued grants, thereby eliminating the need for a security pending the duration of litigation on the merits. *See N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025) ("In cases where the government is the enjoined party and no concrete economic injury is established, as is the case here, courts routinely waive the bond requirement."). Moreover, requiring a bond in the requested amount would "unduly burden" COE and its identified members by essentially doubling the losses their programs have sustained from the Department's decisions, albeit temporarily. *Id.* The court declines to do so and finds that no bond is necessary under the circumstances of the instant actions.

## IV.    CONCLUSION

For these reasons, it is hereby ORDERED that Plaintiff's Motions for Preliminary Injunctions are GRANTED. An Order will accompany this Memorandum Opinion.

Date: January 16, 2026

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge